1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - - -

HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

- - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| PLAINTIFF, | ) |
| VS. | ) CASE NO: CR 87-422(F)-ER |
| JUAN RAMON MATTA-BALLESTEROS DEL POZO, RUBEN ZUNO-ARCE, JUAN JOSE BERNABE-RAMIREZ, AND JAVIER VASQUEZ-VELASCO, | ) |
| DEFENDANTS. | ) VOLUME 15 |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

FRIDAY, JUNE 8, 1990

LOS ANGELES, CALIFORNIA

JULIE CHURCHILL, CSR
SUSAN A. LEE, CSR
OFFICIAL REPORTERS
U.S. DISTRICT COURT, 442-C
312 N. SPRING STREET
LOS ANGELES, CA  90012
(213) 626-6353
(213) 617-8227

ENTERED ON COURTRAN

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

GARY A. FEESS,
UNITED STATES ATTORNEY
BY:  MANUEL A. MEDRANO
     JOHN L. CARLTON
ASSISTANT U.S. ATTORNEYS
1200 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA  90012
(213) 894-0619/894-6682

FOR DEFENDANT JUAN RAMON MATTA-BALLESTEROS DEL POZO:

MARTIN R. STOLAR
MICHAEL J. BURNS, ESQ.
ADOLFO Z. AGUILAR, ESQ.
ATTORNEYS AT LAW
351 NORTH BROADWAY, 4TH FLOOR
NEW YORK, NEW YORK  10013
(212) 219-1919; (213) 855-8888 EXT. 314

FOR DEFENDANT RUBEN ZUNO-ARCE:

MITCHELL, SILBERBERG & KNUPP
BY:  EDWARD M. MEDVENE, ESQ.
     JAMES BLANCARTE, ESQ.
     RONALD DI NICOLA, ESQ.
11377 WEST OLYMPIC BOULEVARD
LOS ANGELES, CALIFORNIA  90064-1683
(213) 312-3150

FOR DEFENDANT JUAN JOSE BERNABE-RAMIREZ:

MARY KELLY
ATTORNEY AT LAW
827 MORAGA DRIVE
BEL AIR, CALIFORNIA   90049
(213) 472-7121
        AND
BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.
BY:  MICHAEL S. MEZA, ESQ.
17050 BUSHARD STREET, STE. 200
FOUNTAIN VALLEY, CALIFORNIA  92708
(714) 898-0461; (213) 924-6606

APPEARANCES (CONTINUED):

        FOR DEFENDANT JAVIER VASQUEZ-VELASCO:

                FEDERAL LITIGATORS GROUP
                BY:  GREGORY NICOLAYSEN, ESQ.
                8530 WILSHIRE BOULEVARD, STE. 404
                BEVERLY HILLS, CALIFORNIA 90211
                (213) 854-5135

ALSO PRESENT:

                DOUGLAS KUEHL, SPEC.AGT., D.E.A.
                HECTOR BERRELLEZ, SPEC.AGT., D.E.A.

                SPANISH INTERPRETERS

15-4

1        LOS ANGELES + CALIFORNIA   FRIDAY, JUNE 8, 1990

2                    + 9:30 A.M.

3

4            (HEARING OUTSIDE PRESENCE OF JURY.)

5            THE CLERK:  CRIMINAL 87-422(F), U.S.A. VERSUS JAVIER

6    VASQUEZ.

7            COUNSEL ON THE CAMARENA CASE, WOULD YOU PLEASE BE

8    SEATED AT COUNSEL TABLE.

9            MR. NICOLAYSEN:  GOOD MORNING, YOUR HONOR.

10           MR. MEDRANO:  GOOD MORNING.

11           THE COURT:  GOOD MORNING, COUNSEL.

12           MR. MEDRANO:  MAY WE BRING IN THE WITNESS TO DO THE

13   HEARING?

14           THE COURT:  YES.  PLEASE BRING IN THE WITNESS.  LET'S

15   INDICATE WHO'S PRESENT HERE FOR THE RECORD.

16           MR. MEDVENE:  IF THE COURT PLEASE, MY NAME IS MEDVENE

17   FOR MR. ZUNO ARCE, YOUR HONOR.   GOOD MORNING.

18           MS. KELLY:  GOOD MORNING, YOUR HONOR.  MARY KELLY FOR

19   MR. BARNABE RAMIREZ WHO'S PRESENT.

20           THE COURT:  INDICATE YOUR CLIENT IS PRESENT ALSO.

21           MR. STOLAR:  GOOD MORNING.   MARTIN R. STOLAR AND

22   MICHAEL J. BURNS ON BEHALF OF JUAN RAMON MATTA WHO'S NOT

23   PRESENT AND WHOSE PRESENCE HAS BEEN WAIVED FOR THIS HEARING.

24           MR. NICOLAYSEN:  GOOD MORNING, YOUR HONOR.  GREG

25   NICOLAYSEN FOR DEFENDANT VASQUEZ-VELASCO, WHO'S PRESENT IN

15-5

1    COURT WITH THE INTERPRETER.

2         MR. MEDVENE:  MR ZUNO IS NOT PRESENT, YOUR HONOR.

3         MS. KELLY:  YOUR HONOR, WE DO HAVE ONE MATTER THAT I

4    WOULD LIKE TO BRING TO THE COURT'S ATTENTION, AND A QUICK

5    REQUEST I'D LIKE TO ASK THE COURT THAT CONCERNS THE ADMISSION

6    OF THE TAPES THAT WE ADDRESSED YESTERDAY, YOUR HONOR.

7         I WOULD ASK YOUR HONOR TO STAY THE COURT'S RULING ON

8    THE ADMISSION OF THE TAPES SO WE COULD PRESENT A PETITION FOR A

9    WRIT OF MANDATE TO THE APPELLATE COURT.

10        THE COURT:  WELL, YOU'D BETTER FILE SOMETHING IN

11   WRITING.  I DO HAVE SOME PAPERS PRESENTED THAT I HAVE -- I HAVE

12   A SUBMISSION.  I THINK THE LOCAL RULES REQUIRE ME TO PRESENT A

13   SUBMISSION TO THE COURT.  THAT HAS BEEN PREPARED.

14        I'VE GIVEN A COPY OF THE PAPERS TO MR. MEDRANO, AND I

15   AM ASKING YOUR HONOR FOR A REQUEST FOR A STAY OF THE RULING SO

16   THAT WE CAN PRESENT THE PAPERS TO THE NINTH CIRCUIT, THE

17   PETITION, AN EMERGENCY PETITION FOR A WRIT OF MANDATE TO THE

18   NINTH CIRCUIT.

19        MR. MEDRANO:  GOOD MORNING, YOUR HONOR.  FOR THE

20   UNITED STATES --

21        THE COURT:  YOU MAY ASK ANYTHING YOU WISH, BUT YOU

22   HAVE TO SUMBIT SOMETHING, SOME LEGAL AUTHORITY SUPPORTING THE

23   REMEDY THAT YOU'RE SEEKING, AND THE ACTION THAT YOU'RE SEEKING.

24        MS. KELLY:  VERY WELL, YOUR HONOR.

25        THE COURT:  I'M NOT SURE YOU HAVE THE RIGHT TO DO

15-6

1   THAT IN THE MIDDLE OF A TRIAL.

2           WHAT IS THAT YOU'RE HOLDING IN YOUR HAND THERE?

3           MS. KELLY:  THE PAPERS THAT WE WOULD BE SUBMITTING TO

4   THE NINTH CIRCUIT, YOUR HONOR.

5           IN THE EVENT THAT YOUR HONOR DENIED THE REQUEST FOR A

6   STAY -- I ASSUMED THAT YOUR HONOR WAS GOING TO DENY THE REQUEST

7   FOR A STAY OF YOUR HONOR'S RULING SO THAT WE COULD PRESENT

8   SOMETHING TO THE NINTH CIRCUIT.

9           SO I HAVE PAPERS THAT IF YOUR HONOR IS GOING TO DENY

10  IT --

11          THE COURT:  WELL, LET'S SAVE THIS UNTIL WE GET ON

12  WITH OUR HEARING THAT WE HAVE SCHEDULED THIS MORNING AND WHEEL

13  GET TO THAT LATER.

14          MS. KELLY:  SHOULD I SUBMIT THESE TO YOU NOW?

15          THE COURT:  IF YOU WISH, YOU MAY.

16          MR. MEDRANO:  MAY I CALL MS. FUENTES TO THE STAND

17  RIGHT NOW?

18          THE COURT:  FIRST LET'S FIND OUT -- STATE YOUR

19  APPEARNCES HERE.

20          MR. MEDRANO:  THANK YOU, YOUR HONOR.  FOR THE UNITED

21  STATES, MANUEL MEDRANO AND JOHN CARLTON.

22          MR. NICOLAYSEN:  GREG NICOLAYSEN FOR DEFENDANT

23  VASQUEZ-VELASCO.

24          THE COURT:  ALL RIGHT.  THIS IS A LIMITED HEARING FOR

25  THE PURPOSE OF CONSIDERING WHETHER OR NOT THE LETTER THAT THIS

15-7

1    DEFENDANT SENT TO HIS WIFE IS PROTECTED BY THE MARITAL

2    PRIVILEGE CLAIMED HERE AS BEING THAT SHOULD BE EXEMPT BECAUSE

3    THE MARITAL RELATIONSHIP BETWEEN THESE PARTIES ESSENTIALLY WAS

4    OVER AT THE TIME THE ADMISSION WAS MADE.

5              MR. MEDRANO:  THANK YOU, YOUR HONOR.  THE WITNESS HAS

6    PREVIOUSLY BEEN SWORN.

7              THE COURT:  ALL RIGHT.  YOU'RE STILL UNDER OATH.

8

9       E. FUENTES ORTIZ + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

10           (WITNESS TESTIFYING THROUGH THE INTERPRETER)

11

12             THE CLERK:  MRS. FUENTES, PLEASE RESTATE YOUR NAME

13   FOR THE RECORD.

14             THE INTERPRETER:  LITA VAN DUZER.

15             THE CLERK:  I NEED THE NAME OF THE WITNESS.

16             THE WITNESS:  ESTELLA FUENTES ORTIZ.

17

18                      DIRECT EXAMINATION +

19   BY MR. MEDRANO:

20   A.   MS. FUENTES, YOU'RE 38 YEARS OLD; IS THAT CORRECT?

21   A.   YES.

22   Q.   BORN IN MEXICO?

23   A.   YES.

24   Q.   I BELIEVE YOU'RE CURRENTLY A U.S. RESIDENT ALIEN?

25   A.   YES.

15-8

1    Q.    AND YOU CAME TO THE UNITED STATES TO START RESIDING ON

2    WHAT DATE?

3    A.    THE 4TH OF MAY OF 1970.

4    Q.    AND STARTING IN 1970, WHERE DID YOU LIVE?

5    A.    IN LOS ANGELES.  IN EAST LOS ANGELES.

6    Q.    THAT WAS FROM 1970 TO WHAT YEAR?

7    A.    UNTIL 1974.

8    Q.    AND IN 1974 DID YOU MARRY JAVIER VASQUEZ VELASCO?

9            THE INTERPRETER:  I'M SORRY?

10   Q.    JAVIER VASQUEZ VELASCO?

11   A.    YES.

12   Q.    AND WHAT DATE DID YOU GET MARRIED?

13   A.    MAY THE 4TH, 1974.

14   Q.    AND THEN DID YOU LIVE -- STRIKE THAT.  FROM 1974 THEN

15   WHERE DID YOU RESIDE WITH JAVIER, WITH THE DEFENDANT?

16   A.    IN THE CITY OF NORWALK, CALIFORNIA.

17   Q.    THAT WAS '74 TO WHAT YEAR?

18   A.    UNTIL JANUARY OF '81.

19   Q.    AND YOU HAVE TWO CHILDREN WITH THE DEFENDANT; IS THAT

20   RIGHT?

21   A.    YES.

22   Q.    AND THEIR AGES ARE 14 AND 13?

23   A.    YES.

24   Q.    NOW, WHAT HAPPENS AFTER JANUARY OF 1981?

25   A.    HE AND I SEPARATED.

15-9

1   Q.   AND DID YOU RELOCATE AWAY FROM LOS ANGELES?

2   A.   I MOVED FROM NORWALK, YES.

3   Q.   WHERE DID YOU GO TO?

4   A.   TO THE CITY OF HOUSTON, TEXAS.

5   Q.   AND YOU HAVE BEEN THERE SINCE FEBRUARY OF 1981 TO THE

6   PRESENT, APPROXIMATELY?

7   A.   YES.

8   Q.   AND DURING THAT TIME HAVE YOU BEEN SEPARATED FROM JAVIER

9   VASQUEZ?

10  A.   YES.

11  Q.   NOW, WHEN YOU SEPARATED IN FEBRUARY OF 1981, WHEN IS THE

12  NEXT TIME YOU SAW JAVIER VASQUEZ?

13  A.   THE NEXT TIME I SAW HIM WAS IN THE SUMMER OF '84.

14  Q.   IN THE SUMMER OF '84?

15  A.   YES.

16  Q.   NOW, FROM FEBRUARY OF '81 WHEN YOU SEPARATED TO SUMMER OF

17  '84, DID YOU HAVE ANY CONTACT WITH JAVIER VASQUEZ?

18  A.   NO.

19  Q.   YOU DIDN'T SEE HIM IN PERSON?

20  A.   NO.

21  Q.   NO PHONE CALLS OR MAIL?

22  A.   NO.

23  Q.   NOW, LET ME DIRECT YOU TO THE SUMMER OF '84.  AT THAT TIME

24  WERE YOU ATTEMPTING A RECONCILIATION?

25  A.   YES.

15-10

1   Q.   AND DID YOU SEE JAVIER VASQUEZ IN THE SUMMER OF '84?

2   A.   YES.

3   Q.   AND DID YOU HAVE YOUR KIDS WITH YOU, AS WELL, WHEN YOU SAW

4   HIM?

5   A.   YES.

6   Q.   AND WHERE WAS IT THAT YOU SAW HIM IN THE SUMMER OF '84?

7   A.   HERE IN LOS ANGELES.

8   Q.   FOR HOW LONG?

9   A.   FOR 15 DAYS.

10  Q.   THEREAFTER, DID YOU AND YOUR CHILDREN RETURN TO HOUSTON,

11  TEXAS?

12  A.   YES.

13  Q.   AND THEREAFTER IN 1985 -- STRIKE THAT.

14       AND JAVIER VASQUEZ, DID HE RETURN WITH YOU IN THE

15  SUMMER OF '84 TO HOUSTON, TEXAS?

16  A.   AFTER THE SUMMER?

17  Q.   RIGHT.  AFTER YOU RETURNED TO HOUSTON, DID HE GO BACK WITH

18  YOU?.

19  A.   TO LOS ANGELES?

20  Q.   NO.  YOU SAW HIM IN LOS ANGELES, CORRECT?

21  A.   YES.

22  Q.   IN THE SUMMER OF '84?

23  A.   YES.

24  Q.   THEREAFTER, DID YOU GO BACK TO HOUSTON?

25  A.   YES.

15-11

1    Q.    AND AT THAT TIME DID HE ALSO GO BACK TO HOUSTON WITH YOU?

2    A.    NO.

3    Q.    NOW, LET ME TAKE YOU TO THE END OF 1984.  DID YOU AGAIN

4    SPEND ANOTHER VACATION WITH JAVIER VASQUEZ?

5    A.    YES.

6    Q.    THAT WAS ABOUT CHRISTMAS OF '84?

7    A.    YES.

8    Q.    AND STILL PART OF YOUR ATTEMPTED RECONCILIATION?

9    A.    YES.

10   Q.    SO NOW LET ME TAKE YOU TO '85.  AS A RESULT OF THESE TWO

11   ATTEMPTS AT RECONCILIATION, DID HE FINALLY JOIN YOU IN HOUSTON,

12   TEXAS IN 1985?

13   A.    AFTER, YES.

14   Q.    AND IT WAS IN ABOUT MAY OF '85 THAT HE JOINED YOU IN

15   HOUSTON, CORRECT?

16   A.    AROUND APRIL OR MAY.

17   Q.    HOW LONG WAS HE WITH YOU STARTING IN APRIL OR MAY OF '85

18   IN HOUSTON?

19   A.    HE STAYED THERE UNTIL THE 11TH OF DECEMBER OF '85.

20   Q.    AND THEREAFTER -- STRIKE THAT.

21         YOUR RECONCILIATION, DID THAT FAIL AT THAT TIME?

22   A.    NO.

23   Q.    WELL, DID YOU DECIDE TO CONTINUE RESIDING TOGETHER AFTER

24   DECEMBER 11 OF 1985?

25         THE INTERPRETER:  I'M SORRY.  COULD YOU REPEAT THAT?

15-12

BY MR. MEDRANO:

Q.   WHEN HE LEAVES ON DECEMBER 11, 1985, DID YOU BECOME

SEPARATED AGAIN?

MR. NICOLAYSEN:  OBJECTION, YOUR HONOR.  THE QUESTION

WAS DECEMBER 11 OF '85.  I THINK THAT MISSTATES THE CHRONOLOGY

THAT THE WITNESS HAS TESTIFIED TO.

MR. MEDRANO:  NO, YOUR HONOR.  SHE SAID THEY

SEPARATED ON DECEMBER 11, 1985.

THE COURT:  OBJECTION OVERRULED.

BY MR. MEDRANO:

Q.   HE LEFT ON DECEMBER 11, '85, CORRECT?

A.   YES.

Q.   THE RECONCILIATION FAILED?

A.   YES.

Q.   AND WHEN HE WAS WITH YOU IN '85, DID YOU LEARN AT THAT

TIME THAT HE HAD MARRIED AGAIN IN MEXICO?

A.   YES.

Q.   DID YOU LEARN HE HAD TWO CHILDREN FROM THIS OTHER WIFE IN

MEXICO?

A.   YES.

Q.   NOW, FROM DECEMBER 11 OF 1985, WHEN IS THE NEXT TIME YOU

EVER HEARD FROM HIM AGAIN?

A.   UNTIL NOVEMBER OF '89.

Q.   IS THAT WHEN YOU GOT THAT LETTER FROM HIM?

A.   YES.

Q.   AND DURING THAT APPROXIMATE FOUR-YEAR PERIOD, YOU HAD NO CONTACT WITH HIM?

A.   NO.

Q.   PHONE OR MAIL?

A.   NO.

Q.   AND, IN FACT, EVEN BEFORE YOU GOT THE LETTER IN NOVEMBER OF '89, DID YOU EVER TRY TO FIND HIM TO TRY TO GET DIVORCED?

A.   YES.

Q.   WHEN WAS THAT?

A.   AROUND SEPTEMBER.

Q.   OF '89?

A.   YES.

Q.   AND FINALLY, MRS. FUENTES, CURRENTLY DO YOU RESIDE OR LIVE WITH ANOTHER MAN?

A.   YES.

Q.   AND THAT HAS BEEN SINCE WHEN?

A.   SINCE '81.

Q.   AND YOU CURRENTLY RESIDE AS MAN AND WIFE?

A.   YES.

Q.   AND FINALLY, MA'AM, YOU'RE CURRENTLY PREGNANT; ARE YOU NOT?

A.   YES.

Q.   AND EXPECTING A CHILD FROM THIS MAN THAT YOU'RE RESIDING WITH?

A.   YES.

15-14

1    Q.    AND YOU DO NOT USE JAVIER VASQUEZ'S NAME; IS THAT CORRECT?

2    A.    YES.

3            MR. MEDRANO:  YOUR HONOR, THAT CONCLUDES DIRECT.

4            THE COURT:  CROSS-EXAMINE.

5            MR. NICOLAYSEN:  THANK YOU.

6

7                    CROSS-EXAMINATION +

8    BY MR. NICOLAYSEN:

9    Q.    GOOD MORNING, MS. FUENTES.  I'M GREG NICOLAYSEN.  I

10   REPRESENT JAVIER.

11   A.    GOOD MORNING.

12   Q.    YOU STATED ON DIRECT EXAMINATION THAT BEFORE NOVEMBER OF

13   '89, YOU HAD NO CONTACT WITH JAVIER BY PHONE OR BY MAIL; DO YOU

14   RECALL SAYING THAT?

15   A.    YES.

16   Q.    IT'S TRUE, THOUGH, IS IT NOT, THAT BEFORE RECEIVING THE

17   LETTER FROM JAVIER IN NOVEMBER OF '89, YOU, YOURSELF, WROTE TO

18   HIM IN LATE OCTOBER.  DO YOU RECALL THAT?

19   A.    NO.

20   Q.    YOU DON'T REMEMBER SENDING A LETTER TO THE METROPOLITAN

21   DETENTION CENTER IN LATE OCTOBER?

22   A.    NO.

23   Q.    YOU NEVER TO YOUR MEMORY WROTE JAVIER A LETTER ASKING HIM

24   IF HE NEEDED ANY ASSISTANCE IN CONNECTION WITH THIS CASE?

25   A.    NO, I DON'T REMEMBER.

15-15

1    Q.    IS IT YOUR TESTIMONY THAT THE LETTER YOU RECEIVED FROM

2    JAVIER IN NOVEMBER '89 -- STRIKE THAT.

3              WHEN YOU RECEIVED THE LETTER FROM JAVIER IN 1989 IN

4    NOVEMBER, DIDN'T IT REFER TO THE EARLIER LETTER THAT YOU HAD

5    SENT?

6    A.    NO.

7    Q.    ISN'T IT TRUE THAT YOU HAVE, AS RECENTLY AS THIS PAST

8    WEEK, TOLD OTHER MEMBERS OF THE VASQUEZ VELASCO FAMILY THAT

9    YOU'RE STILL VERY DEEPLY CONNECTED TO JAVIER AND YOU HOPE THE

10   RELATIONSHIP WILL STILL SOMEDAY GET BACK TOGETHER?

11   A.    YES.

12   Q.    HAVE YOU HAD ANY CONVERSATIONS THIS PAST WEEK WITH CELIA

13   VASQUEZ?

14   A.    NO.

15   Q.    AND IT WAS TRUE, WAS IT NOT, THAT IN 1984 YOU WERE SERIOUS

16   ABOUT TRYING TO GET BACK TO JAVIER EVEN THOUGH HADN'T HAD

17   COMMUNICATIONS FOR THE THREE YEARS PRIOR TO THAT?

18   A.    YES.

19   Q.    SO FOR YOU IT WAS NOT UNUSUAL TO TRY AND RECONCILE A

20   MARRIAGE AFTER A THREE-YEAR PERIOD WITHOUT COMMUNICATION; ISN'T

21   THAT TRUE?

22   A.    YES.

23   Q.    SO FOR YOU TO HEAR FROM JAVIER IN NOVEMBER OF '89 WAS NOT

24   UNUSUAL, WAS IT, EVEN THOUGH YOU HAD NOT HAD COMMUNICATIONS FOR

25   TWO OR THREE YEARS BEFORE THAT?

15-16

1    A.    NO.

2    Q.    AND YOU WERE STILL EMOTIONALLY CONNECTED TO JAVIER IN

3    NOVEMBER OF 1989, JUST AS YOU ARE TODAY; ISN'T THAT TRUE?

4    A.    I'M NOT SURE.

5    Q.    DO YOU NEED A MINUTE TO THINK ABOUT THAT?

6              MR. MEDRANO:  OBJECTION, YOUR HONOR.

7              THE COURT:  WE DON'T HAVE A MINUTE.

8              THE WITNESS:  NO, I DO NOT FEEL CONNECTED

9    SENTIMENTALLY NOW.

10             MR. NICOLAYSEN:  YOUR HONOR, MAY I HAVE JUST A MOMENT

11   TO CONCUR WITH SOMEONE IN THE COURTROOM FROM THE FAMILY

12   CONCERNING AN ANSWER THAT THE WITNESS HAS JUST GIVEN?

13             THE COURT:  (WAVING HAND AS PERMISSION.)

14             MR. NICOLAYSEN:  THANK YOU.

15             (DISCUSSION HELD OFF THE RECORD.)

16             THE COURT:  FOR PURPOSES OF THIS FOUNDATIONAL

17   HEARING, YOUR HONOR, THAT CONCLUDES CROSS-EXAMINATION.

18             THANK YOU.

19             THE COURT:  MRS. FUENTES, DO YOU BELIEVE THAT YOU AND

20   YOUR HUSBAND WOULD EVER CONTINUE YOUR MARRIAGE?

21             THE WITNESS:  NO.

22             THE COURT:  AND DO YOU HAVE ANY INTEREST IN DOING SO

23   AT THE PRESENT TIME?

24             THE WITNESS:  NO.

25             THE COURT:  YOU'RE NOW ATTACHED TO ANOTHER MAN?

15-17

1          THE WITNESS:  YES.

2          THE COURT:  AND DO YOU HAVE SOME FURTHER QUESTIONS,

3    COUNSEL?

4          MR. MEDRANO:  NOT BY THE GOVERNMENT, YOUR HONOR,

5    THANK YOU.

6          MR. NICOLAYSEN:  MAY I JUST ASK ONE MORE QUESTION?

7    IT MIGHT CLARIFY AN ANSWER THAT THE WITNESS JUST GAVE.

8          THE COURT:  YES.

9

10              CROSS-EXAMINATION + (CONTINUED)

11   BY MR. NICOLAYSEN:

12   Q.   MS. FUENTES, DIRECTING YOUR ATTENTION TO OCTOBER OF 1989,

13   DO YOU RECALL HAVING SENT A LETTER ADDRESSED TO JAVIER, WHICH

14   WAS MAILED TO CELIA VASQUEZ HERE IN LOS ANGELES?

15   A.   YES.

16   Q.   AND DO YOU RECALL THAT IN THAT LETTER YOU SPECIFICALLY

17   STATED THAT YOU WOULD BE WILLING TO ASSIST IN ANY WAY YOU COULD

18   IN CONNECTION WITH THIS PARTICULAR CASE?

19   A.   YES.

20   Q.   AND YOU WERE OBVIOUSLY AWARE THAT SHORTLY BEFORE SENDING

21   THE LETTER, JAVIER HAD BEEN ARRESTED IN CONNECTION WITH THIS

22   CASE, CORRECT?

23   A.   YES.

24        MR. NICOLAYSEN:  FINE.  THANK YOU.

25        MR. MEDRANO:  NOTHING FURTHER, YOUR HONOR.

15-18

1           THE COURT:  YOU MAY STEP DOWN.

2           (WITNESS EXCUSED.)

3           MR. MEDRANO:  BRIEF ARGUMENT, YOUR HONOR, OR--

4           THE COURT:  WELL, YOU HAVE NOTHING FURTHER ON THIS

5    ISSUE?

6           MR. MEDRANO:  NO.  THIS IS ALL, YOUR HONOR.

7           THE COURT:  DOES THE DEFENDANT WISH TO PRESENT ANY

8    EVIDENCE?

9           MR. NICOLAYSEN:  NO, YOUR HONOR,  WE'LL STIPULATE

10   THAT THE MARRIAGE WAS IRRECONCILABLE AS OF NOVEMBER OF '89.

11          MR. MEDRANO:  VERY WELL, YOUR HONOR.

12          THE COURT:  THEN THE ISSUE HERE CONCERNS THE QUESTION

13   OF PRIVILEGED, CONFIDENTIAL COMMUNICATIONS BETWEEN THE SPOUSES.

14   AND THE BASIS FOR THIS IMMUNITY GIVEN TO COMMUNICATIONS BETWEEN

15   HUSBAND AND WIFE IS THE PROTECTION OF MARITAL CONFIDENCES

16   REGARDED ESSENTIAL TO THE PRESERVATION OF A MARITAL

17   RELATIONSHIP SO AS TO OUTWEIGH THE DISADVANTAGES TO THE

18   ADMINISTRATION OF JUSTICE, WHICH PRIVILEGE ENTAILS.

19          THE UNITED STATES SUPREME COURT IN WOLFE VERSUS

20   UNITED STATES SAID:

21          "THE PRIVILEGE INVOLVES A BALANCING OF THESE

22          INTERESTS.  SOCIETY HAS LITTLE INTEREST IN PROTECTING

23          THE CONFIDENTIALITY OF SEPARATED COUPLES WHOSE

24          MARRIAGES HAVE FAILED BY THE TIME OF THE

25          COMMUNICATION.

15-19

1              THE NEED FOR TRUTH OUTWEIGHS THIS INTEREST.

2         TO FIND THE PRIVILEGE INAPPLICABLE, THE COURT MUST

3         FIRST FIND THAT THE COUPLE IS SEPARATED AT THE TIME

4         OF THE COMMUNICATION" --

5    WHICH THE COURT FINDS IS TRUE HERE -- AND THE COURT FINDS FROM

6    EVIDENCE THAT HAS BEEN PRESENTED THAT THE THESE PEOPLE ARE

7    IRRECONCILABLY SEPARATED, THAT THE MARRIAGE IS VIRTUALLY OVER

8    FOR ALL INTENTS AND PURPOSES, AND THAT THERE IS NO GOOD REASON

9    TO ALLOW THE PRIVILEGE TO BE ASSERTED UNDER THESE

10   CIRCUMSTANCES, SO I FIND THAT IN IS NO PRIVILEGE.

11             MR. NICOLAYSEN:  FOR THE RECORD, I WOULD AT THIS TIME

12   RENEW MY OBJECTION ON THE GROUNDS OF RELEVANCE.  I STILL

13   MAINTAIN THAT THE CONTENT OF THE LETTER HAS NO PROBATIVE VALUE.

14             THE COURT:  WELL, AS I UNDERSTAND -- IS IT YOUR

15   INTENTION TO OFFER THE ENTIRE LETTER INTO EVIDENCE?

16             MR. MEDRANO:  NO, YOUR HONOR.  THE LETTER, EVIDENTLY

17   DOES NOT EXIST.  SHE THREW IT AWAY OR WHATEVER AND DOESN'T HAVE

18   IT ANY MORE.

19             SHE WILL TESTIFY TO SOME TO THE LIMITED CONTENTS.

20   AND IN PARTICULAR, THE THING OF INTEREST TO THE GOVERNMENT IS

21   HER STATEMENT THAT IN THE LETTER, THE DEFENDANT WRITES TO HER

22   THAT HE NEEDS HER HELP, AND TO REMIND HER OF THE VACATION THAT

23   THEY ALL TOOK TOGETHER.  AND THEN HE GIVES HER THE DATES OF

24   THAT PURPORTED VACATION.

25             THE COURT:  WHAT WERE THE DATES?

15-20

1              MR. MEDRANO:   HE GIVES THE DATES OF JANUARY 23, '85

2       TO FEBRUARY 15, '85.

3              THE COURT:   WHAT WERE THE ACTUAL DATES?

4              MR. MEDRANO:   THAT'S COMPLETELY FALSE AND ERRONEOUS.

5       THE ACTUAL DATES, YOUR HONOR, OF THAT VACATION THEY SPENT

6       TOGETHER WAS ABOUT DECEMBER 19, '85 TO JANUARY 2, '85.  SO

7       THAT'S THE TESTIMONY OF MS. FUENTES.

8              AS SHE'LL TESTIFY FOR YOU AND THE JURY, SHE'S

9       ABSOLUTELY SURE OF THAT BECAUSE THE KIDS HAD TO BE BACK IN

10      SCHOOL ON JANUARY 2 IMMEDIATELY AFTER CHRISTMAS VACATION, IN

11      HOUSTON.

12             MR. NICOLAYSEN:   AGAIN, I RENEW THE OBJECTION.  THAT

13      CAN BE TAKEN ON A NUMBER OF LEVELS.  THE GOVERNMENT WOULD SEEM

14      TO LOOK VERY NARROWLY AT THAT LETTER AS IF TO SUGGEST THAT THE

15      DEFENDANT WAS TRYING TO PLANT IDEAS IN THE MIND OF HIS FORMER

16      WIFE WHEN, IN FACT, IT COULD JUST AS EASILY AND, I THINK, QUITE

17      REASONABLY BE CONSTRUED TO MEAN THAT HE WAS ASKING HER TO

18      CONFIRM HIS RECOLLECTION OF DATES GOING BACK FOUR YEARS.

19             AND IT WILL COME UP --

20             THE COURT:   YOU CAN ASK THE JURY TO REACH THAT

21      CONCLUSION.  IT'S NOT FOR THE COURT TO SAY ONE WAY OR THE

22      OTHER, IS IT?   IT'S SUSCEPTIBLE -- PERHAPS IT'S SUSCEPTIBLE TO

23      BOTH MEANINGS.

24             MR. NICOLAYSEN:   EXCEPT TO THE EXTENT THAT THE ONLY

25      PROFFER OF RELEVANCE WOULD HAVE TO BE A FALSE EXCULPATORY

15-21

1    THEORY.   AND ON THAT BASIS, THE GOVERNMENT HAS THE BURDEN OF

2    ESTABLISHING A FOUNDATION TO SHOW ACTUAL KNOWLEDGE OF THE

3    FALSITY OF THE STATEMENT BEFORE WE CAN ASK THE COURT TO MAKE

4    THE KIND OF WEIGHING THAT YOUR HONOR IS REFERRING TO.   I DON'T

5    THINK THAT FOUNDATION HAS BEEN LAID HERE.

6          THE COURT:   YOUR OBJECTION WAS RELEVANCE.   I BELIEVE

7    IT IS RELEVANT, SO YOUR OBJECTION IS OVERRULED AND THEY MAY

8    PRESENT THE EVIDENCE.

9          MR. NICOLAYSEN:   YOUR HONOR, JUST SO THE RECORD IS

10   CLEAR, MY OBJECTION ON RELEVANCE IS PREMISED ON THE NOTION THAT

11   IT WILL ONLY BE RELEVANT IF IT WERE DEEMED TO BE A FALSE

12   EXCULPATORY STATEMENT.   AND AS SUCH, THE GOVERNMENT HAS NOT MET

13   ITS PRELIMINARY SHOWING, AND THAT'S MY ARGUMENT TO THE COURT.

14         THE COURT:   ALL RIGHT.   NOW, MS. KELLY, WHAT IS IT

15   THAT YOU --

16         MS. KELLY:   YES, YOUR HONOR.   YOUR HONOR, WE'RE

17   SEEKING TO -- WE ARE ORALLY REQUESTING, YOUR HONOR, TO STAY

18   YOUR RULING ON THE ADMISSION OF THE TAPES SO WE MAY PRESENT TO

19   THE NINTH CIRCUIT A PETITION FOR WRIT OF MANDAMUS.

20         THE COURT:   AND YOU ASSUMED I WOULD DENY THAT, DID

21   YOU SAY?

22         MS. KELLY:   YOUR HONOR, I DID ASSUME THAT AND I WAS

23   UP VERY LATE LAST NIGHT TRYING TO PREPARE THE PAPERS, AND I

24   ASSUMED THAT YOU WOULD, SO THAT'S HOW I PREPARED THE PAPERS,

25   AND I WANTED TO ADVISE THE COURT OF THAT.

15-22

1       OBVIOUSLY, IF YOUR HONOR DOES GRANT THE STAY, WE'LL

2   PRESENT THE PETITION ON MONDAY.

3       THE COURT:  DO YOU WISH TO BE HEARD?

4       MR. MEDRANO:  ABSOLUTELY, YOUR HONOR.  THIS IS

5   COMPLETELY INAPPROPRIATE FOR SEVERAL REASONS.  THIS IS AN

6   EVIDENTIARY RULING THAT YOU MADE MADE AT TRIAL.

7       THE WHOLE POINT OF APPEALS UP TO THE NINTH CIRCUIT IS

8   TO TAKE UP ONLY THINGS FOR WHICH THERE IS A SPECIFIC GROUND FOR

9   EITHER AN INTERLOCUTORY APPEAL, AS YOU WELL KNOW, OR IF THERE

10  IS A FINAL JUDGMENT.  THIS IS NOT THE CASE HERE.

11      THEY COULD NO MORE TAKE THIS UP TO THE NINTH CIRCUIT

12  THAN THEY COULD TAKE UP OTHER DENIALS OF OTHER MOTIONS OF

13  RELEVANCE OR RULE 403 GROUNDS THAT THEY HAVE OFFERED TO YOU AND

14  YOU HAVE DENIED.

15      THIS IS A WASTE OF TIME AND INAPPROPRIATE.  THE

16  APPROPRIATE MECHANISM AND VEHICLE IS SHOULD THERE BE A VERDICT

17  AGAINST THEM, THAT IT IS RAISED POST CONVICTION AND GOES UP TO

18  THE 9TH CIRCUIT.

19      THIS IS A LAST-DITCH, UNFAIR ATTEMPT TO TRY TO STAY

20  SOMETHING THAT WE ARE ENTITLED TO PLAY FOR THE JURY.

21      THE COURT:  ARE YOU ENTITLED TO GO TO THE 9TH CIRCUIT

22  ON AN EVIDENTIARY MATTER?

23      MS. KELLY:  YOUR HONOR, I BELIEVE THAT --

24      THE COURT:  WHAT'S THE AUTHORITY?

25      MS. KELLY:  I'M NOT GOING ON AN INTERLOCUTORY APPEAL

15-23

1    BASIS, YOUR HONOR, I'M GOING ON A PETITION FOR A WRIT OF

2    MANDAMUS.

3              THE COURT:  IT RELATES TO AN EVIDENTIARY RULING.

4              WHAT IS THE AUTHORITY FOR DOING THAT?

5              MS. KELLY:  YOUR HONOR, I THINK THAT --

6              THE COURT:  I HAVE NO OBJECTION TO YOUR DOING IT, AND

7    YOU WILL HAVE -- THIS TRIAL WILL BE IN RECESS NEXT WEEK.

8              MS. KELLY:  SO THERE IS NO PREJUDICE TO THE

9    GOVERNMENT BECAUSE, OBVIOUSLY, THEY HAVEN'T CLOSED THEIR CASE

10   IN CHIEF, AND THE TRIAL IS GOING TO BE GOING ON FOR --

11             THE COURT:  WHAT YOU'RE ASKING IS NOT TO PLAY THIS

12   TAPE TODAY, BUT MAYBE THE WEEK AFTER?

13             MS. KELLY:  YES, YOUR HONOR, SO THAT WE DO HAVE A

14   CHANCE TO ASK THE COURT OF APPEALS TO --

15             THE COURT:  WHAT'S WRONG WITH THAT?

16             MR. MEDRANO:  THERE ARE SEVERAL THINGS WRONG WITH

17   THAT.  THIS IS A CONTINUING PART OF THE PROCESS, WHERE THEY'RE

18   SANDBAGGING US.

19             THEY HAVE KNOWN ABOUT THIS FOREVER, BUT THIS IS THEIR

20   LAST-DITCH ATTEMPT TO PRECLUDE US FROM PLAYING THE TAPES.  THE

21   TAPES ARE PROBATIVE, YOUR HONOR.  AGAIN, I ADVISE THE COURT

22   AGAIN THAT THIS IS NO DIFFERENT FROM ANY OTHER EVIDENTIARY

23   RULING THAT YOU'VE MADE.

24             WE HAVE ALL BEEN DOING THIS FOR A LONG TIME.  THAT IS

25   NOT THE TYPE OF THING THAT GOES UP ON A WRIT OF MANDAMUS, YOUR

15-24

1    HONOR, ONLY FINAL JUDGMENTS AND INTERLOCUTORY APPEALS.  IN

2    ADDITION, I BELIEVE -- IF I COULD HAVE MR. CARLTON ADD AN

3    ADDITIONAL POINT, BECAUSE I BELIEVE HE MAY BE MORE UP TO SPEED

4    ON A SPECIFIC AREA.

5            MR. CARLTON:  I WOULD JUST LIKE TO REMIND THE COURT

6    WHAT THE STANDARD IS THAT THE DEFENSE HAS TO PROVE FOR A WRIT

7    OF MANDATE.

8            IN ORDER TO OBTAIN A WRIT OF MANDATE, THEY'D HAVE TO

9    ESTABLISH THAT THE COURT HAD NO DISCRETION TO EXERCISE OTHER

10   THAN THE MANNER IN WHICH THEY CLAIM THAT IT SHOULD BE

11   EXERCISED.  I THINK THAT'S EXACTLY CONTRARY TO THE LAW IN

12   REGARD TO THIS KIND OF ISSUE.

13           AN EVIDENTIARY ISSUE, AND PARTICULARLY, A 403 ISSUE,

14   IS LEFT TO THE SOUND DISCRETION OF THE COURT AND IS RARELY

15   DISTURBED ON APPEAL, MUCH LESS THROUGH THE MECHANISM OF A WRIT

16   OF MANDATE.  AND WE WOULD SUGGEST THAT THIS ENTIRE PROCEDURE IS

17   FRIVOLOUS, AND CERTAINLY NOT MERITING A STAY OF THESE

18   PROCEEDINGS.

19           MS. KELLY:   YOUR HONOR, WITH ALL DUE RESPECT TO

20   COUNSEL, I'M DOING THIS IN GOOD FAITH BECAUSE I BELIEVE AND MY

21   CO-COUNSEL BELIEVE THAT THOSE TAPES ARE BEING OFFERED SOLELY

22   FOR THEIR PREJUDICIAL IMPACT.

23           WE HAVE TAKEN AWAY EVERY POSSIBLE CONCEIVABLE

24   EVIDENTIARY ISSUE BY THE PROFFER OF A STIPULATION.  PLUS, THE

25   EXISTENCE OF THE TRANSCRIPTS -- THEY'RE ALREADY IN EVIDENCE IN

15-25

1    ENGLISH AND SPANISH. THERE IS NOT ONE REASON WHY THIS HAS TO

2    BE OFFERED, YOUR HONOR.

3                 AND FINALLY, WITH RESPECT TO THIS RED HERRING ISSUE

4    ABOUT THE TIMELINESS, THEY HAVE OFFERED STIPULATIONS, YOUR

5    HONOR, IN MID-TRIAL TO US, AS WELL. SO THE FACT THAT A

6    STIPULATION, AS YOUR HONOR POINTED OUT TO THEM SEVERAL DAYS

7    AGO, THE ISSUE IS NOT THE TIMELINESS OF THE STIPULATION, IT'S

8    WHETHER THIS EVIDENCE IS PROPERLY ADMISSIBLE.

9                 AND YOUR HONOR, I THINK THAT WE ARE ENTITLED TO BRING

10   OUR GOOD FAITH PETITION TO THE NINTH CIRCUIT. IF THE NINTH

11   CIRCUIT DISAGREES WITH US, THEY WILL DENY IT. THE GOVERNMENT

12   HAS NOT BEEN PREJUDICED BECAUSE THEY CAN PLAY THE TAPES ON JULY

13   19TH.

14                MR. MEDRANO: ONE FINAL POINT, YOUR HONOR. THERE WAS

15   A GROSS ASSUMPTION THAT IS UNFAIR TO THE GOVERNMENT. THEY

16   HAVE NOT PROVIDED YOU IN THE FORM OF POINTS AND AUTHORITIES ANY

17   CASE LAW THAT ALLOWS TAKING UP TO THE 9TH CIRCUIT THIS TYPE OF

18   ISSUE. THEY JUST ASSUMED THAT YOU WOULD DENY IT SO THEY CAN

19   BYPASS YOU AND GO UP TO THE NINTH CIRCUIT AND FURTHER WASTE

20   TIME OF EVERYBODY AND JUST DELAY WHAT IS INEVITABLY GOING TO

21   HAPPEN, YOUR HONOR.

22                THE COURT: ALL RIGHT. I DENY IT.

23                MR. MEDRANO: THANK YOU, YOUR HONOR.

24                MR. CARLTON: ALONG THESE LINES, YOUR HONOR, JUST

25   SORT OF A PROCEDURAL POINT --

15-26

1          MR. STOLAR:  WE NEED THE DEFENDANTS FIRST, I'M

2     AFRAID.

3          THE COURT:  OH.

4          MR. STOLAR:  IT IS A MINOR CONSIDERATION.

5          THE COURT: ONE OR THE OTHER.

6          MR. CARLTON:  JUST ALONG THESE LINES, WE INTEND AT

7     THIS POINT TO PRESENT MRS. FUENTES VERY BRIEFLY, AND THE NEXT

8     WITNESS WILL BE MR. KUYKENDALL, WHOSE TESTIMONY I DON'T THINK

9     WILL LAST TOO LONG.

10         AND AT THAT POINT, WE'D LIKE TO COMMENCE PRESENTING

11    THE TAPES, WITH YOUR HONOR'S PERMISSION.  SO I'D ASK IF WE

12    COULD HAVE A FEW MINUTES TO SET UP THE PROJECTION SYSTEM.

13         THE COURT:  WHILE WE ARE WAITING FOR THE DEFENDANTS,

14    WE HAVE SOME TIME.  WE'LL TAKE A SHORT RECESS.

15         MR. MEDRANO:  THANK YOU, YOUR HONOR.

16         THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN

17    RECESS.

18         (BRIEF RECESS.)

19         (JURY PRESENT.)

20         THE COURT:  GOOD MORNING.

21         THE JURY:  GOOD MORNING.

22         THE COURT:  YOU MAY PROCEED WITH YOUR NEXT WITNESS.

23         MR. MEDRANO:  THANK YOU, YOUR HONOR.  THE GOVERNMENT

24    AT THIS TIME WOULD RECALL ESTELLA FUENTES TO THE STAND.

25         THE COURT:  PLEASE RESTATE YOUR NAME FOR THE RECORD.

1          THE WITNESS:  ESTELLA FUENTES ORTIZ.

2

3      ESTELLA FUENTES ORTIZ + PLAINTIFF'S WITNESS, SWORN

4              DIRECT EXAMINATION +

5  BY MR. MEDRANO:

6  Q.  MS. FUENTES, YOUR AGE AGAIN, PLEASE?

7  A.  38 YEARS.

8  Q.  NOW, YOU KNOW JAVIER VASQUEZ VELASCO; DO YOU NOT?

9  A.  YES.

10  Q.  AND GIVE US THE DATE THAT -- WELL, ARE YOU MARRIED TO HIM?

11  A.  YES.

12  Q.  WHAT DATE DID YOU GET MARRIED TO JAVIER VASQUEZ VELASCO?

13  A.  THE 4TH OF MAY OF 1974.

14  Q.  WHERE DID THIS OCCUR AT?

15  A.  IN LOS ANGELES, CALIFORNIA.

16  Q.  FROM MAY OF 1974, WHERE DID YOU AND JAVIER VASQUEZ LIVE OR

17  RESIDE?

18  A.  NORWALK, CALIFORNIA.

19  Q.  AND THAT WAS UNTIL WHEN?

20  A.  UNTIL JANUARY OF '81.

21  Q.  AND DID YOU HAVE TWO CHILDREN WITH JAVIER VASQUEZ?

22  A.  YES.

23  Q.  AND THEIR CURRENT AGES ARE WHAT?

24  A.  14 AND 13 YEARS.

25  Q.  NOW, WHAT HAPPENED IN 1981?

15-28

1    A.    JAVIER VASQUEZ AND I SEPARATED.

2    Q.    AND DID YOU LEAVE LOS ANGELES?

3    A.    YES.

4    Q.    WHEN?

5    A.    IN FEBRUARY OF '81.

6    Q.    AND WHERE DID YOU GO TO?

7    A.    TO HOUSTON, TEXAS.

8    Q.    AND IS THAT WHERE YOU CONTINUE TO RESIDE UP TO THE PRESENT

9    TIME?

10   A.    YES.

11   Q.    HAVE YOU BEEN SEPARATED FROM JAVIER VASQUEZ SINCE 1981 TO

12   THE PRESENT?

13   A.    YES.

14   Q.    LET ME TAKE YOU TO 1984.  IN 1984, WAS THERE AN ATTEMPTED

15   RECONCILIATION WITH A JAVIER VASQUEZ?

16   A.    YES.

17   Q.    AND DID YOU SEE JAVIER VASQUEZ IN 1984?

18   A.    YES.

19   Q.    APPROXIMATELY WHEN?

20   A.    IN DECEMBER OF '84.

21   Q.    FROM THE DATE YOU SEPARATED IN FEBRUARY OF '81 UNTIL WHEN

22   YOU SAW HIM IN THE SUMMER OF '84, DID YOU HAVE ANY CONTACT WITH

23   HIM?

24   A.    NO.

25   Q.    AND YOU DIDN'T SEE HIM IN PERSON?

15-29

1    A.    NO.

2    Q.    NO PHONE CALLS OR MAIL OR LETTERS?

3    A.    NO.

4    Q.    AND SO IN THE SUMMER OF '84, DID YOU SPEND SOME TIME WITH

5    JAVIER VASQUEZ?

6    A.    YES.

7    Q.    ABOUT HOW LONG, WOULD YOU SAY?

8    A.    15 DAYS.

9    Q.    AND WHERE WAS THAT?

10   A.    IN LOS ANGELES, CALIFORNIA.

11   Q.    AND LET ME TAKE YOU TO THE END OF 1984, ABOUT CHRISTMAS

12   TIME.

13          DID YOU SEE HIM AT THAT TIME AGAIN?

14   A.    YES.

15   Q.    WAS THIS, AGAIN, STILL PART OF YOUR ATTEMPTED

16   RECONCILIATION?

17   A.    YES.

18   Q.    WHEN WAS IT THAT YOU SAW HIM IN THE END OF '84?

19   A.    THE THE 21ST OF DECEMBER.

20   Q.    I DIDN'T HEAR -- MADAM INTERPRETER, I'M SORRY.

21          THE INTERPRETER:   THE 21ST OF DECEMBER.

22          MR. MEDRANO:   THANK YOU.

23   BY MR. MEDRANO:

24   Q.    AND WAS THIS DECEMBER 21, 1984?

25   A.    YES.

1   Q.   AND DID SEE THE DEFENDANT JAVIER VASQUEZ -- WHERE DID YOU

2   SEE HIM?

3   A.   IN LANOLLA TALEMOLO (PHONETIC) GUANJUATO.

4   Q.   WERE YOUR KIDS WITH YOU, AS WELL, WHEN YOU SAW HIM?

5   A.   YES.

6   Q.   HOW LONG WERE YOU IN MEXICO WITH HIM OVER THE CHRISTMAS

7   HOLIDAYS?

8   A.   UNTIL THE 2ND OF JANUARY OF '85.

9   Q.   AND WHERE DID YOU RETURN AFTER JANUARY 2 OF 1985?

10  A.   TO HOUSTON, TEXAS.

11  Q.   WHY DID YOU HAVE TO GO BACK ON JANUARY 2?

12  A.   BECAUSE MY CHILDREN HAD TO RETURN TO SCHOOL.

13  Q.   NOW, LET ME TAKE YOU TO 1985.  DID YOU ACTUALLY LIVE

14  TOGETHER AGAIN WITH THE DEFENDANT JAVIER VASQUEZ?

15  A.   YES.

16  Q.   AND GIVE ME THE APPROXIMATE DATES.

17  A.   DID YOU LIVE TOGETHER WITH HIM OR DID YOU SEE HIM AGAIN?

18  Q.   THAT YOU LIVED TOGETHER WITH HIM AGAIN IN '85.

19  A.   YES.  IN APRIL OR MAY OF '85.

20  Q.   AND WHERE WAS THIS THAT YOU LIVED TOGETHER AGAIN?

21  A.   IN HOUSTON, TEXAS.

22  Q.   AND HOW LONG THEN DID YOU REMAIN TOGETHER THROUGHOUT THE

23  REST OF '85?

24  A.   UNTIL DECEMBER OF '85.

25  Q.   DO YOU REMEMBER THE DATE IN DECEMBER?

15-31

1    A.   UNTIL THE 11TH.

2    Q.   AND AT THAT TIME DID THE ATTEMPTED RECONCILIATION FAIL?

3    A.   YES.

4    Q.   DID YOU AND YOUR TWO CHILDREN REMAIN IN HOUSTON?

5    A.   YES.

6    Q.   AND DID JAVIER VASQUEZ LEAVE HOUSTON, TEXAS?

7    A.   YES.

8    Q.   NOW, FROM THAT MOMENT, DECEMBER 11, 1985, WHEN IS THE NEXT

9    CONTACT YOU EVER HAD WITH DEFENDANT VASQUEZ?

10   A.   IN NOVEMBER OF '89.

11   Q.   WHAT HAPPENED?

12   A.   JAVIER -- FIRST, I CALLED CELIA.

13   Q.   WHEN?

14   A.   AROUND SEPTEMBER.

15   Q.   AND WHO WAS CELIA?

16   A.   SHE'S JAVIER VASQUEZ'S SISTER.

17   Q.   WHY DID YOU CALL CELIA?

18   A.   I WANTED TO FIND OUT WHERE JAVIER WAS SO I COULD LEGALLY

19   DIVORCE HIM.

20   Q.   BUT IN SEPTEMBER OF '89, YOU DIDN'T SEE OR TALK TO JAVIER,

21   DID YOU?

22   A.   NO.

23   Q.   SO WHAT HAPPENS IN NOVEMBER THEN OF '89?

24   A.   JAVIER GOT IN CONTACT WITH ME BY WRITING ME A LETTER.

25   Q.   DO YOU RECALL THE APPROXIMATE DATE THAT YOU GOT THE

15-32

1   LETTER?

2   A.   THE 27TH OF NOVEMBER OF '89.

3   Q.   THEN SINCE DECEMBER 11 OF '85 WHEN HE LEFT HOUSTON UNTIL

4   NOVEMBER 27TH '89, ALMOST FOUR YEARS LATER, YOU HAD NO CONTACT

5   WITH JAVIER VASQUEZ?

6   A.   NO.

7   Q.   YOU DID NOT SEE HIM IN PERSON?

8   A.   NO.

9   Q.   YOU DIDN'T TALK TO HIM BY TELEPHONE?

10  A.   NO.

11  Q.   NOW, THIS LETTER THAT YOU RECEIVED ON NOVEMBER 27TH OF

12  '89, WERE YOU ABLE TO RECOGNIZE JAVIER VASQUEZ'S HANDWRITING IN

13  THE LETTER?

14  A.   YES.

15  Q.   DID HE SIGN THE LETTER AT THE END?

16  A.   YES.

17  Q.   AND DID YOU RECOGNIZE HIS SIGNATURE ON THIS LETTER?

18  A.   YES.

19          MR. NICOLAYSEN:  YOUR HONOR, WE'LL STIPULATE THAT THE

20  LETTER WAS FROM MR. VASQUEZ.  THERE IS NO NEED FOR FOUNDATION.

21          THE COURT:  VERY WELL.  THE JURY WILL ACCEPT THAT.

22          MR. MEDRANO:  THANK YOU, YOUR HONOR.

23  BY MR. MEDRANO:

24  Q.   AGAIN, DO YOU HAVE THE LETTER ANY LONGER?

25  A.   NO.

15-33

1   Q.    NOW, CAN YOU TELL US WHAT IT WAS THAT HE STATED TO YOU IN

2   THE LETTER?

3   A.    FIRST HE TOLD ME THAT HE WAS VERY SORRY THAT WE HAD NOT

4   BEEN ABLE TO HAVE OUR RECONCILIATION, THAT WE HAD TRIED AND NO

5   WAY -- WE TRIED AND THAT IS IT.

6   A.    HE SAID THAT IN ALL OF THIS, I WAS VERY FORTUNATE BECAUSE

7   I HAD BEEN VERY LUCKY WITH MY CHILDREN.

8             AND THEN HE SAID THAT -- MOVING TO ANOTHER SUBJECT --

9   HE WANTS TO TELL ME WHAT'S HAPPENING TO HIM AT THE PRESENT

10  TIME.

11  Q.    WHAT ELSE DOES HE SAY IN THE LETTER?

12  A.    HE SAID THAT FOR SEVERAL YEARS, APPROXIMATELY FOR TWO

13  YEARS, THE AGENTS FROM D.E.A. WERE FOLLOWING HIM AND ALL HIS

14  FAMILY, TRYING TO FIND SOMETHING AGAINST THEM REGARDING THE

15  DEATH OF CAMARENA.

16  Q.    AND WHAT ELSE DOES HE SAY TO YOU IN THE LETTER?

17  A.    THAT AN AGENT WHOSE NAME WAS ABEL REYNOSO WAS THE ONE THAT

18  WAS MOST INTERESTED IN FINDING EVIDENCE AGAINST THEM REGARDING

19  WHAT I SAID ABOUT CAMARENA'S DEATH.

20            WHEN THEY REALIZED THEY COULD NOT FIND ANYTHING

21  AGAINST JAVIER VASQUEZ AND HIS FAMILY, THEY TRIED TO BRIBE HIM.

22  AND THEY TRIED TO INTERVIEW HIM, TO HAVE INTERVIEWS WITH THEM,

23  AND THEY WANTED TO FIND OUT IF HE COULD TELL THEM OR HIS FAMILY

24  COULD TELL THEM WHETHER THEY HAD ANY INFORMATION REGARDING THAT

25  CASE.

15

1    Q.    NOW, MRS. FUENTES, AT ANY POINT IN THE LETTER DOES JAVIER

2    VASQUEZ ASK YOUR ASSISTANCE?

3    A.    YES.  BUT FIRST HE EXPLAINED TO ME WHY.

4    Q.    WHY DON'T YOU GO AHEAD AND EXPLAIN.

5    A.    SO SINCE THEY DID NOT WANT TO INTERVIEW WITH THEM BECAUSE

6    THEY HAD NOTHING TO SAY IN THAT REGARD, ACCORDING TO WHAT HE

7    STATES IN THE LETTER, THEN THEY DECIDED SINCE THEY WERE ALREADY

8    UNDER INVESTIGATION AND THEY WERE BEING FOLLOWED, THEY WAITED

9    UNTIL THEY MADE A MISTAKE OR A MINOR LAW VIOLATION, HOWEVER

10   SIMPLE IT WAS, AND UNTIL THEY MADE THE MISTAKE OF BEGINNING TO

11   MANUFACTURE CASSETTES, FALSE ONES.

12          AND ABEL REYNOSO SAW A WAY OF BRIBING HIM WITH THAT.

13   Q.    NOW, MRS. FUENTES, AT SOME POINT DOES HE THEN ASK FOR YOUR

14   ASSISTANCE?

15          MR. NICOLAYSEN:  OBJECTION, YOUR HONOR.  THE QUESTION

16   IS LEADING.

17          THE COURT:  OVERRULED.

18          THE WITNESS:  SO ABEL REYNOSO, TOGETHER WITH OTHER

19   FEDERAL AGENTS, WENT AND THEY CONFISCATED ALL OF THEIR

20   CASSETTES AND THE MONEY THAT THEY HAD AT HAND, AND THEY WERE

21   APPREHENDED.

22          AND THEN HE SAYS THAT ONCE THEY HAD THEM OVER HERE,

23   ABEL PROMISED THEM MONEY.  HE PROMISED TO GIVE THEM A PERMIT SO

24   THEY COULD WORK LEGALLY, AND HE PROMISED THEM RESIDENT PAPERS

25   IN THE UNITED STATES IF THEY WOULD COOPERATE WITH ANYTHING THAT

15-35

1    THEY KNEW, HOWEVER INSIGNIFICANT IT WAS.

2    BY MR. MEDRANO:

3    Q.    MRS. FUENTES, NOW AT ANY POINT DOES JAVIER VASQUEZ IN THE

4    LETTER DESCRIBE A VACATION THAT HE HAD WITH YOU?

5    A.    YES.

6    Q.    I WANT YOU TO TELL US ABOUT THAT.  DOES HE ASK FOR YOUR

7    HELP IN ANY WAY?

8    A.    YES.  BECAUSE JAVIER VASQUEZ AND I WERE TOGETHER IN '85 ON

9    TWO OR THREE OCCASIONS AFTER DECEMBER OF '84.

10          HE GOT MIXED UP IN THE LETTER AND HE GAVE ME THE

11   DATES MISTAKEN.  AND SINCE THE TIMES THAT I SAW HIM WERE SO

12   CLOSE TOGETHER, HE GOT IT ALL MIXED UP IN HIS MIND.

13   Q.    LET ME STOP THERE, MRS. FUENTES.  DOES JAVIER VASQUEZ IN

14   THE LETTER -- DOES HE TALK TO YOU ABOUT THIS VACATION?

15   A.    YES.

16   Q.    AND IN THE LETTER DOES HE INDICATE TO YOU WHAT DATES YOU

17   TOOK THE VACATION TOGETHER?

18          MR. NICOLAYSEN:  AGAIN, OBJECTION.  THAT IS A LEADING

19   QUESTION, YOUR HONOR.

20          THE COURT:  OVERRULED.

21   BY MR. MEDRANO:

22   Q.    DID YOU HEAR THE QUESTION?

23   A.    CAN YOU SAY IT AGAIN, PLEASE?

24   Q.    IN THE LETTER, DOES HE TALK TO YOU ABOUT THE DATES OF THIS

25   VACATION THAT YOU HAD TOGETHER?

15-36

1    A.    YES, BECAUSE HE MUST HAVE THOUGHT I HAD FORGOTTEN THAT.

2    Q.    IN THE LETTER, DOES HE REMIND YOU OF THE DATES?

3              MR. NICOLAYSEN:    AGAIN, THAT'S A LEADING QUESTION AND

4    OBJECT AND ASK THE COURT TO REMIND --

5              THE COURT:    OVERRULED.

6              THE WITNESS:    YES.

7    BY MR. MEDRANO:

8    Q.    WHAT DATES DOES HE GIVE YOU IN THE LETTER FOR THE

9    VACATION?

10   A.    FROM THE 23RD OF JANUARY TO THE 7TH OF FEBRUARY.

11   Q.    AND THAT'S WHEN HE SAYS YOU WERE ON VACATION TOGETHER?

12   A.    YES.   WE WERE TOGETHER BUT NOT WITH THE CHILDREN.

13   Q.    NOW, IN THE LETTER, THOSE ARE THE DATES THAT HE REMINDS

14   YOU OF?

15   A.    YES.

16   Q.    AND TALKING ABOUT THOSE DATES, DOES HE TELL YOU WHETHER OR

17   NOT THE KIDS WERE ALONG WITH YOU?

18   A.    YES.

19   Q.    AND DID HE TELL YOU AS TO THOSE DATES WHERE IN MEXICO YOU

20   WERE?

21   A.    YES.

22   Q.    WHERE?

23   A.    IN QUERETARO PUEBLA MEXICO.   TOLUCA.

24   Q.    NOW, MRS. FUENTES, YOU'VE ALREADY TESTIFIED ABOUT THE

25   CHRISTMAS VACATION YOU HAD WITH THE DEFENDANT.

15-37

1          DO YOU RECALL THAT?

2    A.   YES.

3    Q.   AND TELL US AGAIN THE ACTUAL DATES OF THE VACATION.

4    A.   FROM THE 21ST OF DECEMBER TO JANUARY 2ND OF '85.

5    Q.   AND AGAIN, WHY IS IT THAT YOU -- STRIKE THAT.

6          AFTER JANUARY 2ND, DID YOU HAVE TO BE BACK IN

7    HOUSTON?

8    A.   YES.

9    Q.   WHY WAS THAT?

10   A.   BECAUSE THE CHILDREN HAD TO GO BACK TO SCHOOL.

11   Q.   NOW, THE DATES THAT JAVIER TELLS YOU IN HIS LETTER OF

12   DECEMBER 23-- STRIKE THAT -- OF JANUARY 23, 1985 TO FEBRUARY 7,

13   1985, THOSE DATES, WOULD YOUR KIDS HAVE BEEN IN SCHOOL AT THAT

14   TIME PERIOD?

15   A.   YES.

16   Q.   FINALLY, IN THIS LETTER WHEN HE'S DISCUSSING THIS VACATION

17   WITH YOU, AT ANY TIME DOES JAVIER VASQUEZ ASK YOU FOR YOUR

18   HELP?

19   A.   BEFORE SAYING THAT, HE ASKED ME IF I COULD HELP HIM

20   BECAUSE HE SAYS I WAS THE ONLY ONE THAT COULD TESTIFY THAT I

21   HAD BEEN WITH HIM, BECAUSE IT IS TRUE THAT HE WAS, BUT NOT WITH

22   THE CHILDREN.

23          MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR.

24          (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

25          MR. MEDRANO:  YOUR HONOR, THAT CONCLUDES DIRECT.

15-38

1    THANK YOU.

2              THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

3              MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

4                        CROSS-EXAMINATION +

5    BY MR. NICOLAYSEN:

6    Q.   GOOD MORNING, MRS. FUENTES.

7    A.   GOOD MORNING.

8    Q.   I WANT TO DIRECT YOUR ATTENTION TO THE MONTH OF OCTOBER OF

9    1989.

10             CAN YOU PUT THAT MONTH IN YOUR MIND?

11   A.   YES.

12   Q.   ALL RIGHT.  NOW, IN OCTOBER OF 1989, YOU BECAME AWARE AT

13   SOME POINT THAT THIS CASE HAD BEEN BROUGHT AGAINST JAVIER

14   VASQUEZ; ISN'T THAT TRUE?

15   A.   YES.

16   Q.   AND WHEN YOU LEARNED ABOUT THAT, YOU BECAME CONCERNED; DID

17   YOU NOT?

18   A.   WHY?  BECAUSE OF HIM OR BECAUSE OF ME?

19   Q.   WELL, YOU WERE CONCERNED FOR HIM, WEREN'T YOU?

20   A.   WELL, IT'S NATURAL.

21   Q.   SURE.  AND YOU THEN WENT A HEAD AND YOU WROTE A LETTER

22   ADDRESSED TO JAVIER IN OCTOBER OF '89; DO YOU RECALL?

23   A.   NO.  IT WAS ADDRESSED TO CELIA.

24   Q.   ALL RIGHT.  IT WAS ADDRESSED TO CELIA, JAVIER'S SISTER

25   HERE IN LOS ANGELES; IS THAT RIGHT?

15-39

1    A.   YES.

2    Q.   AND IN THE LETTER, YOU SPECIFICALLY MADE A REFERENCE TO

3    THIS PARTICULAR CASE THAT HAD JUST BEEN BROUGHT; DO YOU RECALL

4    THAT?

5    A.   YES.

6    Q.   AND YOU EXPRESSED YOUR CONCERN AND OFFERED TO HELP IN ANY

7    WAY YOU COULD; DO YOU REMEMBER THAT?

8    A.   IF IT HAD SOMETHING THAT HAD REALLY HAPPENED, YES.

9    Q.   YOU WERE OFFERING TO BE AVAILABLE TO CLARIFY INFORMATION,

10   FOR EXAMPLE, IF THE NEED AROSE; ISN'T THAT TRUE?

11   A.   YES, JUST THE SAME AS I TOLD THE PEOPLE FROM THE D.E.A.

12   ALSO.

13   Q.   RIGHT.   THEN, YOU WERE OPEN, WERE YOU NOT -- IN OTHER

14   WORDS, YOU WERE RECEPTIVE TO HEARING FROM JAVIER OR FROM OTHER

15   MEMBERS OF THE FAMILY IN CONNECTION WITH THIS CASE, WEREN'T

16   YOU?

17   A.   YES.

18   Q.   AND ABOUT MAYBE THREE WEEKS AFTER YOU SENT THE LETTER TO

19   CELIA - THIS BRINGS US NOW TO NOVEMBER OF '89 - YOU DID, IN

20   FACT, RECEIVE A LETTER FROM JAVIER; DIDN'T YOU?

21   A.   YES.

22   Q.   NOW, THIS IS THE LETTER, INCIDENTALLY, THAT YOU WERE

23   DISCUSSING A LITTLE BIT EARLIER, ISN'T IT?

24   A.   YES.

25   Q.   AND BY THE WAY, WHERE IS THIS LETTER; DO YOU HAVE IT?

15-40

1    A.    NO, NO, I DON'T HAVE IT.

2    Q.    HAS IT BEEN LOST?

3    A.    YES.  I LEFT IT ON A LITTLE TABLE WHEN I CAME THE FIRST

4    TIME, AND I WENT BACK.  WHEN I WENT BACK, IT WAS NOT THERE ANY

5    MORE.  BECAUSE I WAS GOING TO BRING IT, BUT I FORGOT IT.

6    Q.    THIS LITTLE TABLE, WHERE IS THAT; IN A RESIDENCE?

7    A.    IT'S IN THE KITCHEN.

8    Q.    OF YOUR HOME?

9    A.    (NODDING HEAD.)

10   Q.    YOU'RE NODDING YOUR HEAD, MA'AM.

11   A.    YES.

12   Q.    DO YOU HAVE ANY IDEA WHO MIGHT HAVE TAKEN THE LETTER?

13   A.    WELL, I DON'T KNOW.  MAYBE IT WAS THROWN IN THE TRASH.  I

14   DON'T KNOW.

15   Q.    WHEN DID THIS HAPPEN, TO THE BEST OF YOUR RECOLLECTION?

16   A.    I HAD PUT IT AWAY, AND I PULLED IT OUT TO BRING IT ON THE

17   24TH OF JANUARY WHEN I WAS GOING TO COME FOR THE INTERVIEW.

18   Q.    AND WAS IT LOST BEFORE YOU ARRIVED IN LOS ANGELES FOR THAT

19   INTERVIEW?

20   A.    NO, I FORGOT IT.  BECAUSE I WAS GOING TO BRING IT AND I

21   WENT BACK, I COULD NOT FIND IT ANY MORE.  AND I ASKED THE

22   CHILDREN, BECAUSE THEY DO CLEAN THE HOUSE.

23   Q.    AND WHAT DID THEY TELL YOU?

24   A.    THAT I HAD NOT -- THAT THEY HAD NOT SEEN ANYTHING.

25   Q.    HOW LONG WERE YOU IN LOS ANGELES?

15-41

1    A.    TWO DAYS.

2    Q.    IS IT YOUR TESTIMONY TODAY THAT DURING THE TWO DAYS THAT

3    YOU WERE HERE IN LOS ANGELES MEETING WITH THE UNITED STATES

4    ATTORNEY, THAT LETTER APPARENTLY DISAPPEARED IN YOUR HOME BACK

5    IN TEXAS?

6              IS THAT YOUR TESTIMONY?

7              MR. MEDRANO:   OBJECTION.

8              THE COURT:   JUST A MOMENT.

9              MR. MEDRANO:   OBJECTION TO THE FORM OF THE QUESTION.

10             THE COURT:   THE FORM OF THE QUESTION IS IMPROPER,

11   CONTAINING AN ASSERTION THAT SHE WAS MEETING WITH THE UNITED

12   STATES ATTORNEY.

13   BY MR. NICOLAYSEN:

14   Q.    YOU REFERENCE THE TRIP IN JANUARY, IN FACT, ON JANUARY

15   24TH; DO YOU REMEMBER TELLING US THAT?

16   A.    YES.

17   Q.    NOW, THAT TRIP WAS, IN FACT, TO COME TO LOS ANGELES TO

18   MEET WITH MR. MEDRANO, ONE OF THE PROSECUTORS HERE; ISN'T THAT

19   TRUE?

20   A.    YES.

21   Q.    AND YOU DID, IN FACT, MEET WITH HIM; DID YOU NOT?

22   A.    YES.

23   Q.    AND IT WAS IN CONNECTION WITH THAT PARTICULAR TRIP, THAT

24   IS, THE TRIP TO MEET WITH MR. MEDRANO HERE IN LOS ANGELES, THAT

25   YOU WERE OUT OF TOWN FOR TWO DAYS; IS THAT CORRECT?

15-42

1    A.    IS IT YOUR TESTIMONY TODAY, MRS. FUENTES, THAT DURING

2    THOSE TWO DAYS THAT YOU WERE HERE IN LOS ANGELES IN JANUARY

3    MEETING WITH MR. MEDRANO THE LETTER SOMEHOW DISAPPEARED FROM

4    THE TABLE BACK IN YOUR HOUSE IN HOUSTON, TEXAS?

5    A.    YES.

6    Q.    AND DID YOU EVER DO ANY INVESTIGATION TO FIND IT OTHER

7    THAN TALKING TO YOUR KIDS?

8    A.    YES, I DID LOOKE FOR IT AMONG ALL MY PAPERS AND IN THE

9    HOUSE TO SEE IF MAYBE I HAD MADE A MISTAKE, BUT I DID NOT FIND

10   IT.

11   Q.    AND NONE OF YOUR KIDS ADMITTED TO HAVING TAKEN THE LETTER;

12   IS THAT RIGHT?

13   A.    THEY DID NOT KNOW.  THEY DID NOT SEE IT.

14   Q.    SO AS WE DISCUSS THE MATTER TODAY IN COURT, THE

15   DISAPPEARANCE OF THE LETTER IS JUST A MYSTERY; IS THAT RIGHT?

16        MR. MEDRANO:  OBJECT TO THE FORM OF THE QUESTION.

17   CALLS FOR CONCLUSION AND SPECULATION.

18        THE COURT:  WE HAVE BEEN BEATING THIS TO DEATH,

19   COUNSEL.  MOVE ALONG.

20   BY MR. NICOLAYSEN:

21   Q.    HAS IT BEEN ABOUT SIX MONTHS OR SO SINCE YOU LAST READ THE

22   LETTER?

23   A.    NO, BECAUSE I READ IT SEVERAL TIMES.

24   Q.    WHEN IS THE LAST TIME THAT YOU READ IT?

25   A.    THE DAY BEFORE THE EXACT DATE THAT I CAME TO LOS ANGELES,

15-43

1    I READ IT AGAIN.

2    Q.    ALL RIGHT.  SO THAT WOULD BRING US BACK TO ABOUT THE THIRD

3    WEEK OF JANUARY; IS THAT RIGHT?

4    A.    YES.

5    Q.    SO IT HAS BEEN ABOUT FIVE MONTHS SINCE YOU READ THE

6    LETTER; IS THAT FAIR?

7    A.    YES.  BUT I READ IT SEVERAL TIMES.

8    Q.    I UNDERSTAND.  BY THE WAY, DID YOU PREPARE ANY NOTES ABOUT

9    THAT LETTER?

10   A.    NO.

11   Q.    SO YOUR TESTIMONY TODAY IS BASED ON YOUR MEMORY FROM THE

12   LAST TIME YOU READ THE LETTER BACK IN JANUARY; IS THAT RIGHT?

13   A.    YES.

14   Q.    NOW, THE LETTER THAT YOU HAD SENT TO CELIA THAT YOU TOLD

15   US ABOUT IN OCTOBER OF '89, I'M GOING TO ADDRESS THAT FOR JUST

16   A MINUTE.

17            ARE YOU WITH ME?

18   A.    YES.

19   Q.    DO YOU RECALL IN THAT LETTER THAT YOU, IN FACT, OFFERED TO

20   ATTEMPT TO LOCATE ANY PAPERS OR DOCUMENTS, IF THAT WOULD BE OF

21   ANY ASSISTANCE?

22   A.    YES.

23   Q.    AND WHEN JAVIER VASQUEZ WROTE YOU BACK IN THE THIRD WEEK

24   OF NOVEMBER OF '89 HE, IN FACT, ASKED IF YOU WOULD LOOK FOR

25   SOME PAPERS AND DOCUMENTS; DO YOU RECALL?

15-44

1   A.   YES.

2   Q.   HE WAS, IN FACT, INTERESTED IN RECEIPTS OF THE TRIPS THAT

3   YOU TOOK IN 1985, IF BY ANY CHANCE YOU HAPPENED TO HAVE THEM;

4   ISN'T THAT RIGHT?

5   A.   YES.

6   Q.   AND BECAUSE IT'S TRUE, IS IT NOT, THAT BEFORE THE TWO OF

7   YOU BEGAN LIVING TOGETHER IN APRIL OF '85, YOU HAD ACTUALLY

8   TAKEN AT LEAST TWO TRIPS TOGETHER WITHOUT THE CHILDREN IN 1985;

9   ISN'T THAT RIGHT?

10  A.   TWO OR THREE TRIPS, YES.

11  Q.   AND THAT'S BETWEEN JANUARY OF '85 AND APRIL WHEN YOU BEGAN

12  LIVING TOGETHER AGAIN; ISN'T THAT CORRECT?

13  A.   YES.

14  Q.   AND IN THE LETTER TO YOU OF NOVEMBER OF '89, JAVIER WAS

15  ASKING FOR YOUR HELP TO TRY TO CLARIFY IN HIS MIND EXACTLY WHEN

16  THOSE TWO OR THREE TRIPS TOOK PLACE, WASN'T HE?

17         MR. MEDRANO:   OBJECTION.  I THINK THIS CALLS FOR

18  SPECULATION AND CONCLUSION ON THE PART OF THE WITNESS.

19         THE COURT:  OVERRULED.

20         THE WITNESS:  DO I ANSWER?

21         THE COURT:  YOU MAY ANSWER.

22         THE WITNESS:  WELL, YES.  I THINK THAT -- I THINK

23  THAT HE COULD NOT REMEMBER THE DATES WELL AND HE WAS TRYING TO

24  FIND OUT THE DATES, BUT HE KNEW THAT HE HAD BEEN WITH ME.

25         MR. NICOLAYSEN:  I MISSED THE LAST PART OF THE

15-45

1  ANSWER.  SAY THAT AGAIN.

2          THE INTERPRETER:  BUT HE KNEW THAT HE HAD BEEN WITH

3  ME.

4  BY MR. NICOLAYSEN:

5  Q.  AND YOU KNEW THAT YOU HAD BEEN WITH HIM AS WELL, CORRECT?

6  A.  YES.

7  Q.  AND SO HE WAS SIMPLY TRYING TO GET THE DATES STRAIGHTENED

8  OUT IN SENDING THE LETTER; ISN'T THAT WHAT YOU UNDERSTOOD WHEN

9  YOU READ IT?

10          MR. MEDRANO:  OBJECTION, YOUR HONOR.  THAT DOES CALL

11  FOR A CONCLUSION BY THE WITNESS.

12          THE COURT:  OVERRULED.

13          IF THAT'S WHAT SHE UNDERSTOOD FROM THE LETTER, SHE

14  MAY ANSWER.

15          THE INTERPRETER:  MAY I HEAR THE QUESTION AGAIN?

16  BY MR. NICOLAYSEN:

17  Q.  SO YOU UNDERSTOOD, DID YOU NOT, MRS. FUENTES, THAT HIS

18  LETTER WAS AN ATTEMPT TO GET CLEAR OR GET AN UNDERSTANDING WITH

19  YOU AS TO WHAT THE DATES OF THESE TWO OR THREE TRIPS WERE?

20  A.  YES.

21  Q.  AND THE LETTER WAS -- AND HE HAS TOLD YOU IN THE LETTER,

22  DID HE NOT, THAT HE THOUGHT THE RECEIPTS WOULD BE THE BEST WAY

23  OF PINPOINTING THOSE DATES, CORRECT?

24  A.  YES.

25  Q.  NOW, DID YOU, IN FACT, ATTEMPT TO LOCATE SOME RECEIPTS?

15-46

1    A.   YES, I DID TRY TO FIND THEM AMONG ALL THE PAPERS, ALL THE

2    PAPERS THAT I HAVE IN MY HOUSE.   BUT SINCE I HAD MOVED, MAYBE I

3    THREW THEM AWAY.

4    Q.   BUT AS WE SIT HERE TODAY, THERE ARE NO RECEIPTS THAT WE

5    CAN LOOK AT IN PINPOINTING THOSE DATES; IS THAT RIGHT?

6    A.   NO.  I DID TELL THE D.E.A. AGENTS THAT I HAD TRAVELED BY

7    CONTINENTAL AIRWAYS TWICE, ONCE FROM LOS ANGELES --

8              THE COURT:   THAT'S NOT QUESTION.

9              YOU ALREADY ASKED THE QUESTION AND SHE SAID THEY WERE

10   LOST OR GONE, AND YOU'RE ASKING HER AGAIN TO REPEAT THE SAME

11   QUESTION.

12             MOVE ON TO SOMETHING ELSE.

13             MR. NICOLAYSEN:   THE RECORD DOES ESTABLISH THEIR

14   LOSS; THAT'S CORRECT.

15   BY MR. NICOLAYSEN:

16   Q.   IN HIS LETTER TO YOU IN NOVEMBER OF '89, JAVIER DID NOT

17   TELL TO YOU TO LIE TO THE U.S. GOVERNMENT, DID HE?

18   A.   NO.

19             MR. NICOLAYSEN:   THANK YOU, MRS. FUENTES.  I HAVE

20   NOTHING FURTHER, YOUR HONOR.

21             THE COURT:   ANYTHING FURTHER?

22             MR. MEDRANO:   BRIEFLY, YOUR HONOR.

23                      REDIRECT EXAMINATION +

24   BY MR. MEDRANO:

25   A.   MRS. FUENTES, SINCE '81 DO YOU RESIDE WITH ANOTHER MAN AS

15-47

1    MAN AND WIFE TO THE PRESENT DATE?

2    A.    YES.

3                MR. MEDRANO:    THAT'S IT, YOUR HONOR.    THANK YOU.

4                THE COURT:    ALL RIGHT.    YOU MAY STEP DOWN.

5                (WITNESS EXCUSED.)

6                THE COURT:    CALL YOUR NEXT WITNESS.

7                MR. CARLTON:    THE GOVERNMENT CALLS JAMES KUYKENDALL.

8                (WITNESS SUMMONED TO THE COURTROOM.)

9

10      JAMES KUYKENDALL + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

11                THE CLERK:    PLEASE BE SEATED.    PLEASE STATE YOUR FULL

12   NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

13                THE WITNESS:    JAMES KUYKENDALL, K U Y K E N D A L L.

14

15                         DIRECT EXAMINATION +

16   BY MR. CARLTON:

17   Q.    MR. KUYKENDALL, DURING WHAT PERIOD WERE YOU EMPLOYED BY

18   THE D.E.A.?

19                THE COURT:    HAVEN'T WE BEEN THROUGH THIS BEFORE WITH

20   THIS WITNESS?

21                MR. CARLTON:    YES, YOUR HONOR.

22                THE COURT:    LET'S GET ON WITH WHY YOU CALLED HIM

23   AGAIN.

24   BY MR. CARLTON:

25   Q.    DRAWING YOUR ATTENTION TO AUGUST OF 1985, MR.

15-48

1    KUYKENDALL -- ACTUALLY, I'D LIKE YOU TO LOOK IN FRONT OF YOU AT

2    WHAT HAS BEEN MARKED AS EXHIBIT 75.  DO YOU SEE THAT?

3    A.    YES, SIR.

4    Q.    HAVE YOU SEEN THOSE ITEMS BEFORE?  ACTUALLY LOOK AT THE

5    BROWN BAG OR BROWN ENVELOPE INSIDE.  WOULD YOU LOOK AT THAT.

6    A.    YES, SIR, I HAVE.

7    Q.    AND WHAT WAS THE OCCASION?

8    A.    THESE -- THE BROWN ENVELOPE WAS GIVEN TO ME BY MY

9    SECRETARY ON AUGUST THE 28TH 1985, AND I DELIVERED -- I CARRIED

10   IT TO WASHINGTON, D.C. AND DELIVERED TO IT SOMEONE THERE.

11   Q.    WHO WAS YOUR SECRETARY?

12   A.    MIRIAM ANGULO.

13   Q.    SHE WAS THE PERSON WHO GAVE THE BAG TO YOU?

14   A.    YES, SIR.

15   Q.    WHERE DID SHE GIVE IT TO YOU?

16   A.    THE D.E.A. OFFICE IN GUADALAJARA, MEXICO.

17   Q.    AT THE TIME SHE GAVE IT TO YOU, WAS IT SEALED?

18   A.    YES, IT WAS.

19   Q.    DID YOU FEEL ANYTHING INSIDE OF IT?

20   A.    THERE WAS SOMETHING INSIDE OF IT, YES.

21   Q.    WHAT DID YOU DO WITH THE ENVELOPE?

22   A.    I KEPT IT IN MY POSSESSION.  I TRAVELED TO WASHINGTON, D.C.

23   ON THE 29TH OF AUGUST, AND ARRIVING LATE, I KEPT IT IN MY

24   POSSESSION THAT NIGHT, AND ON THE 30TH OF AUGUST, I WENT TO THE

25   D.E.A. HEADQUARTERS AND GAVE IT TO MR. MATTY MAHER.

15-49

1    Q.    IT REMAINED SEALED THE ENTIRE TIME?

2    A.    YES, SIR.

3    Q.    DID YOU SEE THE ENVELOPE OPENED AT THAT TIME?

4    A.    YES, I DID.

5    Q.    WERE THERE CASSETTE TAPES INSIDE?

6    A.    YES, THERE WERE.

7    Q.    WERE THOSE TAPES DENOMINATED COPIAS ONE THROUGH FIVE?

8    A.    YES, THEY WERE.

9    Q.    IS THE WORD COPIA IN ENGLISH COPY?  IS THAT WHAT THAT

10   MEANS?

11   A.    YES, IT IS.

12   Q.    DID YOU HAVE OCCASION TO LISTEN COPIAS TWO AND FOUR?

13   A.    YES, I DID.

14   Q.    HOW OFTEN DID YOU LISTEN TO THOSE?

15   A.    AT LEAST 40, 50 TIMES.

16   Q.    I WOULD ALSO AT THIS POINT LIKE YOU TO LOOK IN FRONT OF

17   YOU AT WHAT HAS BEEN MARKED AS EXHIBITS 78 AND 79.

18            I BELIEVE THE MARKINGS ARE INSIDE THE FIRST PAGE.

19   A.    YES, SIR.

20   Q.    DO YOU RECOGNIZE THOSE?

21   A.    YES, SIR, I DO.

22   Q.    WHAT ARE THEY?

23   A.    THEY ARE THE TRANSCRIPTION OF THE CASSETTE TAPES IN

24   SPANISH.

25   Q.    SPANISH TRANSCRIPTIONS?

15-50

1    A.    YES.

2    Q.    AND YOU'VE HAD OCCASION TO COMPARE THE SPANISH

3    TRANSCRIPTIONS TO THE CASSETTE TAPES?

4    A.    YES, I HAVE.

5    Q.    YOU'RE FLUENT IN SPANISH; ARE YOU NOT?

6    A.    YES, SIR.

7    Q.    ARE THESE ACCURATE TRANSCRIPTIONS OF COPIAS TWO AND FOUR?

8    A.    YES, THEY ARE.

9    Q.    LOOKING AT WHAT HAS BEEN MARKED AS EXHIBITS 80 AND 81, DO

10   YOU RECOGNIZE THOSE?

11   A.    YES, SIR.  YES, I DO.

12   Q.    WHAT ARE THEY?

13   A.    THEY'RE ENGLISH TRANSLATIONS OF THE SPANISH

14   TRANSCRIPTIONS.

15   Q.    HAVE YOU HAD OCCASION TO COMPARE THOSE ENGLISH

16   TRANSLATIONS TO THE SPANISH TRANSCRIPTIONS.

17          MR. STOLAR:  OBJECT TO THE CUMULATIVE NATURE OF THIS

18   TESTIMONY.

19          THE COURT:  SUSTAINED.

20   BY MR. CARLTON:

21   Q.    LOOKING AT WHAT HAS BEEN MARKED AS EXHIBITS 82 AND 83,

22   WOULD YOU, PLEASE.

23   A.    YES, SIR.

24   Q.    DO YOU RECOGNIZE THOSE?

25   A.    IF I COULD OPEN THEM UP?

15-51

1    Q.    YES, PLEASE.

2    A.    YES, I DO.

3    Q.    WHAT ARE THEY?

4    A.    THEY ARE THE VIDEO CASSETTES OF THE ENGLISH TRANSLATIONS.

5    Q.    ALL RIGHT.  THERE IS AN AUDIO PORTION TO THOSE CASSETTES

6    THAT YOU'VE JUST DISCUSSED; IS THAT RIGHT?

7    A.    YES, THERE IS.

8    Q.    WHAT DOES THE AUDIO PORTION CONSIST OF?

9    A.    THE SPANISH -- THE CASSETTE TAPES.

10    Q.    COPIAS TWO AND FOUR?

11    A.    YES, THEY ARE.

12    Q.    AND YOU HAVE LISTENED IN THEIR ENTIRETY TO EXHIBITS 82 AND

13    83?

14    A.    YES, I HAVE.

15    Q.    IS THERE A VIDEO PORTION TO THOSE EXHIBITS 82 AND 83?

16    A.    YES, THERE IS.

17    Q.    WHAT DOES THE VIDEO PORTION CONSIST OF?

18    A.    THE ENGLISH TRANSLATION.

19    Q.    THE VIDEO PORTION IS IDENTICAL TO THE ENGLISH

20    TRANSLATIONS, WHICH ARE EXHIBITS 80 AND 81?

21    A.    YES, SIR.

22    Q.    ALL RIGHT.  NOW, AS THE RESIDENT AGENT IN CHARGE OF THE

23    GUADALAJARA OFFICE, YOU SUPERVISED AGENT CAMARENA?

24    A.    YES, I DID.

25    Q.    YOU SOCIALIZED WITH HIM, AS WELL?

15-52

1    A.    YES, I DID.

2    Q.    YOU HEARD HIM SPEAK ON MANY OCCASIONS?

3    A.    YES.

4    Q.    DID YOU COME TO RECOGNIZE HIS VOICE?

5    A.    YES.  I WOULD.

6    Q.    HAVING LISTENED TO COPIAS TWO AND FOUR, DID YOU RECOGNIZE

7    ANYONE'S VOICE ON THOSE TWO TAPES?

8    A.    I RECOGNIZED THE VOICE OF ENRIQUE CAMARENA.

9    Q.    NOW, HAVING THEN READ THE SPANISH AND ENGLISH TRANSCRIPT

10   OF THOSE TWO COPIAS AND SEEING ENGLISH TRANSLATIONS ON THE TWO

11   VIDEOS, ARE THMOSE PORTIONS WHERE YOU HAVE RECOGNIZED AGENT

12   CAMARENA'S VOICE MARKED IN ANY WAY IN THE ENGLISH TRANSLATIONS?

13   A.    YES, THEY ARE.

14   Q.    HOW ARE THEY IDENTIFIED?  HOW ARE THEY IDENTIFIED IN THE

15   TRANSLATION AND ON THE VIDEOTAPE?

16   A.    WITH A LARGE CAPITAL LETTER C.

17   Q.    SO WHENEVER THE LETTER C APPEARS IN THE LEFTHAND MARGIN,

18   WILL WHAT FOLLOWS THAT BE A PORTION OF COPIA TWO OR COPIA FOUR

19   WHERE YOU HAVE IDENTIFIED AGENT CAMARENA'S VOICE?

20   A.    YES, SIR.  THE TRANSCRIPTS ARE IN QUESTION AND ANSWER FORM

21   AND THERE IS A CAPTAIN LETTER C FOR AGENT CAMARENA'S VOICE.

22   Q.    HAVING LISTENED TO THE TAPES, IS AGENT CAMARENA RESPONDING

23   TO QUESTIONS THROUGHOUT THOSE TAPES?

24   A.    HE IS RESPONDING TO QUESTIONS, YES.

25   Q.    NOW, IS THERE OTHER INFORMATION ON THOSE TWO COPIAS;

15-53

1    COPIAS TWO AND FOUR, INDICATING TO YOU THAT IT WAS AGENT

2    CAMARENA THAT WAS BEING QUESTIONED?

3    A.    YES.

4    Q.    AND AT SOME POINT ON THE TAPES DOES AGENT CAMARENA

5    DESCRIBE A HOUSE OWNED BY ERNESTO FONSECA?

6    A.    YES, HE DOES.

7    Q.    DOES HE PROVIDE DIRECTIONS TO THAT PARTICULAR HOUSE?

8    A.    YES, HE DOES.

9    Q.    DID YOU EVER HAVE OCCASION TO ACTUALLY FOLLOW THOSE

10    DIRECTIONS IN THE CITY OF GUADALAJARA TO SEE WHERE THEY WOULD

11    TAKE YOU?

12    A.    YES, I DID.

13    Q.    AND WHAT DID YOU DO IN THAT REGARD?  FIRST OF ALL --

14    STRIKE THAT.

15          WERE YOU FAMILIAR WITH THE HOUSE THAT AGENT CAMARENA

16    DESCRIBES ON THE TAPES?

17    A.    YES.

18    Q.    AND DO YOU RECALL WHERE THAT WAS LOCATED?

19    A.    AT THE CORNER OF TOPACIO AND CUARZO STREET.

20    Q.    WAS THIS A HOUSE ABOUT WHICH YOU HAD INFORMATION AT THE

21    TIME OF AGENT CAMARENA'S ABDUCTION?

22    A.    YES, IT WAS.

23    Q.    NOW, YOU HAD OCCASION THEN TO FOLLOW THE DIRECTIONS GIVEN

24    TO THAT HOUSE BY AGENT CAMARENA ON THESE TAPES?

25    A.    YES, I DID.

15-54

1    Q.    COULD YOU DESCRIBE EXACTLY WHAT YOU DID IN FOLLOWING THOSE

2    DIRECTIONS.  AND IN ORDER TO ASSIST IN THIS REGARD, I WOULD ASK

3    THE COURT'S PERMISSION FOR YOU TO BE ABLE TO STEP TO THE SIDE

4    TO THE CHART THAT HAS BEEN SET UP ON THE EASEL NEXT TO YOU.

5              THE COURT: YOU MAY DO THAT

6              THE WITNESS:   IN FOLLOWING THE DIRECTIONS  --

7              MR. MEZA:  MAY THE WITNESS REFER TO THE EXHIBIT NO.

8    YOUR HONOR?

9              MR. CARLTON:  THIS HAS BEEN MARKED AS EXHIBIT 84,

10   YOUR HONOR.

11             THE WITNESS:  THIS HAS EXHIBIT 78 ON IT.

12             MR. CARLTON:  ALL RIGHT.  THEN WE'LL CALL IT 78.

13             MR. STOLAR:  EXCUSE ME.  THERE ARE NOW TWO NUMBER 78S

14   IN EVIDENCE AND I DON'T THINK THAT'S A GOOD IDEA.

15             MR. CARLTON:  YOUR HONOR, MAY WE REMARK THAT 84?  I

16   THOUGHT IT WAS.

17             THE COURT:  YES, IT MAY BE REMARKED 84.

18             (WITNESS STEPPED DOWN TO THE EASEL.)

19             THE WITNESS:   I WOULD HAVE TO REFER TO THE

20   DIRECTIONS, AS THEY ARE GIVEN BY SPECIAL AGENT CAMARENA.

21             HE SAID TO TAKE THE STREET MARIANO OTERO AVENUE, THIS

22   STREET (INDICATING), AND GO THROUGH THREE TRAFFIC LIGHTS.  AT

23   THIS POINT ON THAT AVENUE AROUND A TRAFFIC CIRCLE, THERE ARE

24   THREE TRAFFIC LIGHTS.

25             HE THEN TELLS THE LISTENER TO TAKE THE LATERAL ALONG

15-55

1    MARIANO OTERO, WHICH IS THIS SIDE, UNTIL HE ARRIVES AT MANOLO'S

2    RESTAURANT AND TURN TO THE LEFT.  BECAUSE OF TRAFFIC LAWS IN

3    GUADALAJARA ON THAT AVENUE, THE ONLY PLACE YOU CAN MAKE A LEFT

4    TURN IS FROM THE LATERAL LANE.

5           AND THEN HE SAID TO PROCEED ON THE STREET CALLED

6    TOPACIO, AROUND THE TRAFFIC CIRCLE, AND GO AROUND THE TRAFFIC

7    CIRCLE, AND AFTER A LONG BLOCK, YOU ARRIVE AT THE HOUSE AT THE

8    CORNER OF TOPACIO AND CUARZO, WHICH WAS OWNED BY ERNESTO

9    FONSECA.

10   Q.   NOW, MR. KUYKENDALL, FOLLOWING THOSE SAME DIRECTIONS,

11   WOULD YOU ARRIVE AT THAT HOUSE IF YOU HAD DRIVEN ALONG MARIANO

12   OTERO FROM THE OPPOSITE DIRECTION?

13   A.   NO, SIR, BECAUSE HE'S EXPLICIT THAT YOU HAVE TO MAKE A

14   LEFT TURN.  YOU WOULD NOT HAVE BEEN ABLE TO MAKE A LEFT TURN

15   FROM THE OTHER DIRECTION.

16   Q.   I NOTICE THAT YOU STARTED FROM A PARTICULAR LOCATION ON

17   MARIANO OTERO.  WHY IS THAT?

18   A.   BECAUSE HE SAID YOU TAKE THREE TRAFFIC LIGHTS BEFORE

19   REACHING MANOLO'S.  IF HE HAD STARTED BEFORE THIS PARTICULAR

20   INTERSECTION, THERE IS A TRAFFIC LIGHT HERE.  A LITTLE FURTHER,

21   THERE IS A RAILROAD OVERPASS AND THEN OTHER TRAFFIC LIGHTS.

22          IF HE HAD STARTED BEYOND THIS, HE WOULD NOT HAVE GONE

23   THROUGH THREE TRAFFIC LIGHTS.

24   Q.   SO HAD YOU STARTED FROM ANY OTHER LOCATION ON MARIANO

25   OTERO, THOSE DIRECTIONS WOULD NOT HAVE TAKEN YOU TO THE HOUSE

15-56

1  HE WAS DESCRIBING?

2  A.   IT WOULD HAVE HAD TO HAVE BEEN SOMEPLACE IN THIS AREA,

3  YES.

4  Q.   WHAT IS THE SMALL STREET AT THE INTERSECTION WHERE YOUR

5  DIRECTIONS BEGAN?

6  A.   LOPE DE VEGA HITS THE LATERAL RIGHT ABOUT HERE.

7  Q.   THANK YOU VERY MUCH.   WOULD YOU RETURN.

8        (WITNESS RESUMED THE WITNESS STAND.)

9        NOW AT ANY POINT DURING THE PERIOD THAT YOU

10 SUPERVISED AGENT CAMARENA, DID HE EVER REPORT TO YOU THAT HE

11 HAD BEEN TO A RESIDENCE AT 881 LOPE DE VEGA?

12 A.   NO, SIR.

13 Q.   HAD HE BEEN TO THAT RESIDENCE IN PURSUIT OF HIS

14 INVESTIGATIONS, WOULD HE NORMALLY HAVE REPORTED THAT TO YOU?

15 A.   YES, SIR.

16 Q.   AT ANY TIME DURING THE PERIOD THAT YOU SUPERVISED AGENT

17 CAMARENA, DID HE EVER INFORM YOU THAT HE HAD BEEN INTERROGATED

18 BY NARCOTICS TRAFFICKERS?

19 A.   NO, SIR.

20 Q.   WOULD THAT HAVE BEEN THE KIND OF THING HE WOULD HAVE HAD

21 TO INFORM YOU OF IN THE COURSE OF HIS DUTIES?

22 A.   YES, IT WOULD HAVE BEEN.

23 Q.   IS THERE INFORMATION PROVIDED BY AGENT CAMARENA ON THE

24 TAPE -- WELL, STRIKE THAT.

25        MAY I HAVE JUST A MOMENT, YOUR HONOR?

1       (BRIEF PAUSE.)

2              AT SOME POINT ON THE TAPE DOES AGENT CAMARENA REFER

3   TO YOU?

4   A.   YES, HE DOES.

5   Q.   IN PARTICULAR, DOES HE REFER TO A FRIEND OF YOURS, AS

6   WELL, AS SOMEONE WHO HAS A MUNICIPAL POSITION IN MEXICO CITY?

7   A.   HE REFERS TO ME ON TWO SEPARATE OCCASIONS.  ON ONE

8   OCCASION IT IS SOMEONE WHO HAD A POLITICAL -- IT IS IN

9   REFERENCE TO SOMEONE WHO HAD A POLITICAL POSITION.

10  Q.   WAS YOUR ASSOCIATION WITH THAT INDIVIDUAL WELL KNOWN?

11  A.   NO, IT WAS NOT.

12  Q.   DID AGENT CAMARENA KNOW OF THAT?

13  A.   YES, HE DID.

14  Q.   ON THE TAPE, DOES AGENT CAMARENA PROVIDE DIRECTIONS TO THE

15  HOUSE OF AGENT VICTOR WALLACE?

16  A.   YES, HE DOES.

17  Q.   AGAIN, WAS THAT INFORMATION MAINTAINED IN STRICTEST

18  CONFIDENCE WITHIN THE D.E.A.?

19  A.   AS CLOSE AS POSSIBLE, YES, SIR.

20  Q.   DID AGENT CAMARENA KNOW OF THAT?

21  A.   YES, HE DID.

22  Q.   AT SOME POINT ON THESE TAPES ALSO, DOES CAMARENA DESCRIBE

23  THE --

24          MR. MEZA:  OBJECT TO THE LEADING NATURE OF THE

25  QUESTION.

15-58

1           THE COURT:  RESTATE YOUR QUESTION.

2   BY MR. CARLTON:

3   Q.    DOES AGENT CAMARENA EVER DESCRIBE THE OPERATIONS OF THE

4   GUADALAJARA OFFICE OF THE D.E.A. ON THESE TAPES?

5   A.    YES, HE DOES.

6   Q.    DO YOU RECALL WHAT HE SAID ABOUT THOSE OPERATIONS?

7   A.    I BELIEVE HE MADE REFERENCE TO THE NUMBER OF AGENTS

8   STATIONED AT THE OFFICE AND WHAT THEY WERE -- WHAT THEIR JOBS

9   WERE, WHAT THEY WERE ENGAGED IN AT THE TIME.

10  Q.    THE INVESTIGATIONS THEY WERE WORKING ON?

11  A.    YES.

12  Q.    WAS THAT INFORMATION ACCURATE?

13  A.    YES, IT WAS.

14  Q.    WAS THIS INFORMATION THAT WAS ALSO MAINTAINED WITHIN THE

15  STRICTEST CONFIDENCE WITHIN THE D.E.A.?

16  A.    YES, IT WAS.

17  Q.    DID AGENT CAMARENA HAVE ACCESS TO THAT INFORMATION?

18  A.    YES, HE DID.

19  Q.    AT SOME POINT ON THE TAPES DOES AGENT CAMARENA REFER TO A

20  PAYCHECK THAT HAD NOT BEEN DEPOSITED IN HIS ACCOUNT?

21  A.    YES, HE DID.

22  Q.    WHAT DOES HE SAY ABOUT THAT?

23  A.    THAT THE --

24           MR. MEZA:  OBJECTION, YOUR HONOR.  THE TAPE SPEAKS

25  FOR ITSELF.

15-59

1           THE COURT:  SUSTAINED.

2    BY MR. CARLTON:

3    Q.   WERE THESE STATEMENTS BY AGENT CAMARENA -- WELL, STRIKE

4    THAT.

5           BASED ON YOUR KNOWLEDGE OF AGENT CAMARENA, YOUR

6    KNOWLEDGE OF THE OPERATIONS OF THE D.E.A.'S GUADALAJARA OFFICE

7    DURING THE PERIOD, YOUR HAVING LISTENED TO THESE TAPES AND THE

8    INFORMATION CONTAINED ON THEM, DO YOU HAVE AN OPINION AS TO

9    WHAT THESE TAPES ARE, WHAT THEY RECORD?

10          MR. STOLAR:  OBJECTION.  NO BASIS FOR THAT OPINION.

11          THE COURT:  OBJECTION SUSTAINED.

12   BY MR. CARLTON:

13   Q.   DO YOU HAVE AN OPINION BASED ON THE INFORMATION ON THESE

14   TAPES AS TO WHEN THESE RECORDINGS WERE MADE?

15   A.   YES, I DO.

16   Q.   AND WHAT IS THAT OPINION?

17   A.   WITHIN A DAY OR TWO AFTER AGENT CAMARENA'S ABDUCTION.

18   Q.   AT SOME POINT DID YOU MEET WITH AN INDIVIDUAL NAMED RUBEN

19   ZUNO ARCE?

20   A.   YES, I DID.

21   Q.   WHEN WAS THAT?

22   A.   SEPTEMBER THE 26TH 1986.

23   Q.   WHERE DID YOU MEET WITH HIM?

24   A.   AT JIM'S RESTAURANT, NORTH SIDE OF SAN ANTONIO, SAN

25   ANTONIO, TEXAS.

15-60

1    Q.    DID MR.  -- DID SOMEONE ARRANGE THAT MEETING FOR YOU?

2    A.    YES.

3    Q.    WHO WAS THAT?

4    A.    EX-D.E.A. AGENT ART RODRIGUEZ.

5    Q.    WAS ANYONE ELSE PRESENT DURING YOUR MEETING WITH MR. ZUNO

6    ARCE?

7    A.    ART RODRIGUEZ.

8    Q.    NOW, DURING THAT MEETING WITH MR. ZUNO ARCE, DID YOU

9    DISCUSS THE RESIDENCE AT 881 LOPE DE VEGA?

10   A.    YES, I DID.

11   Q.    DID HE SAY WHETHER HE OWNED THAT RESIDENCE?

12   A.    HE SAID HE HAD OWNED IT, YES.

13   Q.    DID HE SAY WHEN HE HAD COME TO OWN THAT RESIDENCE?

14   A.    I BELIEVE THAT HE SAID HE ACQUIRED IT SOME 25 YEARS

15   PREVIOUSLY.  I THINK UPON HIS MARRIAGE.

16   Q.    DID HE INDICATE TO YOU FROM WHOM HE HAD ACQUIRED THE

17   RESIDENCE?

18   A.    IT WAS A GIFT FROM HIS MOTHER, I BELIEVE.

19   Q.    DID HE SAY WHEN HE ACQUIRED IT WHETHER THERE WERE ANY

20   BUILDINGS ON THE PROPERTY?

21   A.    THAT THERE WERE NO BUILDINGS ON THE PROPERTY.

22   Q.    AND DID HE SAY WHETHER HE HAD CONSTRUCTED OR HAD

23   CONSTRUCTED ANY BUILDINGS ON THE PROPERTY?

24   A.    HE HAD THEM CONSTRUCTED, YES.

25   Q.    DID HE DESCRIBE WHICH BUILDINGS HE HAD CONSTRUCTED?

15-61

1    A.   THE HOUSE.   I GUESS THE HOUSE AND OUT BUILDINGS AND THE

2    SWIMMING POOL.

3    Q.   DID HE INDICATE WHETHER HE HAD ACQUIRED OTHER PROPERTY

4    ADJACENT TO THE PROPERTY HIS MOTHER HAD GIVEN HIM AT THAT

5    LOCATION?

6    A.   HE SAID HE HAD ACQUIRED AN ADJOINING PIECE OF PROPERTY AND

7    HAD A TENNIS COURT BUILT ON IT.

8    Q.   NOW, DID MR. ZUNO ARCE TELL YOU WHETHER AT SOME POINT HE

9    HAD MOVED TO THE UNITED STATES?

10   A.   YES, HE DID.

11   Q.   DID HE SAY WHEN HE MOVED TO THE UNITED STATES?

12   A.   1978.

13   Q.   DID HE SAY WHETHER HE HAD LIVED IN THE UNITED STATES

14   DURING SOME PERIOD?

15   A.   FROM 1978 UNTIL 1982.

16   Q.   AND DID HE TELL YOU WHAT HE DID IN 1982?  DID HE RETURN TO

17   MEXICO?

18   A.   HE RETURNED TO MEXICO, YES.

19   Q.   DID HE TELL YOU WHAT HE DID WITH THE PROPERTY AT 881 LOPE

20   DE VEGA WHILE LIVING IN THE UNITED STATES?

21   A.   THAT HE HAD LEASED IT, RENTED IT.

22   Q.   DID HE TELL YOU DURING WHAT PERIOD HE CONTINUED TO RENT OR

23   LEASE THAT PROPERTY?

24   A.   I BELIEVE IT WAS LEASED UNTIL MAY OF 1984.

25   Q.   DID HE TELL YOU WHAT HAPPENED IN MAY OF 1984 WITH REGARD

1    TO THE PROPERTY?

2    A.    THE RENTER MOVED OUT AND HE HAD SOME REPAIRS DONE TO THE

3    HOUSE, AND I BELIEVE HE HAD IT REFURNISHED.

4    Q.    NOW, DID MR. ZUNO ARCE TELL YOU WHERE HE LIVED AFTER HIS

5    RETURN TO MEXICO IN 1982?

6    A.    I DON'T RECALL THAT, SIR.

7    A.    HE SAID HE STAYED IN THE HOUSE THREE OR FOUR TIMES.

8    Q.    THE HOUSE AT 881 LOPE DE VEGA?

9    A.    YES, SIR.

10   Q.    DID HE TELL YOU WHETHER HE EVENTUALLY SOLD THAT PIECE OF

11   PROPERTY?

12   A.    YES, HE DID.

13   Q.    WHAT DID HE SAY ABOUT THAT?

14   A.    HE SAID THAT HE SOLD THE PROPERTY TO A MR. RUBEN SANCHEZ

15   BARBA; THAT THEY MET, I BELIEVE, DECEMBER THE 22ND OF 1984 TO

16   DISCUSS THE SALE.

17   Q.    DID HE SAY WHEN THE SALE WAS ACTUALLY CONSUMMATED?

18   A.    THAT THEY HAD PLANNED TO MEET JANUARY THE 5TH OF 1985 TO

19   COMPLETE THE SALE, THE TRANSACTION, BUT THEY ACTUALLY MET ON

20   JANUARY 9TH OF 1985.

21   Q.    DID HE TELL YOU WHERE THEY MET?

22   A.    I SUPPOSE AT THE OFFICE OF NOTARY NUMBER ONE IN AMECA,

23   JALISCO.

24   Q.    AND DID HE INDICATE THAT THE TRANSACTION WAS FINALIZED AT

25   THAT TIME?

15-63

1   A.   THAT'S WHAT HE SAID.  YES, SIR.

2            MR. CARLTON:  YOUR HONOR, I WOULD MOVE AT THIS

3   TIME -- STRIKE THAT.

4            MAY I HAVE JUST A MOMENT?

5            (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

6            MR. CARLTON:  NOTHING FURTHER OF THIS WITNESS.

7            THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

8                         CROSS-EXAMINATION +

9   BY MR. MEDVENE:

10  Q.   GOOD MORNING, MR. KUYKENDALL, SIR.

11  A.   GOOD MORNING.

12  Q.   MR. KUYKENDALL, IN AUGUST OF '86, SHORTLY BEFORE THE

13  OCCASION THAT YOU INTERVIEWED ZUNO ARCE, DID YOU OFFER THROUGH

14  ART RODRIGUEZ TO GO TO MEXICO TO TALK TO HIM?

15           MR. CARLTON:  OBJECTION, YOUR HONOR.  RELEVANCE AND

16  HEARSAY.

17           THE COURT:  OVERRULED.

18           THE WITNESS:  I REALLY DON'T RECALL, SIR.  MAYBE.

19  BY MR. MEDVENE:

20  Q.   DID YOU GET WORD FROM MR. RODRIGUEZ THAT MR. ZUNO WOULD BE

21  PLEASED TO COME TO THE UNITED STATES AND MEET WITH YOU?

22  A.   YES.

23  Q.   MR. RODRIGUEZ, AS YOU SAID, WAS A FORMER D.E.A. AGENT; IS

24  THAT CORRECT?

25  A.   YES, HE IS.

15-64

1     Q.   TO YOUR KNOWLEDGE, A FRIEND OF ENRIQUE CAMARENA?

2              MR. CARLTON:  OBJECTION, YOUR HONOR.  FOUNDATION AND

3     RELEVANCY.

4              THE COURT:  YOU MAY ANSWER.

5              THE WITNESS:  HE KNEW HIM.  YES, SIR.

6     BY MR. CARLTON:

7     Q.   NOW, YOU DIDN'T THREATEN MR. ZUNO IN ANY WAY THAT HE HAD

8     TO COME TO THE UNITED STATES, DID YOU?

9     A.   NO, SIR.

10    Q.   THERE WAS NO WARRANT OUT FOR HIS ARREST, WAS THERE?

11    A.   NO, SIR.

12    Q.   YOU ASKED IF HE WOULD COME AND HE VOLUNTARILY CAME TO MEET

13    YOU IN SAN ANTONIO; IS THAT TRUE?

14    A.   YES, IT IS.

15    Q.   NOW WHEN HE ARRIVED, HE SAID HE WOULD BE PLEASED TO ANSWER

16    WHATEVER QUESTIONS YOU HAVE; IS THAT CORRECT?

17    A.   HE DID.

18    Q.   HE DIDN'T REFUSE TO ANSWER ANY QUESTIONS.

19    A.   NO, SIR.

20    Q.   HE ANSWERED, TO THE BEST OF YOUR KNOWLEDGE, ALL YOUR

21    QUESTIONS FULLY?

22             MR. CARLTON:  OBJECTION, YOUR HONOR.  LACK OF

23    FOUNDATION.

24             THE COURT:  OVERRULED.

25             THE WITNESS:  HE ASKED (SIC) THE QUESTIONS I PUT TO

1    HIM, YES, SIR.  ANSWERED THE QUESTIONS.  I'M SORRY.

2    BY MR. MEDVENE:

3    Q.    BEFORE HE ANSWERED THE QUESTIONS, HE DIDN'T ASK FOR ANY

4    IMMUNITY, DID HE?

5    A.    NO, SIR.

6    Q.    HE DIDN'T ASK FOR ANY MONEY, DID HE?

7    A.    NO.

8    Q.    HE DIDN'T ASK TO RELOCATE HIS FAMILY, DID HE?

9    A.    NO.

10   Q.    YOU ASKED HIM QUESTIONS AND HE ANSWERED THEM?

11   A.    THAT'S CORRECT.

12   Q.    NOW, AT THE END OF THE INTERVIEW, MR. ZUNO TOLD YOU IN

13   SUBSTANCE THAT IF YOU WANTED ANYTHING FURTHER OF HIM TO, CALL

14   AND WE WOULD COME BACK AND BE OF WHATEVER ASSISTANCE HE COULD;

15   IS THAT CORRECT?

16   A.    I DON'T RECALL, BUT POSSIBLY SO.

17   Q.    YOU TOLD MR. ZUNO AT THE CONCLUSION OF YOUR MEETING THAT

18   HE COULD LEAVE AND RETURN TO MEXICO?

19   A.    THAT'S CORRECT.

20   Q.    AND YOU TOLD HIM HE COULD RETURN TO MEXICO BECAUSE BASED

21   ON YOUR OFFICE'S INVESTIGATION, THERE WAS NO EVIDENCE THAT

22   MR. ZUNO WAS IN ANY WAY INVOLVED IN THE KIDNAPPING OF ENRIQUE

23   CAMARENA; IS THAT CORRECT?

24   A.    I DON'T RECALL HAVING SAID THAT, SIR.

25   Q.    SIR, I'M ASKING YOU IF IT ISN'T TRUE THAT YOU -- NOT WHAT

15-66

1    YOU SAID TO HIM, BUT ISN'T IT TRUE THAT YOU PERMITTED HIM TO

2    RETURN TO MEXICO BECAUSE BASED ON YOUR OFFICE'S INVESTIGATION,

3    THERE WAS NO EVIDENCE HE WAS INVOLVED IN THE KIDNAPPING OF

4    ENRIQUE CAMARENA.  ISN'T THAT SO, SIR?

5              MR. CARLTON:  OBJECTIONION.  LACK OF PERSONAL

6    KNOWLEDGE.

7              THE COURT:  OVERRULED.

8    BY MR. MEDVENE:

9    Q.   THAT'S TRUE, ISN'T IT, SIR?

10   A.   I WOULD HAVE TO SAY I DIDN'T KNOW ANYTHING, SIR.

11   Q.   IN ADDITION, THERE WAS NO EVIDENCE THAT YOU KNEW OF THAT

12   HE WAS A MEMBER OF WHAT HAS BEEN CALLED THE GUADALAJARA DRUG

13   CARTEL?  THAT'S TRUE, TOO, SIR, ISN'T IT?

14   A.   NOT TO MY KNOWLEDGE, NO.

15   Q.   YOU WERE SUPERVISOR TO THE GUADALAJARA OFFICE?

16   A.   YES.

17   Q.   WHAT YEARS?

18   A.   FROM FEBRUARY OF '82 UNTIL OCTOBER OF '85.

19   Q.   AND YOUR BASIC JOB THERE WAS TO FIND OUT WHO WAS DEALING

20   IN DRUGS?

21   A.   YES.

22   Q.   HAD A MYRIAD -- LOTS OF INFORMANTS THAT SUPPLIED

23   INFORMATION, CORRECT?

24   A.   YES.

25   Q.   NOW, WITH RESPECT TO YOUR DISCUSSION WITH MR. ZUNO ABOUT

1    THE HOUSE, HE TOLD YOU, IN SUBSTANCE, THAT HE HAD INHERITED THE

2    PROPERTY MANY YEARS AGO FROM HIS MOM OR DAD?

3    A.    THAT IT HAD BEEN GIVEN TO HIM, RIGHT, BY HIS PARENTS.

4    Q.    YES, SIR.    THAT HE BUILT THE HOUSE THAT WAS ON THAT

5    LOCATION IN APPROXIMATELY 1970?

6    A.    I DON'T THINK HE TOLD ME THE DATE, BUT THAT HE HAD BUILT

7    THE BUILDING ON THE PROPERTY, THE HOUSE ON THE PROPERTY, YES.

8    Q.    MANY YEARS BEFORE?

9    A.    RIGHT.

10   Q.    THAT HE LEASED THE ENTIRETY OF THE PROPERTY TO AN

11   INDIVIDUAL WHO HE GAVE YOU HIS NAME FROM SOMETIME IN 1978 TO

12   APPROXIMATELY MAY OF '84?

13   A.    THAT IS CORRECT.

14   Q.    AND HE GAVE YOU THE PERSON'S NAME IN CASE YOU WANTED TO

15   CHECK WITH THAT PERSON?

16   A.    YES, HE DID.

17   Q.    HE TOLD YOU SUBSEQUENT TO MAY OF '84 THAT WHEN THE TENANT

18   LEFT, THAT HE MIGHT HAVE SLEPT AT THAT HOUSE ON THREE OR FOUR

19   OCCASIONS?

20   A.    THAT'S WHAT HE SAID, YES, SIR.

21   Q.    THAT SOMETIME IN OR ABOUT DECEMBER, HE SOLD THE HOUSE OR

22   ENTERED INTO A SALES ARRANGEMENT TO SELL THE HOUSE TO DR. RUBEN

23   SANCHEZ BARBA?

24   A.    YES, THAT'S RIGHT.

25   Q.    NOW, YOU KNEW FROM YOUR INVESTIGATION AT THE TIME YOU HAD

15-68

1    SEEN MR. ZUNO THAT AFTER RUBEN SANCHEZ BARBA ACQUIRED THE HOUSE

2    FROM MR. ZUNO, THAT SOMETIME IN MID JANUARY OF 1985 HIS BROTHER

3    JESUS ACTUALLY SHOWED THE HOUSE TO CARO QUINTERO; ISN'T THAT

4    TRUE?

5            MR. CARLTON:  OBJECTION, YOUR HONOR.  HEARSAY.

6            THE COURT:  SUSTAINED, UNLESS YOU CAN SHOW IT'S BASED

7    ON PERSONAL KNOWLEDGE.

8    BY MR. MEDVENE:

9    Q.   WAS THERE AN INVESTIGATION CONDUCTED, SIR, BY D.E.A.

10   AGENTS UNDER YOUR SUPERVISION OR THAT REPORTED GENERALLY TO YOU

11   WITH RESPECT TO THE RELATIONSHIP BETWEEN MR. JESUS SANCHEZ

12   BARBA AND CARO QUINTERO?

13   A.   NO, SIR.

14   Q.   ARE YOU AWARE OF ANY INTERVIEWS CONDUCTED BY THE D.E.A.

15   WHERE THEY QUESTIONED JESUS SANCHEZ BARBA ABOUT WHETHER OR NOT

16   AFTER HIS BROTHER OBTAINED THE HOUSE HE, JESUS, HAD SHOWN THE

17   HOUSE TO CARO QUINTERO?

18           MR. CARLTON:  OBJECTION, YOUR HONOR.  TO ANSWER THE

19   QUESTION, YOU HAVE TO GET IN HEARSAY AND THIS IS BEYOND THE

20   SCOPE OF THE DIRECT.

21           THE COURT:  OVERRULED.  THE QUESTION, THE FORM OF THE

22   QUESTION IS IMPROPER.  YOU SHOULD RESTATE YOUR QUESTION.

23           MR. MEDVENE:  YES, SIR.

24   BY MR. MEDVENE:

25   Q.   AS A RESULT OF YOUR OFFICE'S INVESTIGATION, MR.

15-69

1    KUYKENDALL, YOU WERE AWARE, WERE YOU NOT, THAT AT SOME POINT IN

2    TIME JESUS SANCHEZ BARBA WAS INTERVIEWED BY D.E.A. AGENTS?

3    A.    IT WAS NOT A RESULT OF MY OFFICE'S INVESTIGATION, SIR.

4    Q.    BUT IT WAS -- BUT THERE WAS A D.E.A. INTERVIEW OF JESUS

5    SANCHEZ BARBA, TO YOUR KNOWLEDGE, SOMETIME IN 1985; IS THAT

6    TRUE?

7    A.    I THINK SO, YES, SIR.

8              MR. CARLTON:  OBJECTION, YOUR HONOR.  MOVE TO STRIKE,

9    LACK OF FOUNDATION.

10             THE COURT:  WELL, DO YOU THINK SO OR DO YOU KNOW?

11             THE WITNESS:  I'M NOT CERTAIN, SIR.  I DIDN'T

12   PARTICIPATE IN THAT.

13             THE COURT:  THEN THE ANSWER MAY BE STRICKEN.

14   BY MR. MEDVENE:

15   Q.    DO YOU KNOW A SPECIAL AGENT WILLIAM COONCE, C O O N C E?

16   A.    YES, I DO.

17   Q.    AND YOU KNOW THAT HE WAS WORKING OR ASSISTING IN VARIOUS

18   PHASES OF WHAT WE MIGHT CALL THE CAMARENA INVESTIGATION IN

19   1985; IS THAT CORRECT?

20   A.    I BELIEVE HE WAS THE HEAD OF THE INVESTIGATION.

21   Q.    AND YOU WERE VERY MUCH INVOLVED AS HEAD OF THE GUADALAJARA

22   OFFICE IN THE INVESTIGATION ALSO IN THE SPRING OF 1985.  THAT'S

23   CORRECT, ISN'T IT, SIR?

24   A.    THE SPRING OF '85, YES.

25   Q.    SO IF MR. COONCE IN MAY OF 1985 WOULD HAVE INTERVIEWED

15-70

1    JESUS SANCHEZ BARBA WITH RESPECT TO LOPE DE VEGA PROPERTY, IN

2    THE GENERAL COURSE OF EVENTS, THEY WOULD KEEP YOU ADVISED AS

3    HEAD OF THE GUADALAJARA OFFICE; ISN'T THAT TRUE?

4    A.    NOT PARTICULARLY, NO.  NOT THEN.

5    Q.    DO YOU REMEMBER AT SOME POINT BEING ADVISED THAT MR.

6    COONCE HAD SPOKEN TO JESUS SANCHEZ BARBA SOMETIME IN MAY OF

7    '85, AND JESUS SANCHEZ BARBA TOLD HIM THAT --

8            MR. CARLTON:  OBJECTION.  HEARSAY.

9            THE COURT:  SUSTAINED.

10   BY MR. MEDVENE:

11   Q.    WERE YOU AWARE OF ANY INFORMATION DEVELOPED IN THE COURSE

12   OF THE D.E.A.'S INVESTIGATION THAT THIS MAN JESUS SANCHEZ BARBA

13   AT SOME TIME AFTER HIS BROTHER ACQUIRED THE HOUSE IN JANUARY,

14   SHOWED IT TO RAFAEL CARO QUINTERO?

15           MR. CARLTON:  OBJECTION TO THE FORM OF THE QUESTION,

16   AND IT'S GETTING IN HEARSAY.

17           THE COURT:  COUNSEL, YOU SHOULD AVOID ASSERTING FACTS

18   IN YOUR QUESTION.

19           MR. MEDVENE:  YES, SIR.

20           THE COURT:  THE OBJECTION IS SUSTAINED.

21           MR. MEDVENE:  MAY I APPROACH THE WITNESS, YOUR

22   HONOR, FOR PURPOSES OF SHOWING HIM THE REPORT TO SEE IF IT

23   REFRESHES HIS RECOLLECTION?  A D.E.A. REPORT.

24           MR. CARLTON:  HE HASN'T TESTIFIED HIS RECOLLECTION

25   NEEDS REFRESHING.

15-71

1        THE COURT:  THE WITNESS NEEDS TO TESTIFY THAT HIS

2   RECOLLECTION NEEDS REFRESHING.

3        MR. MEDVENE:  I'D LIKE TO SHOW THE WITNESS THE REPORT

4   TO SEE IF HE RECALLS HAVING SEEN IT, YOUR HONOR.

5        THE COURT:  ALL RIGHT.

6   BY MR. MEDVENE:

7   Q.   I PLACED BEFORE YOU, SIR, A DOCUMENT THAT SAYS "PREPARED

8   MAY 17, 1985 BY WILLIAM R. COONCE AT WASHINGTON, D.C."  IT IS A

9   ONE-PAGE DOCUMENT.

10        THE MARKS ON THERE, SIR, ARE MINE.  THE UNDERLINING

11   IS MINE.  I JUST ASK, SIR, IF YOU REMEMBER HAVING EVER SEEN

12   THAT DOCUMENT?

13   A.   NO, SIR.  I DON'T THINK I EVER SAW THE DOCUMENT.

14   Q.   DO YOU REMEMBER EVER RECEIVING FROM WHATEVER SOURCE ANY

15   INFORMATION -- IN THAT DOCUMENT, IN PARTICULAR, ANY INFORMATION

16   THAT MIGHT HAVE DEALT WITH JESUS SANCHEZ BARBA SHOWING THE

17   HOUSE TO CARO QUINTERO?

18   A.   YES, SIR.

19   Q.   AND ARE YOU REFRESHED NOW THAT IN THE COURSE OF YOUR

20   OFFICE'S INVESTIGATION, IT WAS ASCERTAINED THAT SOMETIME

21   SUBSEQUENT TO THE SALE OF LOPE DE VEGA HOUSE BY MR. ZUNO --

22        MR. CARLTON:  I'LL OBJECT WITHOUT A FOUNDATION, YOUR

23   HONOR, TO EVEN ASKING THE QUESTION ON THE GROUNDS THAT IT'S

24   IMPROPER FORM.

25        THE COURT:  LET'S HEAR THE QUESTION.

15-72

1    BY MR. MEDVENE:

2    Q.   LET ME TRY AGAIN.

3         ARE YOU REFRESHED NOW, SIR, THAT --

4         THE COURT:   HE DIDN'T LOOK AT THAT TO REFRESH

5    ANYTHING EXCEPT TO DETERMINE WHETHER HE RECALLED IT, WHETHER HE

6    RECALLED EVER HAVING SEEN IT.   THAT WAS THE PURPOSE FOR WHICH

7    YOU ASKED TO SHOW IT TO HIM.

8         MR. MEDVENE:   ALL RIGHT, SIR.

9    BY MR. MEDVENE:

10   Q.   IS IT TRUE, SIR, THAT AS A RESULT OF THE D.E.A.

11   INVESTIGATION, TO YOUR KNOWLEDGE, THEY ASCERTAINED THAT

12   SOMETIME AFTER THE HOUSE HAD BEEN SOLD BY MR. ZUNO, JESUS

13   SANCHEZ BARBA SOMETIME IN JANUARY OF 1985 SHOWED THE HOUSE TO

14   CARO QUINTERO?

15        MR. CARLTON:   OBJECTION.   LACK OF FOUNDATION.

16        THE COURT:   OVERRULED.   YOU MAY ANSWER.

17        THE WITNESS:   I BELIEVE THAT I LEARNED THAT A HOUSE

18   HAD BEEN SHOWN TO RAFAEL CARO QUINTERO.   I'M NOT CERTAIN THAT I

19   KNEW IT WAS JESUS SANCHEZ BARBA THAT SHOWED IT.

20   BY MR. MEDVENE:

21   Q.   DOES THAT DOCUMENT REFRESH YOUR RECOLLECTION THAT IT WAS

22   JESUS SANCHEZ BARBA THAT SHOWED IT?

23   A.   IT WAS A MEMBER OF THAT FAMILY, SIR, BUT THE NAME, I'M NOT

24   CERTAIN ABOUT THE NAME.

25   Q.   JESUS SANCHEZ BARBA OR A MEMBER OF HIS FAMILY; IS THAT

15-73

1    WHAT YOU'RE SAYING?

2    A.   YES, YES.

3    Q.   AND IS IT ALSO TRUE THAT YOU ASCERTAINED IN THE COURSE OF

4    YOUR INVESTIGATION THAT AFTER THAT MEETING, QUINTERO HAD TOLD

5    JESUS SANCHEZ BARBA THAT THE HOUSE --

6          MR. CARLTON:   OBJECTION.  HEARSAY.

7    BY MR. MEDVENE:

8    Q.   -- THAT THE HOUSE SHOULD BE REMODELED BEFORE HE WOULD BE

9    INVOLVED WITH THAT HOUSE?

10          MR. CARLTON:   I REITERATE THE HEARSAY OBJECTION, YOUR

11   HONOR.

12          THE COURT:   SUSTAINED.

13   BY MR. MEDVENE:

14   Q.   YOU DID ASCERTAIN, DID YOU NOT, SIR, IN THE COURSE OF YOUR

15   INVESTIGATION THAT SOMETIME AFTER THE SALE OF THE HOUSE BY

16   MR. ZUNO SOMETIME IN JANUARY, THERE WERE EXTENSIVE REPAIRS AND

17   REMODELING DONE TO THE LOPE DE VEGA HOUSE DONE THROUGH JESUS

18   SANCHEZ BARBA?

19          MR. CARLTON:  OBJECTION.  LACK OF FOUNDATION.  CALLS

20   FOR HEARSAY.

21          THE COURT:   OVERRULED.

22   BY MR. MEDVENE:

23   Q.   IS THAT TRUE, SIR?

24   A.   THE INVESTIGATION REVEALED THAT; I DIDN'T.

25   Q.   BUT THE INVESTIGATION REVEALED IT; IS THAT CORRECT, SIR?

15-74

1              MR. CARLTON:  OBJECTION.  MOVE TO STRIKE.

2              THE COURT:  OVERRULED.

3    BY MR. MEDVENE:

4    Q.   THE INVESTIGATION REVEALED THAT; IS THAT CORRECT?

5    A.   AS FAR AS I KNOW, YES, SIR.

6              MR. MEDVENE:   IF THE COURT PLEASE, THE WITNESS, I

7    UNDERSTAND, IS FROM A DISTANCE.  MAY I TAKE ONE MINUTE TO GO

8    OUTSIDE THE DIRECT FOR PURPOSES OF JUST INTRODUCING TWO

9    DOCUMENTS?

10             THE COURT:  IF IT'S BRIEF, I'LL PERMIT IT.

11             MR. MEDVENE:  YES, SIR.  IT WILL BE BRIEF.

12   BY MR. MEDVENE:

13   Q.   IN CONNECTION WITH THE ZACATECAS INVESTIGATION YOU TOLD US

14   ABOUT YOUR FIRST TIME HERE, YOU PREPARED OR CO-SIGNED ON

15   CERTAIN REPORTS; IS THAT CORRECT?

16   A.   YES, IT IS.

17   Q.   MAY I APPROACH, YOUR HONOR?  I APPROACH WITH WHAT HAS BEEN

18   MARKED G AND WHAT HAS BEEN MARKED H.

19             G, SIR, PURPORTS TO BE A DOCUMENT PREPARED JANUARY

20   13, 1984, SIGNED BY ENRIQUE CAMARENA AND YOURSELF.

21             AND LET'S TALK ABOUT THAT DOCUMENT FIRST AND THEN

22   WE'LL TALKING ABOUT H.  JUST BRIEFLY, WHAT IS G?

23   A.   IT IS A D.E.A.-6, WHICH IS A DRUG ENFORCEMENT

24   ADMINISTRATION REPORT OF INVESTIGATION, AND IT IS CONCERNING

25   THE LOCATION OF LARGE MARIJUANA FIELDS IN THE STATE OF

15-75

1   ZACATECAS, MEXICO, PREPARED AND SIGNED BY SPECIAL AGENT ENRIQUE

2   CAMARENA, AND I APPROVED IT.

3   Q.   DOES THAT PURPORT TO LIST SOME TEN GROUPS THAT WERE THE

4   CULTIVATORS OF MARIJUANA IN ZACATECAS IN 1984?

5           MR. CARLTON:  HEARSAY, YOUR HONOR.

6           THE COURT:  OVERRULED.

7           THE WITNESS:  IT IS A REPORT COMPILED OF INFORMATION

8   GIVEN TO US BY INFORMANTS THAT PURPORT TO CONTAIN MEMBERS OF

9   GROUPS OF CULTIVATORS IN ZACATECAS.

10  BY MR. MEDVENE:

11  Q.   YES.  AND YOU ALSO HAVE BEFORE YOU WHAT HAS BEEN MARKED H.

12  THAT'S WRITTEN IN LONGHAND.  IS THAT YOUR HAND?

13  A.   IT'S BLOCK LETTERS.  IT IS MY HANDWRITING.

14  Q.   WHAT DOES THAT PURPORT TO BE?

15  A.   THIS IS A HANDWRITTEN -- SEVERAL HANDWRITTEN PAGES OF

16  INFORMATION THAT I TURNED OVER TO THE MEXICAN AUTHORITIES

17  BEFORE THE RAIDS IN ZACATECAS IN MAY OF 1984.

18  Q.   WHAT DOES IT PURPORT TO LIST; THE FINANCIERS?

19  A.   THE FINANCIERS, FOREMEN, LOCATIONS, THEN SOME MORE

20  INFORMATION HERE ABOUT PEOPLE INVOLVED, AND SOME OF THE

21  GROWERS.

22          MR. MEDVENE:  THANK YOU, SIR.  I WOULD MOVE INTO

23  EVIDENCE G AND H, YOUR HONOR.

24          MR. CARLTON:  OBJECTION TO HEARSAY, YOUR HONOR.

25          THE COURT:  OBJECTION SUSTAINED.

15-76

1   BY MR. MEDVENE:

2   Q.   WITH RESPECT TO G, THE D.E.A. REPORT, A LISTING OF THE

3   MARIJUANA GROWERS, MR. ZUNO IS NOT LISTED; IS THAT CORRECT?

4            MR. CARLTON:  OBJECTION.  CALLS FOR A REPEAT --

5            THE COURT:  OVERRULED.

6   BY MR. MEDVENE:

7   Q.   IS THAT CORRECT?

8   A.   NO, HE'S NOT.

9   Q.   LET'S TALK ABOUT H, FINANCIERS, FOREMEN, WHATEVER ELSE YOU

10  SAID, HAVING TO DO WITH THESE DRUGS.

11           NO MR. ZUNO; IS THAT CORRECT?

12  A.   THAT IS CORRECT.

13           MR. MEDVENE:  THANK YOU, SIR.  NOTHING MORE, YOUR

14  HONOR.

15           THE COURT:  ALL RIGHT.

16           MR. MEDRANO:  MAY WE HAVE JUST ONE MOMENT, YOUR

17  HONOR?

18           THE COURT:  YES.  DO YOU HAVE SOME QUESTIONS OF THIS

19  WITNESS?

20                    CROSS-EXAMINATION +

21  BY MR. STOLAR:

22  Q.   JUAN RAMON MATTA OR MATTA BALLESTEROS' NAME IS ALSO NOT

23  LISTED AS BEING A GROWER OR FINANCIER IN CONNECTION WITH THE

24  THE MARIJUANA THAT FIELDS; IS IT?

25  A.   NO, SIR.

15-77

1    Q.    AND IN CONNECTION WITH THE ZACATECAS -- WELL, WITHDRAWN.

2              WHEN AGENT CAMARENA -- YOU SAY YOU SUPERVISED HIM; IS

3    THAT RIGHT?   THAT WAS YOUR DIRECT TESTIMONY HERE?

4    A.    YES, IT WAS.

5    Q.    WHEN HE WORKED ON CASES, HE PREPARED REPORTS; DID HE NOT?

6    D.E.A.-6'S, LIKE YOU'VE SPOKEN ABOUT?

7    A.    MOST OF THE TIME.

8    Q.    OKAY.  AND YOU WOULD CO-SIGN -- YOU WOULD BE THE APPROVER?

9    BOX 14 SAYS "APPROVED BY"; IS THAT RIGHT?

10   A.    YES.

11   Q.    ONE OF THE THINGS YOU WOULD CHECK WOULD BE TO MAKE SURE

12   THAT HE GOT THE CORRECT FILE TITLE AND FILE NUMBER AND THINGS

13   OF THAT NATURE?

14   A.    YES, SIR.

15   Q.    AND THESE REPORTS OF DIFFERENT INVESTIGATIONS ALL HAD

16   DIFFERENT FILE TITLES, OR SOME OF THEM DID; IS THAT RIGHT?

17   A.    YES.

18   Q.    FOR EXAMPLE, THE FILE COULD BE CALLED JUAN JOSE QUINTERO

19   PEYEZ, ET AL., AND THAT WAS ONE CASE, IS THAT RIGHT?

20   A.    IT COULD BE.

21   Q.    OTHER FILES COULD BE DONE CALLED "OPERATION CHICKLET"; IS

22   THAT RIGHT?

23   A.    YES.

24   Q.    CAN YOU TELL US BY YOUR MEMORY, IF YOU HAVE, THE DIFFERENT

25   FILE NAMES, DIFFERENT FILE TITLES OF THE CASES THAT WERE WORKED

15-78

1    ON BY AGENT CAMARENA?

2             MR. CARLTON:  OBJECTION, YOUR HONOR.  BEYOND THE

3    SCOPE AND LACK OF RELEVANCE.

4             MR. STOLAR:   IT'S PERFECTLY RELEVANT.

5             THE COURT:  OVERRULED.

6             THE WITNESS:  I CANNOT POSSIBLY REMEMBER ALL THE FILE

7    TITLES, SIR.

8    BY MR. STOLAR:

9    Q.   IF I SHOWED YOU A NUMBER OF AGENT CAMARENA'S 6'S THAT YOU

10   CO-SIGNED WHICH, UNFORTUNATELY, HAVE THE FILE TITLES BLACKED

11   OUT ON THEM, DO YOU THINK THAT MIGHT HELP YOU REMEMBER SOME OF

12   THEM?

13            THE COURT:  IT MIGHT.

14            MR. STOLAR:  WITH YOUR PERMISSION, JUDGE.

15            THE COURT:  ALL RIGHT.

16            (DOCUMENTS TENDERED TO THE WITNESS.)

17   BY MR. STOLAR:

18   Q.   AS YOU GO THROUGH, IF YOU WOULD, IF ONE OF THEM JUMPS OUT

19   AT YOU, STATE THAT.

20            (WITNESS REVIEWING DOCUMENTS.)

21   A.   WELL, THERE ARE SEVERAL DIFFERENT CASES.

22   Q.   SEVERAL DIFFERENT CASES?

23   A.   YES.

24   Q.   DO YOU REMEMBER ANY OF THE TITLES?

25   A.   I BELIEVE ONE OF THEM WOULD HAVE BEEN ENTITLED "MANUEL

15-79

1    CHAVEZ".

2    Q.    RIGHT.

3    A.    I BELIEVE THAT THIS ONE WAS PROBABLY ENTITLED "RAFAEL CARO

4    QUINTERO".

5              THERE ARE A COUPLE HERE THAT I CANNOT RECALL EXACTLY

6    WHAT THE FILE TITLE WOULD HAVE BEEN.

7    Q.    BUT IT WOULDN'T BE ONE OF THE FOUR THAT YOU KNOW ABOUT,

8    RIGHT, IT WOULD BE SOMETHING DIFFERENT THAN THE ONES WE KNOW

9    ABOUT NOW.  OPERATION CHICKLET, JUAN JOSE QUINTERO PEYEZ,

10   RAFAEL QUINTERO, AND SO FORTH.  WE HAVE IDENTIFIED FOUR

11   DIFFERENT FILE TITLES?

12   A.    I THINK I IDENTIFIED TWO FOR YOU.  I DID ACTUALLY IDENTIFY

13   TWO FOR YOU.

14   Q.    OKAY.

15             THE COURT:  WE'LL TAKE OUR NOON RECESS AND THE

16   WITNESS CAN LOOK OVER THESE EXHIBITS AND YOU CAN RESUME YOUR

17   QUESTIONING AT 1:30.

18             THE CLERK:  PLEASE RISE.

19             (JURY EXCUSED.)

20             (COURT STANDS IN RECESS UNTIL 1:30 P.M.)

21

22

23

24

25

15-80

1        LOS ANGELES + CALIFORNIA, FRIDAY, JUNE 8, 1990

2                        + 1:30 P.M.

3        (JURY ABSENT:)

4        THE COURT:   LET THE RECORD SHOW THE COURT HAS CONVENED

5   OUTSIDE THE PRESENCE OF THE JURY WITH ALL COUNSEL AND

6   DEFENDANTS PRESENT.

7        MR. MEDVENE:   THANK YOU VERY MUCH, YOUR HONOR.

8        THE COURT:   THIS BETTER BE GOOD.

9        MR. MEDVENE:   YES.

10       THE COURT:   WHAT IS THE NEED FOR THIS?

11       MR. MEDVENE:   THE GOVERNMENT JUST GAVE US, WITHIN THE

12  LAST FIVE MINUTES, A TWO-PAGE DOCUMENT THAT THEY INDICATED MR.

13  KUYKENDALL HAD IN HIS FILE THAT HAS A LIST OF NAMES THAT THEY

14  INDICATED MR. KUYKENDALL WROTE OUT IMMEDIATELY AFTER THE --

15       THE COURT:   WILL YOU GET TO THE POINT.

16       MR. MEDVENE:   IMMEDIATELY AFTER THE ABDUCTION.

17       THE COURT:   YES.

18       MR. MEDVENE:   IT HAS MR. ZUNO'S NAME IN IT.  WE HAD

19  NEVER HAD THAT.

20       THEY TOLD US THE BASIS FOR THAT WAS THAT IN 1982,

21  THERE WAS INCIDENT UNRELATED TO THIS CASE ABOUT AN AIRCRAFT, OR

22  AN AIRCRAFT COMING IN FROM TEXAS.  AND THEY TOLD US THAT THEY

23  INTENDED, IF YOUR HONOR PERMITTED, TO GET INTO THE FACT THAT

24  MR. KUYKENDALL HAD MADE UP -- EVEN THOUGH HE'S TESTIFIED ON THE

25  STAND THAT IN 86 THERE WAS NO EVIDENCE AGAINST MR. ZUNO, THAT

15-81

1  HE MADE UP A LIST OF SUSPECTS, WHICH IS A HEARSAY LIST.  HE

2  MADE THIS UP IN 85 SOMETIME.

3       I WOULD SAY, YOUR HONOR, THAT THEY SHOULD NOT BE

4  PERMITTED TO ASK QUESTIONS ABOUT THIS LIST, BECAUSE IT'S NOT

5  ONLY HEARSAY, BUT THE TIMING OF TRYING TO GET INTO OR FORCING

6  US TO GET INTO SOME INCIDENT IN 82 HAVING TO DO WITH A PLANE IS

7  NOT RELEVANT.  IT'S NOT RELEVANT BECAUSE MR. KUYKENDALL HAS

8  ALREADY TESTIFIED THAT THEY HAD NO EVIDENCE.

9       ALL WE ASKED ABOUT WAS, IN 86:  DID YOU HAVE ANY

10  EVIDENCE AGAIN HIM?

11       AND HE SAID, "WE HAD NO EVIDENCE AGAINST HIM."

12       SO IT WOULD BE HIGHLY PREJUDICIAL AND MISLEADING,

13  WHETHER HE WAS EVER A SUSPECT OR NOT.  I THINK THEY HAD NO

14  EVIDENCE AGAINST HIM IN 86.

15       SO IT'S NOT RELEVANT ON THE TIME PERIOD, IT'S A

16  HEARSAY STATEMENT, IT'S THE FIRST TIME WE'VE GOTTEN THESE

17  D.E.A. REPORTS, YOUR HONOR, DATED FEBRUARY 26 OF 82, HAVING TO

18  DO WITH MR. ZUNO AND HIS PLANE AND COMING BACK AND FORTH INTO

19  THIS COUNTRY, HAVING NOTHING TO DO WITH THIS INCIDENT --

20       THE COURT:  COUNSEL, YOU'RE RAMBLING.  I HAVE NO IDEA

21  WHAT YOU'RE TALKING ABOUT.

22       MR. CARLTON:  MAY I EXPLAIN, YOUR HONOR?

23       THE COURT:  YES, PLEASE EXPLAIN.

24       MR. CARLTON:  WHAT COUNSEL IS TALKING ABOUT IS A

25  HANDWRITTEN LIST PREPARED BY MR. KUYKENDALL IN FEBRUARY OF

15-82

1   1985, JUST JOTTING DOWN IDEAS ABOUT THE CAMARENA INVESTIGATION,

2   INCLUDING NAMES OF SOME PEOPLE HE THOUGHT MIGHT BE SUSPECTS.

3   INCLUDED ON THAT LIST IS THE NAME RUBEN ZUNO ARCE.

4           NOW, THIS IS THE DOCUMENT THAT WAS MAINTAINED IN MR.

5   KUYKENDALL'S PERSONAL FILES ALL THIS TIME.

6           THIS INFORMATION WAS NOT ELICITED ON DIRECT TESTIMONY

7   FROM MR. KUYKENDALL, NOR ON HIS RECALLING TODAY.  WE BELIEVE

8   THAT IT WAS OPENED UP AGAINST OUR OBJECTIONS WHEN MR. MEDVENE

9   INQUIRED AS TO WHETHER THERE WAS ANY EVIDENCE THAT MR. CAMARENA

10  WAS A SUSPECT.

11          MR. MEDVENE:  NO, I DIDN'T ASK THAT QUESTION.

12          THE COURT:  JUST A MOMENT.

13          MR. CARLTON:  I'M SORRY:  MR. ZUNO WAS A SUSPECT IN

14  MR. CAMARENA'S ABDUCTION.

15          NOW, IN ORDER FOR THAT TO STAND -- THAT IS MISLEADING

16  IN LIGHT OF THE EVIDENCE THAT WE HAVE HERE THAT IN FACT --

17          THE COURT:  JUST A MINUTE.

18          MR. CARLTON:  YES.

19          THE COURT:  I THINK THAT I CAN RESOLVE THIS.

20          THE DOCUMENT THAT WAS REFERRED TO EARLIER BY THIS

21  WITNESS AND ABOUT WHICH HE WAS QUESTIONED RELATED SPECIFICALLY

22  AS TO THE ZACATECAS MARIJUANA FIELDS, WHICH IS A PART OF THE

23  HEART OF YOUR CASE HERE, THAT THE TAKING OVER OF THAT FIELD AND

24  THE DESTRUCTION OF IT FORMED THE RETALIATORY MOTIVE OF THE

25  DEFENDANTS AND THE DEFENDANTS' -- AND THIS CARTEL TO RETALIATE

1    OR, RATHER, TO GET EVEN AND TO RETALIATE AGAINST THE D.E.A. AND

2    MR. CAMARENA.

3            BECAUSE IT'S WHAT IT IS, I THINK IT WAS APPROPRIATE

4    FOR THE DEFENSE COUNSEL TO ELICIT THE FACT THAT, OF THE PEOPLE

5    DESIGNATED ON THAT LIST, THAT HIS CLIENT'S NAME WAS NOT ON IT.

6            NOW, WHAT YOU'RE OFFERING IS A SUSPICION BY THIS

7    WITNESS.  YOU COULD NOT ASK HIM DIRECTLY IF HE SUSPECTED MR.

8    ZUNO.  THAT IS AN IMPROPER QUESTION.  IF YOU HAD EVIDENCE

9    AGAINST HIM, YES.

10            THIS LIST THAT YOU'RE TALKING ABOUT YOU SAY IS A LIST

11    OF SUSPECTS THAT HE BELIEVED MIGHT BE INVOLVED.

12            MR. CARLTON:  WELL, THERE'S A BASIS FOR HIS BELIEF.

13            THE COURT:  WHAT?

14            MR. CARLTON:  THERE'S A BASIS FOR HIS BELIEF, YOUR

15    HONOR.

16            THE COURT:  THEN YOU CAN PRODUCE THE BASIS AND

17    INTRODUCE THAT, BUT I DON'T THINK THAT YOU CAN INTRODUCE THE

18    FACT THAT HE WAS A SUSPECT IN THIS WITNESS'S MIND.

19            MR. CARLTON:  WELL, THE WITNESS HAS TESTIFIED IN

20    RESPONSE TO MR. MEDVENE'S CROSS-EXAMINATION THAT THERE WAS NO

21    EVIDENCE THAT MR. ZUNO WAS A SUSPECT IN THE CAMARENA --

22            MR. MEDVENE:  I DIDN'T ASK THAT QUESTION, JUDGE.  I'LL

23    TELL YOU --

24            MR. CARLTON:  OH, YES, HE DID.

25            THE MEDVENE:  -- I ASKED, "DID YOU HAVE EVIDENCE THAT

15-84

1    HE WAS INVOLVED IN THE PLANNING OF CAMARENA?" (AS STATED.)   AND
2    THE WITNESS SAID NO.

3          THAT HAS NOTHING TO DO WITH THIS.

4          THE COURT:  ALL RIGHT.  THE OBJECTION WILL BE
5    SUSTAINED.

6          MR. MEDVENE:  THANK YOU, YOUR HONOR.

7          EXCUSE ME.  THERE'S ONE MORE QUESTION THAT WE WANT TO
8    ASK.

9          WE UNDERSTAND -- AND WE ASK WITH DUE DEFERENCE TO ONE
10   OF THE DEFENSE COUNSEL, BUT -- THAT HE WAS GOING AS TO ASK,
11   "DID YOU MAKE A LIST UP OF SUSPECTS TO SHOW THAT MATTA'S NAME
12   WASN'T MENTIONED?"

13         I APOLOGIZE TO DEFENSE COUNSEL.

14         WE DON'T THINK COUNSEL SHOULD ASK:  DID HE MAKE A LIST
15   UP?

16         IF COUNSEL WANTS TO ASK, "WAS MATTA A SUSPECT IN 82?",
17   WE OBVIOUSLY HAVE NO CONCERN WITH THAT; BUT NOT IF HE MADE UP A
18   LIST, BECAUSE AFRAID IT WILL OPEN UP THIS LIST, AND THAT'S
19   IMPROPER.

20         SO WE'RE ASKING NOW --

21         MR. STOLAR:  I HAD INTENDED AND DO INTEND TO ASK THE
22   WITNESS WHETHER, SHORTLY AFTER AGENT CAMARENA DISAPPEARED, DID
23   THE WITNESS JOT DOWN IN PERSONAL NOTES THAT LIST OF POSSIBLE
24   SUSPECTS AND POSSIBLE PLACES TO GO LOOK.  I EXPECT THE ANSWER
25   TO THAT WILL BE YES.

15-85

1        I WILL THEN ASK HIM, "MR. MATTA'S NAME IS NOT ON THAT

2   LIST, IS IT?"

3        I EXPECT THE ANSWER TO BE NO.

4        THAT'S THE TWO QUESTIONS I INTEND TO ASK.

5        MR. MEDVENE:  IF THAT'S OTHERWISE PROPER, IT SEEMS TO

6   ME ALL THAT COUNSEL HAS TO ASK IS, "DID YOU HAVE IN MIND A

7   LIST, AND WAS MR. MATTA'S NAME ON IT? "

8        THE COURT:  THE QUESTIONS HE'S GOING ASK ARE

9   APPROPRIATE.

10        MR. CARLTON:  NOW, ONE LAST POINT, YOUR HONOR.

11        I ANTICIPATE -- MAYBE MR. MEDRANO CAN TELL ME IF MY

12   INFORMATION IS INCORRECT -- THAT ON CLOSING ARGUMENT THEY'RE

13   GOING TO SEEK TO ARGUE THAT MR. ZUNO ARCE WASN'T EVEN A SUSPECT

14   UNTIL 89, THAT HE WAS QUESTIONED BY MR. KUYKENDALL IN SEPTEMBER

15   OF 1986 AND LET GOT BECAUSE NO ONE HAD ANY EVIDENCE OR

16   SUSPICIONS AGAINST HIM.

17        AND THE POINT OF ALL OF THIS IS THAT THAT'S NOT TRUE,

18   THAT HE WAS A SUSPECT TO MR. KUYKENDALL AND THERE WAS A REASON

19   FOR THAT.

20        THE COURT:  WELL, YOU CANNOT ELICIT FROM THIS WITNESS

21   WHETHER OR NOT A DEFENDANT WAS SUSPECT.  THAT IS NOT EVIDENCE

22   OF GUILT.  THAT IS ONLY EVIDENCE OF THE WITNESS'S BELIEF.

23        MR. MEDVENE:  THANK YOU.

24        MR. MEDRANO:  YOUR HONOR, THEN AT THIS TIME, MAY WE

25   RESPECTFULLY ASK THAT YOU STRIKE THE CROSS-EXAMINATION BY MR.

15-86

1    MEDVENE, WHERE HE ELICITED EXACTLY THAT FROM MR. KUYKENDALL.

2             HE ASKED HIM, "IN SEPTEMBER 86, IN YOUR MIND, WAS ZUNO

3    A SUSPECT?"

4             AND OVER OUR OBJECTION, YOU ALLOWED HIM TO ANSWER,

5    "YES."

6             MR. MEDVENE:  I DIDN'T ASK HIM THAT.

7             MR. MEDRANO:  PARDON ME.  "NO."

8             SO WE WOULD ASK, YOUR HONOR, THAT THAT PORTION AND

9    THOSE ANSWERS BE STRICKEN.  OTHERWISE, AT CLOSING ARGUMENT,

10   HE'S GOING TO ARGUE THAT HE WAS NEVER A SUSPECT.

11            MR. MEDVENE:  I SAID HE DIDN'T HAVE --

12            THE COURT:  JUST A MOMENT.  WAIT UNTIL THE TRANSCRIPT

13   IS PRODUCED AND WE'LL LOOK AT THE QUESTIONS AND THE ANSWERS.

14   THEN YOU CAN MAKE THE PROPER MOTION.

15            MR. MEDRANO:  VERY WELL, YOUR HONOR.

16            THE COURT:  LET'S GET THE JURY HERE.

17            AND, COUNSEL, IF YOU'RE INTENDING TO GO MUCH FURTHER

18   WITH THIS WITNESS, HE WAS BASICALLY CALLED AS A FOUNDATION

19   WITNESS AND TO DISCUSS THIS CONVERSATION HE HAD WITH MR. ZUNO.

20   I DON'T WANT TO GET INTO YOUR CASE AT THIS POINT.

21            I WOULD ASK YOU TO DEFER IF THIS IS GOING TO BE MUCH

22   LONGER.  ALL RIGHT?  THEN YOU CAN HAVE A CHANCE TO CALL HIM AS

23   YOUR OWN WITNESS.

24            MR. STOLAR:  IF HE'D BEEN AVAILABLE, I GUESS I COULD,

25   IF HE'D BE WILLING TO TALK AFTERWARDS.

15-87

1    I'LL KEEP IT SHORT.  ALL RIGHT?

2    THE COURT:  KEEP IT SHORT.

3    MR. MEDVENE:  IF THE COURT PLEASE, COUNSEL HAS JUST

4    TOLD ME THEY PLAN TO GO INTO AN 82 PLANE INCIDENT WITH MR. ZUNO

5    ABOUT "DID HE FLY A PLANE INTO TEXAS" THAT HAS NO RELEVANCE TO

6    THIS CASE, AND IT'S AN ACT THEY'VE JUST TOLD US ABOUT.

7    YOU'VE BEEN REAL STRONG AGAINST US ON TIMING.

8    THEY HAVE A D.E.A. REPORT IN 82 ABOUT MR. ZUNO FLYING

9    A PLANE INTO TEXAS AND SOME ALLEGATIONS ABOUT PHYSICAL THINGS..

10   THEY TOOK THIS AS A REPORT.  THEY DIDN'T ASK ANYBODY ELSE ABOUT

11   IT.

12   ONE, TIMELINESS:  THEY'D SURE HAVE TO GO FURTHER IF

13   IT'S A STATE STANDARD.

14   TWO, IT'S AN 82 INCIDENT, HAVING NOTHING TO DO WITH

15   THE KIDNAPPING, NOTHING TO DO WITH ANYTHING.

16   I DON'T THINK THEY SHOULD ASK IT.

17   MR. CARLTON:  YOUR HONOR, THIS IS DIRECTLY RELEVANT TO

18   THE ISSUE THAT WE JUST TALKED ABOUT.

19   THE COURT:  WHAT IS IT THAT --

20   MR. CARLTON:  IT'S ELICITED.  IT OPENED UP ON

21   CROSS-EXAMINATION.

22   THE INCIDENT IS THAT IN 1982 SPECIAL AGENT CAMARENA

23   PLACED A LOOKOUT ON MR. ZUNO'S AIRCRAFT, A TEX LOOKOUT, WHICH

24   MEANT THAT HIS NAME WAS THEN IN THE CUSTOMS COMPUTER WHEN HE

25   CAME INTO THE UNITED STATES.  NOW, APPARENTLY, MR. ZUNO WAS

15-88

1    STOPPED AS A RESULT OF THAT TEX LOOKOUT.

2              IN MAY OF -- APRIL OF 1982, AN INDIVIDUAL CAME INTO

3    THE D.E.A. OFFICE IN GUADALAJARA CLAIMING TO MR. KUYKENDALL AND

4    MR. CAMARENA THAT HE HAD JUST RECEIVED A TELEPHONE CALL FROM

5    MR. ZUNO THREATENING TO KILL HIM, KILL HIS SON, BECAUSE ZUNO

6    WAS SURE THAT HE WAS THE D.E.A. INFORMANT WHO HAD PUT HIS NAME

7    IN THE TEX LOOKOUT.

8              AND WHEN THIS INDIVIDUAL ASKED MR. ZUNO WHY HE HAD

9    DONE THAT, HE SAID, QUOTE/UNQUOTE, "ASK AGENT CAMARENA."

10             THIS IS 1982.  AND THAT'S WHY HE WAS A SUSPECT COME

11   FEBRUARY OF 1985.

12             MR. MEDVENE:  IT'S THE RANKEST HEARSAY, HAVING NOTHING

13   TO DO WITH THIS --

14             THE COURT:  CALM DOWN.

15             MR. CARLTON:  WE NEVER ELICITED THIS ON DIRECT.  THIS

16   WAS NOT PART OF THE --

17             THE COURT:  AND YOU'RE NOT GOING ELICIT IT NOW.

18             MR. CARLTON:  ALL RIGHT.

19             THE COURT:  BRING THE JURY IN.

20             THE CLERK:  PLEASE RISE.

21             (JURY PRESENT:)

22             THE COURT:  YOU MAY CONTINUE.

23

24      JAMES KUYKENDALL + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

25                   CROSS-EXAMINATION + (RESUMED)

15-89

1   BY MR. STOLAR:

2   Q    GOOD AFTERNOON, MR. KUYKENDALL.  BEFORE WE BROKE FOR LUNCH,

3   I ASKED YOU TO LOOK THROUGH A SERIES OF D.E.A.-6'S ON VARIOUS

4   SPECIFICATIONS THAT HAD BEEN FILED BY AGENT CAMARENA AND

5   COUNTERSIGNED BY YOU.  AND YOU ALSO LOOKED THROUGH THEM DURING

6   THE LUNCHEON RECESS FOR A BRIEF AMOUNT OF TIME; IS THAT RIGHT?

7   A    YES, I DID.

8   Q    ON ANY OF THOSE FILE TITLES, ON ALL OF THE REPORTS THAT

9   AGENT CAMARENA DID, WERE ANY OF THOSE FILE TITLES "JUAN RAMON

10  MATTA" OR "JUAN RAMON MATTA BALLESTEROS"?

11  A    NOT THE ONES YOU SHOWED ME; NO, SIR.

12  Q    NOW, IS IT TRUE THAT SHORTLY AFTER AGENT CAMARENA

13  DISAPPEARED, FOR YOUR OWN PERSONAL USE YOU JOTTED DOWN A LIST

14  OF HOT PEOPLE YOU CONSIDERED POSSIBLE SUSPECTS OR PLACES THAT

15  YOU MIGHT POSSIBLY WANT TO GO LOOK?

16  A    PEOPLE IN GROUPS.

17  Q    PEOPLE IN GROUPS.  DOES THE NAME JUAN RAMON MATTA OR JUAN

18  RAMON MATTA BALLESTEROS APPEAR ON YOUR LIST?

19  A    NO.

20  Q    YOU INDICATED YOU HAD LISTENED TO COPIAS 2 AND 4 AND

21  IDENTIFIED AGENT CAMARENA ON IT; IS THAT RIGHT?

22  A    YES.

23  Q    DID YOU EVER LISTEN TO COPIAS 1, 3 AND 5?

24  A    YES.

25  Q    IS AGENT CAMARENA'S VOICE ON THOSE?

15-90

1    A    YES.

2    Q    IS RAFAEL CARO QUINTERO'S VOICE ON THOSE?

3    A    I DON'T KNOW.

4    Q    WERE YOU ABLE TO RECOGNIZE ANY OTHER VOICES ON IT?

5    A    YES.

6    Q    NOW, FINALLY, THE D.E.A. OFFICE IN GUADALAJARA HAD A RADIO

7    COMMUNICATION SYSTEM, DID IT NOT?

8    A    YES.

9    Q    WERE YOU AWARE THAT ANY OF THE MARIJUANA TRAFFICKERS HAD

10   THE FREQUENCIES AND WERE LISTENING TO THE COMMUNICATIONS.

11            MR. CARLTON:  OBJECTION.  BEYOND THE SCOPE.

12            MR. STOLAR:  LAST QUESTION.

13            THE COURT:  OVERRULED.

14            THE WITNESS:  WE HAD HEARD RUMORS OF THAT.  WE WEREN'T

15   CERTAIN.

16            MR. STOLAR:  THANK YOU.  I HAVE NOTHING FURTHER AT

17   THIS TIME.

18            MR. MEZA:  A COUPLE OF QUESTIONS.

19                    CROSS-EXAMINATION +

20   BY MR. MEZA:

21   Q    IN COPIAS 2 AND 4, THE NAME OF THE PERSON THAT YOU WERE

22   FRIENDS WITH, WHAT WAS THE NAME THAT WAS REFERRED TO ON THE

23   TAPE?

24   A    I DON'T BELIEVE THE NAME WAS ON THERE, SIR.  I DON'T KNOW

25   THE NAME IS ON THERE.

15-91

1   Q   IT'S A NICKNAME; RIGHT?  YOU SAID THERE WAS A REFERENCE TO
2   A FRIEND?
3   A   I THINK THERE WERE REFERENCES TO TWO FRIENDS, SIR.
4   Q   HOW WERE THEY REFERRED TO ON THE TAPES?
5   A   ONE WAS REFERRED TO AS THE MAYOR OF A VILLAGE.  THE OTHER
6   ONE, I THINK HIS NAME IS ON THERE, LAST NAME.
7   Q   OKAY.  WHAT WAS THAT NAME?
8   A   OLIVEROS.
9   Q   WOULD YOU SPELL IT:  O  L  I --
10  A   V   E   R   O   S.
11  Q   NOW, YOU TOLD US YOU FOLLOWED A ROUTE WHICH WAS DESCRIBED
12  ON TAPE.  WHEN DID YOU FOLLOW THAT ROUTE?
13  A   WHILE I WAS STILL STATIONED IN GUADALAJARA.  I LEFT THERE
14  THE END OF SEPTEMBER 1985.
15  Q   OKAY.  SO SOMETIME BETWEEN AUGUST AND SEPTEMBER OF 85; IS
16  THAT RIGHT?
17  A   RIGHT.
18  Q   WHEN DID YOU LISTEN TO THE TAPE FIRST?
19  A   I LISTENED TO THE TAPES FIRST ON AUGUST THE 30TH 1985.
20  Q   IN WASHINGTON?
21  A   IN WASHINGTON.
22  Q   THEN YOU RETURNED AND FOLLOWED THE ROUTE?
23  A   RIGHT.  I WASN'T TRANSFERRED OUT UNTIL THE END OF SEPTEMBER
24  1985, AND I RETURNED ON ANOTHER OCCASION WITH SOME ASSISTANT
25  UNITED STATES ATTORNEYS AND FOLLOWED THE ROUTE AGAIN.

15-92

1    Q    NOW, HOW FAR IS IT -- DIRECTING YOUR ATTENTION TO EXHIBIT

2    84, HOW FAR IS IT, ROUGHLY, FROM WHERE YOU HAVE LOPE DE VEGA

3    INDICATED TO THE DESIGNATION OF FONSECA'S HOUSE?  HOW FAR IS

4    IT?

5    A    BETWEEN TWO TO THREE MILES, I THINK.  TWO MILES, TWO AND A

6    HALF MILES.

7    Q    WHERE'S THE AMERICAN CONSULATE IN RELATIONSHIP TO THE LOPE

8    DE VEGA HOUSE?

9    A    WELL, RETURNING ON MARIANO OTERO IN THE OPPOSITE DIRECTION

10   FROM WHICH THE ARROWS ARE POINTING.

11   Q    YOU'D BE HEADING EAST?

12   A    HEADING EAST, CORRECT.  YOU WOULD TRAVEL SOME THREE BLOCKS

13   AND REACH ANOTHER TRAFFIC CIRCLE, WHICH WOULD INTERSECT --

14   SEVERAL STREETS INTERSECT WITH THAT, COME INTO THAT TRAFFIC

15   CIRCLE.  ONE OF THEM IS CHAPULTEPEC AVENUE.

16        YOU WOULD MAKE A LEFT ON CHAPULTEPEC AVENUE AND TRAVEL

17   ABOUT FOUR BLOCKS, I SUPPOSE, AND YOU WOULD MEET LIBERTAD AND

18   TURN TO THE RIGHT ON LIBERTAD AND GO A BLOCK.

19   Q    ALL RIGHT.  THE TROUBLE THAT THE AGENTS -- THAT AGENT

20   CAMARENA MENTIONED CONCERNING THE PAYCHECKS, YOU WERE AWARE OF

21   THAT; CORRECT?

22   A    YES.

23   Q    ALL RIGHT.  DID HE EVER COME TO YOU FOR ANY MONEY?

24   A    NO.

25   Q    DID YOU LOAN HIM ANY MONEY?

15-93

1    A    NO.

2    Q    THE TAPES THAT YOU RECEIVED IN AUGUST, YOU WERE AWARE THAT

3    THERE WERE TAPES IN EXISTENCE PRIOR TO YOUR RECEIPT OF THEM;

4    ISN'T THAT RIGHT?

5    A    YES.

6    Q    AND WHEN WERE YOU FIRST MADE AWARE OF THE EXISTENCE OF

7    THESE TAPES?

8    A    APRIL THE -- (PAUSE.)

9    Q    12TH.

10   A    12TH?   11TH OR 12TH, OR RIGHT AFTER, YES.

11   Q    YOU WERE IN MEXICO CITY, WERE YOU NOT, WHEN YOU FIRST

12   RECEIVED THE INFORMATION?

13   A    NO.  I WAS IN GUADALAJARA.

14   Q    AND WHEN YOU RECEIVED THE INFORMATION CONCERNING THE

15   POSSIBLE EXISTENCE OF TAPES, YOU FLEW TO MEXICO CITY; IS THAT

16   RIGHT?

17   A    THAT'S RIGHT.

18   Q    AND YOU WENT WITH MR. KUNTZ (PHONETIC)?

19   A    I ACCOMPANIED HIM.  YES, I DID.

20   Q    WHEN YOU GOT TO MEXICO CITY, YOU MET WITH MR. WHITE, DID

21   YOU NOT?

22   A    YES, I DID.

23   Q    AND YOU DISCUSSED WITH HIM THE POSSIBLE EXISTENCE OF THESE

24   TAPES?

25   A    THAT'S CORRECT.

15-94

1    Q    AND HE SHOWED YOU A DOCUMENT, DID HE NOT, THAT CONCERNED

2    THE POSSIBLE EXISTENCE OF THESE TAPES?

3    A    I DON'T RECALL NOW IF I ACTUALLY SAW A DOCUMENT OR HE TOLD

4    ME WHAT HE HAD READ FROM THE DOCUMENT.

5    Q    DO YOU KNOW WHO GENERATED THAT DOCUMENT?

6    A    I KNOW WHAT HE TOLD ME.

7    Q    WHAT WERE YOU TOLD?

8             MR. CARLTON:  OBJECTION.  HEARSAY.

9             THE COURT:  SUSTAINED.

10   BY MR. MEZA:

11   Q    WELL, AFTER YOU WERE TOLD ABOUT THE DOCUMENT, WHAT DID YOU

12   DO NEXT?

13   A    ON THAT PARTICULAR DAY, NOTHING.

14   Q    WELL, DIDN'T THE DOCUMENT CAUSE YOU TO YOU BELIEVE THAT, IN

15   FACT, TAPES WERE IN EXISTENCE?

16             MR. CARLTON:  OBJECTION.  IRRELEVANT.

17             THE COURT:  SUSTAINED.

18   BY MR. MEZA:

19   Q    AS A RESULT OF THE INFORMATION RECEIVED FROM MR. WHITE,

20   DIDN'T YOU PURSUE -- FURTHER PURSUE -- WHETHER OR NOT THE

21   DATE -- THE DOCUMENTS, OR THE TAPES, WERE IN EXISTENCE?

22   A    YES, SIR.

23   Q    WHAT WAS THERE ABOUT THE INFORMATION THAT MR. WHITE GAVE

24   YOU THAT CAUSED YOU TO FURTHER PURSUE THE EXISTENCE OF THESE

25   TAPES?

15-95

1              MR. CARLTON:  OBJECTION.  IRRELEVANT.

2              THE COURT:  SUSTAINED.

3    BY MR. MEZA:

4    Q    ALL RIGHT.  IF YOU WOULD, MS. CLERK, EXHIBIT 63, IS THAT UP

5    HERE?  I KNOW I MADE A REQUEST EARLIER.

6              THE COURT:  YOU WISH THE WITNESS TO LOOK AT EXHIBIT

7    63?

8              MR. MEZA:  YES, YOUR HONOR.

9              (EXHIBIT PROVIDED TO DO WITNESS.)

10   BY MR. MEZA:

11   Q    SEE THAT IN FRONT OF YOU?  IT'S A PHOTOGRAPH?

12   A    RIGHT.

13   Q    ALL RIGHT.  OTHER THAN AGENT CAMERENA, YOU INDICATE YOU

14   KNOW AT LEAST ONE OF THE OTHER INDIVIDUALS, DO YOU NOT?

15   A    I KNOW ONLY ONE OF THE OTHER INDIVIDUALS.

16   Q    AND WHICH -- IS THAT PERSON IN THE PHOTOGRAPH?  IS HE THE

17   PERSON IN THE MIDDLE OR TO THE RIGHT?

18   A    IN THE MIDDLE.  THE MAN WITH GLASSES.

19   Q    WHAT IS HIS NAME?

20   A    ROBERTO VALDEZ.

21   Q    DO YOU KNOW THE NAME OF THE OTHER PERSON?

22   A    NO, I DO NOT.

23   Q    HAVE YOU EVER SEEN THAT OTHER PERSON BEFORE?

24   A    NOT TO MY KNOWLEDGE.

25             MR. MEZA:  THAT CONCLUDES THE CROSS, YOUR HONOR.

15-96

1          I HAVE -- I WOULD LIKE THIS WITNESS TO REMAIN

2     AVAILABLE AT A FUTURE TIME.  THANK YOU.

3               THE COURT:  ALL RIGHT.

4               MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

5               THE COURT:  ANY REDIRECT?

6               MR. CARLTON:  JUST A FEW QUESTIONS, YOUR HONOR.

7                    REDIRECT EXAMINATION +

8     BY MR. CARLTON:

9     Q    MR. KUYKENDALL, HOW LONG WERE YOU ACTIVELY INVOLVED IN THE

10    INVESTIGATION OF AGENT CAMARENA'S DISAPPEARANCE AND MURDER, ON

11    A DAILY BASIS?

12    A    UNTIL MAYBE THE END OF APRIL, SOMETHING LIKE THAT.

13    Q    OF 1985?

14    A    1985.

15    Q    AND THIS INVESTIGATION WAS GIVEN THE CODE NAME "LEYENDA";

16    IS THAT CORRECT?

17    A    YES, IT WAS.

18    Q    AND AFTER APRIL OF 1985, WERE YOU OFFICIALLY A PART OF THE

19    LEYENDA INVESTIGATION?

20    A    NO.

21    Q    AND AFTER THAT POINT, DID YOU HAVE REGULAR ACCESS TO THE

22    EVIDENCE AND INFORMATION OBTAINED IN THE COURSE OF THE

23    INVESTIGATION?

24    A    NO.

25    Q    WERE YOU ASKED THEN TO ASSIST THE INVESTIGATION ON AN

15-97

1    OCCASIONAL BASIS?

2    A    YES.

3    Q    NOW, TURNING TO THE LIST THAT YOU JUST TESTIFIED TO, THE

4    LIST THAT YOU PREPARED IN FEBRUARY OF 1985, WAS THAT A LIST OF

5    EVERYONE WHO WAS POTENTIALLY A SUSPECT IN AGENT CAMARENA'S

6    ABDUCTION?

7    A    NO.

8    Q    WELL, WHAT WAS THAT LIST?

9    A    THEY WERE JUST LISTS OF INDIVIDUALS AND GROUPS OF

10   INDIVIDUALS THAT I THOUGHT SHOULD BE CHECKED OUT AS SOON AS

11   POSSIBLE.

12   Q    NOT EVERYONE YOU THOUGHT SHOULD BE CHECKED OUT?

13   A    NO.

14   Q    NOW, DO YOU RECALL HOW YOUR MEETING WITH MR. ZUNO IN 1986

15   CAME ABOUT?

16   A    IT WAS MUTUALLY ARRANGED BETWEEN MYSELF AND AGENT

17   RODRIGUEZ, ART RODRIGUEZ.

18   Q    DO YOU RECALL WHETHER IT WAS SUGGESTED TO YOU?

19   A    NO, I DO NOT, SIR.

20   Q    COULD HAVE BEEN?

21   A    IT'S POSSIBLE.

22        MR. CARLTON:   JUST A MOMENT, YOUR HONOR.

23        (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

24   BY MR. CARLTON:

25   Q    WHAT OTHER NAMES WERE ON THE LIST THAT YOU PREPARED?

1          MR. MEDVENE:  OBJECTION.  RELEVANCE, MATERIALITY.

2          THE COURT:  SUSTAINED.

3          MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

5          MR. STOLAR:  SUBJECT TO FURTHER RECALL.

6          THE COURT:  YES.

7          MR. CARLTON:  WE WOULD ASK AT THIS TIME, YOUR HONOR,

8    TO PLAY THE TAPES.

9          MR. STOLAR:  THE TAPES HAVE NOT BEEN MOVED INTO

10   EVIDENCE YET; AND WHEN THEY ARE, I'D LIKE TO LODGE AN

11   OBJECTION.

12          THE COURT:  HAVE YOU OFFERED THE TAPES INTO EVIDENCE?

13   HAVE THEY BEEN RECEIVED?

14          MR. CARLTON:  IF THAT'S A PRECONDITION, I WILL NOW

15   OFFER THEM INTO EVIDENCE.

16          THE COURT:  IT IS.  I'M NOT SURE WHETHER THEY HAVE

17   BEEN OR NOT, BUT IF NOT --

18          MR. STOLAR:  THEY HAVE NOT.

19          THE COURT:  ALL RIGHT.

20          MR. STOLAR:  ALL RIGHT.  IS GOVERNMENT'S EXHIBIT 74

21   BEING OFFERED IN EVIDENCE?

22          MR. CARLTON:  WE WOULD AT THIS TIME -- AT THIS TIME,

23   YOUR HONOR, WE WOULD MOVE IN GOVERNMENT'S 82 AND 83.

24          MR. STOLAR:  WHICH ARE?

25          MR. CARLTON:  THE TWO VIDEOTAPES.

15-99

1          MS. KELLY:  OBJECTION, YOUR HONOR.

2          MR. STOLAR:  THE TAPES, THE CASSETTE TAPES FROM WHICH

3    THE VIDEOTAPE WAS MADE, HAVE NOT BEEN OFFERED IN EVIDENCE.

4          MR. CARLTON:  MOVE THOSE IN, TOO.

5          THE COURT:  WHAT ARE THEY?

6          MR. CARLTON:  EXHIBIT 75.

7          MR. STOLAR:  ALL RIGHT.  NOW, THERE'S AN OBJECTION ON

8    THE BASIS OF THE FOUNDATION AND THE CHAIN OF CUSTODY AS TO

9    THOSE TAPES COMING INTO EVIDENCE.

10          THE COURT:  WHICH TAPES?

11          MR. STOLAR:  THESE TAPES, THE ONES THEY WANT TO PLAY.

12    THE CHAIN OF CUSTODY, WE DON'T KNOW WHERE THEY CAME FROM.

13          IT STARTS WITH MR. WHITE SOMEPLACE IN MEXICO CITY.

14          THE COURT:  WHAT IS YOUR OBJECTION, THE GROUNDS?

15          MR. STOLAR:  NO CHAIN OF CUSTODY, NO FOUNDATION.

16          MR. CARLTON:  THIS WAS ALL RESOLVED PRIOR TO --

17          MR. NICOLAYSEN:  YOUR HONOR, AT THIS TIME, I WOULD

18    RESPECTFULLY ASK THE COURT TO ADMONISH THE JURY THAT THE TAPES

19    ARE NOT BEING OFFERED AGAINST MY CLIENT.

20          THE COURT:  WELL, THE TAPES ARE RECEIVED IN EVIDENCE.

21          (EXHIBIT 75, 82-83 # RECEIVED IN EVIDENCE.)

22          MS. KELLY:  I'D JUST LIKE TO STATE FOR THE RECORD THAT

23    I JOIN IN THAT OBJECTION AND I HAVE AN ADDITIONAL OBJECTION

24    THAT THE VIDEOTAPES ARE CUMULATIVE.

25          THE COURT:  THE OBJECTION IS OVERRULED.  THE TAPES

15-100

1    WILL BE RECEIVED AND THEY MAY BE PLAYED FOR THE JURY.

2          I WANT TO GIVE --

3          MR. CARLTON:  I'M SORRY.  I JUST WANTED TO MOVE IN

4    EXHIBIT 84, AS WELL.

5          THE COURT:  THAT MAY BE RECEIVED, AS WELL.

6          (EXHIBIT 84 # RECEIVED IN EVIDENCE.)

7          THE COURT:  NOW, WHAT THIS IS, THESE ARE AUDIOTAPES

8    WITH A SIMULTANEOUS ENGLISH TRANSLATION?

9          MR. CARLTON:  THAT'S CORRECT.

10          THE COURT:  SO THE TAPES ARE IN SPANISH, BUT THERE'S A

11    SIMULTANEOUS ENGLISH TRANSLATION WHICH YOU WISH TO SHOW, ON

12    THIS VIDEO?

13          MR. CARLTON:  THAT IS CORRECT, YOUR HONOR.  THE AUDIO

14    PORTION IS A COPY OF THE TWO COPIA TAPES, COPIA 2 AND 4.  AND

15    ON THE SCREEN -- ACTUALLY THE WALL OF THE COURTROOM -- WILL BE

16    PROJECTED, SIMULTANEOUSLY, THE ENGLISH TRANSLATION.

17          THE COURT:  ALL RIGHT.  NOW, LET ME INSTRUCT THE JURY

18    AS FOLLOWS ON THIS:

19          THE FIRST THING I WANT YOU TO UNDERSTAND IS THAT THIS

20    EVIDENCE, WHICH YOU WILL SEE AND HEAR, IS NOT OFFERED AGAINST

21    THE DEFENDANT JAVIER VASQUEZ VELASCO.  AND IT MAY NOT BE

22    CONSIDERED BY YOU AS EVIDENCE IN HIS CASE.

23          IT MAY BE CONSIDERED AS EVIDENCE AGAINST ANY OTHER

24    DEFENDANT IN THE CASE, HOWEVER.

25          NOW, THIS TAPE RECORDING IS JUST ANOTHER ITEM OF

15-101

1   EVIDENCE TO BE CONSIDERED BY YOU IN THIS CASE ALONG WITH ALL

2   THE OTHER EVIDENCE IN THE CASE, KEEPING IN MIND YOUR ULTIMATE

3   RESPONSIBILITY IN THIS CASE, WHICH IS TO DETERMINE WHETHER OR

4   NOT THE CRIMES ALLEGED IN THE INDICTMENT HAVE BEEN COMMITTED

5   AND, MORE PARTICULARLY, WHETHER EACH OF THE DEFENDANTS, WHOSE

6   CASE YOU MUST SEPARATELY CONSIDER, HAS BEEN SHOWN, HAS BEEN

7   PROVED, TO HAVE COMMITTED THE CRIMES CHARGED AGAINST HIM,

8   PARTICULARLY.

9        AND THESE ARE NOT DECISIONS THAT SHOULD BE BASED ON

10  YOUR EMOTIONS, ON SYMPATHY OR PASSION OR PUBLIC OPINION OR

11  PUBLIC FEELING OR PREJUDICE OR YOUR OWN PERSONAL EMOTIONAL

12  RESPONSES.  THIS CASE MUST BE DECIDED ON A DETACHED AND CAREFUL

13  CONSIDERATION OF ALL THE EVIDENCE AS IT RELATES TO EACH

14  DEFENDANT.

15       AND SO THAT IF THIS TAPE ENGENDERS ANY EMOTIONAL

16  RESPONSE IN YOU AT ANY TIME, KEEP IN MIND THAT YOUR EMOTIONS

17  ARE NOT EVIDENCE AND THAT ULTIMATELY YOU HAVE TO DECIDE WHAT

18  THE EVIDENCE THE EVIDENCE HAD THIS CASE HAS SHOWN AND BASE YOUR

19  DECISION ON THAT WITH COMPLETE OBJECTIVITY AND WITHOUT REGARD

20  TO ANY EMOTIONAL FEELINGS THAT YOU HAVE.

21       AS YOU'LL RECALL, I TALKED WITH YOU ABOUT THIS DURING

22  THE JURY SELECTION.

23       NOW, WITH THAT IN MIND, YOU MAY PROCEED WITH THE

24  TAPES.

25       NOW, MAY WE HAVE A STIPULATION THAT THIS DOES NOT NEED

15-102

1    TO BE REPORTED?

2          MR. STOLAR:  OH, CERTAINLY.

3          MR. MEDRANO:  SO STIPULATED, YOUR HONOR.

4          DEFENSE COUNSEL:  SO STIPULATED.

5          MR. STOLAR:  YOUR HONOR, WE'VE MADE SOME ARRANGEMENTS

6    SO WE CAN MOVE OVER.

7          THE COURT:  YES.  THAT'S OKAY.  I KNOW ABOUT THAT.

8          NOW, COUNSEL, I UNDERSTOOD, WAS GOING TO SIT THERE;

9    NOT THE DEFENDANTS.

10         THE MARSHAL:  YES, YOUR HONOR; THAT'S VERY TRUE.

11   COUNSEL IS BEING VERY DIFFICULT RIGHT NOW.

12         THE COURT:  JUST A MOMENT.  WE'LL HAVE MR. ZUNO RETURN

13   TO HIS SEAT.

14         THE MARSHAL:  THANK YOU.

15         THE COURT:  NOW, COUNSEL, IF YOU WISH TO MOVE TO THIS

16   TABLE DURING THE SHOWING, YOU MAY DO SO.

17         MR. MEZA:  YES.  THANK YOU.  (REMAINS SEATED AT

18   COUNSEL TABLE.)

19         THE COURT:  YOU MAY PROCEED.

20         (TRANSCRIPT DISPLAYED ON SCREEN; AUDIO TAPE PLAYED.)

21         THE COURT:  IS THIS ALL THE VOLUME YOU CAN GET OUT OF

22   IT?

23         MR. CARLTON:  YOUR HONOR, THE VOLUME CAN BE TURNED UP

24   ONLY FROM THE JURY BOX.  THE VOLUME WILL INCREASE AFTER THE

25   FIRST 17 MINUTES.

15-103

1          MR. BURNS:  EXCUSE ME, YOUR HONOR.  MY CLIENT CAN'T

2   HEAR THE SPANISH AT ALL.  I WILL STATE THAT FOR THE RECORD.

3          THE COURT:  WELL, JUST A MOMENT.  THE COURT HAS NOT

4   BEEN ADVISED THERE'S ANY DISPUTE ABOUT THE ENGLISH TRANSLATION.

5          MR. BURNS:  IT WAS JUST THE VOLUME, YOUR HONOR.  HE

6   COULD NOT HEAR IT.

7          A JUROR:  YOUR HONOR, WE'RE GETTING A LOT OF STATIC

8   RIGHT HERE, IN OUR EARS.

9          MR. CARLTON:  YOUR HONOR, THE FIRST 17 MINUTES OF THE

10  TAPE ARE NOT OF THE QUALITY OF THE REREMAINDER OF THE TAPE.

11  IT'S TRUE THERE IS QUITE A BIT OF STATIC IN THE FIRST 17

12  MINUTES.  THAT WILL CHANGE FOR THE BALANCE OF THE TAPE.

13         THE COURT:  ALL RIGHT.

14         MR. CARLTON:  THAT'S THE WAY THE TAPES ARE.

15         THE COURT:  THEN I'LL ASK THE JURY TO TOLERATE IT FOR

16  17 MINUTES.

17         (TRANSCRIPT DISPLAYED; AUDIO TAPE PLAYED.)

18         THE COURT:  IS THAT THE CONCLUSION OF ONE TAPE?

19         MR. CARLTON:  THAT WAS THE CONCLUSION OF THE FIRST

20  TAPE, YOUR HONOR.

21         THE COURT:  WELL, WE'LL TAKE A BRIEF RECESS.

22         (BRIEF RECESS.)

23         THE COURT:  YOU MAY PROCEED.

24         (TRANSCRIPT DISPLAYED ON SCREEN; AUDIO TAPE PLAYED.)

25         THE COURT:  DOES THAT CONCLUDE THE --

15-104

1          MR. CARLTON:  YES, YOUR HONOR.  THAT'S THE CONCLUSION

2     OF THE TAPES.

3          THE COURT:  DO YOU HAVE ANOTHER WITNESS YOU WISH TO

4     CALL?

5          MR. CARLTON:  YES, YOUR HONOR.  I THINK I CAN FIT ONE

6     WITNESS IN BETWEEN NOW AND 4:30.

7          THE GOVERNMENT CALLS JACK DILLON.

8          (WITNESS SUMMONED TO COURTROOM.)

9          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

10

11          JOHN H. DILLON + PLAINTIFF'S WITNESS, SWORN

12

13          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE RECORD

14     AND SPELL YOUR LAST NAME.

15          THE COURT:  MY NAME IS JOHN H. DILLON, D  I  L  L

16     O  N, JUNIOR.

17                    DIRECT EXAMINATION +

18     BY MR. CARLTON:

19     Q    MR. DILLON, WHAT IS YOUR PRESENT EMPLOYMENT?

20     A    I'M EMPLOYED AS A SPECIAL AGENT FOR THE FEDERAL BUREAU OF

21     INVESTIGATION.

22     Q    HOW LONG HAVE YOU BEEN EMPLOYED BY THE F.B.I.?

23     A    I'VE BEEN AN AGENT FOR 19-1/2 YEARS.

24     Q    WHAT IS YOUR PRESENT ASSIGNMENT FOR THE F.B.I.?

25     A    CURRENTLY, I'M ASSIGNED AS THE UNIT CHIEF IN CHARGE OF THE

15-105

1    FIREARMS-TOOL MARK UNIT IN THE F.B.I. LABORATORY.  IN THAT

2    CAPACITY I SUPERVISE FIREARM IDENTIFICATIONS, TOOL MARK

3    IDENTIFICATIONS/EXAMINATIONS, AND OTHER TAPES OF EXAMINATIONS.

4    Q    HOW LONG HAVE YOU BEEN IN THAT ASSIGNMENT?

5    A    ALMOST TWO YEARS.

6    Q    PRIOR TO THAT, WHAT WAS YOUR ASSIGNMENT WITH THE F.B.I.?

7    A    PREVIOUSLY, I WAS ASSIGNED FOR ABOUT SIX YEARS AT THE

8    F.B.I. ACADEMY AT QUANTICO, VIRGINIA, WHERE I HAD CHARGE OF THE

9    FORENSIC SCIENCE PROGRAM FOR F.B.I. NEW AGENTS AND ALSO FOR

10   D.E.A. NEW AGENTS.

11   Q    AND WHILE YOU WERE IN THAT POSITION, CAN YOU JUST DESCRIBE

12   GENERALLY WHAT YOUR DUTIES WERE?  WHAT DID YOU DO?

13   A    YES.  PART OF THOSE DUTIES WERE TO INSTRUCT NEW D.E.A. AND

14   F.B.I. AGENTS IN THE TECHNIQUES ASSOCIATED WITH COLLECTION AND

15   PRESERVATION OF PHYSICAL EVIDENCE, AS MIGHT BE RECOVERED AT A

16   CRIME SCENE, AND TECHNIQUES TO GO ABOUT DOING A CRIME SCENE

17   SEARCH.

18   Q    NOW, YOU'VE MENTIONED SOMETHING CALLED FORENSIC SCIENCE, I

19   BELIEVE, OR FORENSIC TECHNIQUES.

20        CAN YOU TELL US WHAT THE TERM "FORENSIC" MEANS?

21   A    "FORENSIC," IN THE CONTEXT OF PHYSICAL EVIDENCE, IS

22   BASICALLY USING SCIENCE FOR THE INTERPRETATION OF PHYSICAL

23   OBJECTS RECOVERED AT A CRIME SCENE AND THE EXAMINATIONS THAT GO

24   WITH THOSE.

25   Q    AND YOU'VE ALSO USED THE TERM "PHYSICAL EVIDENCE."  HOW DO

1   YOU MEAN THAT?

2   A    PHYSICAL EVIDENCE ARE OBJECTS THAT MAY BE RECOVERED AT THE

3   SCENE OF A CRIME, OR IN CONNECTION WITH A CRIMINAL ACT, THAT

4   MAY TEND TO PROVE SOME ELEMENT OF THE CASE, SUCH AS LOCATION OR

5   WHO MAY HAVE HAD SOMETHING TO DO WITH THAT PARTICULAR INCIDENT.

6   Q    AND YOU'VE USED THE TERM "CRIME SCENE."  WHAT DO YOU MEAN

7   BY THAT?

8   A    "CRIME SCENE" IS THE AREA OR PLACE, LOCATION, WHERE A

9   VIOLATION OF LAW MAY HAVE TAKEN PLACE.

10  Q    NOW, IN THE COURSE OF YOUR WORK WITH THE ACADEMY, DID YOU

11  ALSO HAVE OCCASION TO ACTUALLY WORK ON SOME PARTICULAR

12  INVESTIGATIONS?

13  A    YES, I DID.  THE ASSISTANT DIRECTOR OF THE F.B.I.

14  LABORATORY ON OCCASION DID DIRECT ME TO CARRY OUT RECOVERY AND

15  PRESERVATION OF PHYSICAL EVIDENCE.

16  Q    DID YOU HAVE SOME INVOLVEMENT IN THE INVESTIGATION OF AGENT

17  CAMARENA'S DISAPPEARANCE?

18  A    YES, I DID.  IN MARCH, AND SPECIFICALLY MARCH 6 OF 1985, I

19  WAS NOTIFIED AT HOME BY THE ASSISTANT DIRECTOR IN CHARGE OF THE

20  F.B.I. LABORATORY TO PROCEED TO GUADALAJARA, MEXICO, TO ASSIST

21  THE DRUG ENFORCEMENT AGENCY AGENTS THERE IN THEIR INVESTIGATION

22  RELATING TO THE DEATH OF D.E.A. AGENT ENRIQUE CAMARENA AND

23  ANOTHER INDIVIDUAL.

24  Q    NOW, WAS THERE A PARTICULAR PURPOSE IN YOUR GOING TO

25  GUADALAJARA AT THAT TIME?

1    A    YES.  SPECIFICALLY, TO -- IT WAS A TWOFOLD OPERATION.

2         I TRAVELED IN COMPANY WITH MR. CARL COLLINS OF THE

3    F.B.I. IDENTIFICATION DIVISION, WHO WAS A FINGERPRINT

4    SPECIALIST.  AND HE AND I WERE TO PROCEED TO GUADALAJARA, AND

5    HE WAS TO -- THIS WAS SPELLED OUT BY MY ASSISTANT DIRECTOR.

6         HE WAS TO, AS A FIRST PRIORITY, IDENTIFY REMAINS

7    THOUGHT TO BE THOSE OF AGENT CAMARENA; AND I WAS TO RECOVER ANY

8    PHYSICAL OBJECTS, ITEMS OF PHYSICAL EVIDENCE, THAT MIGHT BE OF

9    USE LATER IN THE CASE.

10   Q    NOW, DID YOU TAKE SOME EQUIPMENT WITH YOU?

11   A    YES.  A STANDARD CRIME SCENE SEARCH AND EVIDENCE PRESERVING

12   RECOVERING MATERIALS.

13   Q    WHAT WERE THOSE?

14   A    CONTAINERS FOR EVIDENCE, MARKING MATERIALS, AND EVERYTHING

15   FROM SCRAPING TOOLS TO A WHOLE SPECTRUM OF TOOLS THAT COULD BE

16   OF VALUE IN RECOVERING EVIDENCE, DEPENDING ON WHERE IT WAS

17   FOUND.

18   Q    WHEN DID YOU ARRIVE AT GUADALAJARA?

19   A    AT FIRST LIGHT ON MARCH 7TH, AT GUADALAJARA AIRPORT.

20   Q    AND ONCE YOU ARRIVED THERE, WHAT DID YOU DO?

21   A    WELL, WE WERE GREETED, MR. COLLINS AND I, AT GUADALAJARA

22   AIRPORT, BY D.E.A. AGENT JOE GONZALEZ.  AGENT GONZALEZ

23   TRANSPORTED US TO THE RESIDENT OFFICE AT THE U.S. CONSULATE IN

24   GUADALAJARA.

25   Q    AND DID YOU ON THAT DATE GO TO A MORGUE IN GUADALAJARA?

1  A   YES.  AFTER ARRIVING AT THE CONSULATE, WE WERE BRIEFED ON

2  THE APPARENT CIRCUMSTANCES BY SEVERAL AGENTS, INCLUDING JAMES

3  KUYKENDALL, ED HEATH, JOE GONZALEZ.

4          AND WE THEN PROCEEDED TO THE HEADQUARTERS OF THE

5  MEXICAN FEDERAL JUDICIAL POLICE IN ORDER TO INSURE THAT THEIR

6  ATTORNEY GENERAL IN MEXICO HAD GRANTED PERMISSION FOR US TO

7  PROCEED TO THE MORGUE.

8          AND FROM THAT OFFICE, AFTER ABOUT AN HOUR, WE

9  PROCEEDED TO THE GUADALAJARA MORGUE AND ARRIVED THERE IN THE

10  VICINITY OF ABOUT 11 O'CLOCK AND WERE -- WE WENT TO UNLOAD OUR

11  EQUIPMENT.  AND AT THAT POINT, WE WERE TOLD TO LOAD THE

12  EQUIPMENT BACK INTO OUR VEHICLE AND WAIT UNTIL THEY HAD, AT THE

13  MORGUE, ALSO ASCERTAINED THAT PERMISSION HAD BEEN GRANTED TO

14  ACTUALLY PROCEED WITH THE GATHERING OF EVIDENCE.

15  Q   SO WAS IT MEXICAN AUTHORITIES WHO TOLD YOU TO WAIT?

16  A   YES.

17  Q   AND EVENTUALLY, WERE YOU ALLOWED TO ENTER THE MORGUE?

18  A   YES.  SHORTLY AFTER NOON, WE WERE PERMITTED TO ACTUALLY

19  ENTER THE MORGUE.

20  Q   WHEN YOU GOT INTO THE MORGUE, WHERE DID YOU GO?

21  A   WE WENT INTO AN EXAMINATION ROOM THAT CONTAINED STEEL

22  TABLES, EXAMINATION TABLES, AND ALSO THE REMAINS OF TWO

23  INDIVIDUALS.

24  Q   WERE THESE REMAINS IDENTIFIED IN ANY WAY?

25  A   THE AUTHORITIES AT THE GUADALAJARA MORGUE HAD DESIGNATED

15-109

1   THESE BODIES AS BODY NO. 1 AND BODY NO. 2, AND MR. COLLINS AND

2   I RETAINED THAT CONVENTION FOR REFERENCE PURPOSES.

3   Q    WAS AGENTS COLLINS --

4          MR. STOLAR:  YOUR HONOR, MAY I OBJECT?  THE TESTIMONY

5   IS CUMULATIVE, WHATEVER COLLINS DID.

6          MR. CARLTON:  THIS IS JUST FOUNDATION, YOUR HONOR.

7   WE'LL BE MOVING RIGHT ALONG.

8          THE COURT:  I SUGGEST YOU MOVE ALONG TO THE POINT, THE

9   REASON YOU CALLED THIS WITNESS.

10  BY MR. CARLTON:

11  Q    DID YOU DIRECT YOUR INVESTIGATION TO ONE PARTICULAR BODY?

12  A    YES, INITIALLY TO THE BODY DESIGNATED AS BODY NO. 1.  AND

13  MR. COLLINS IDENTIFIED THE BODY AS BEING, THOSE, THE REMAINS OF

14  AGENT CAMARENA.

15  Q    NOW, WHAT DID YOU HAVE TO DO WITH THAT BODY?

16  A    AT THAT POINT, MY CONCERN WAS TO GATHER ANY KINDS OF

17  PHYSICAL EVIDENCE -- TRACE EVIDENCE SOME PEOPLE CALL IT -- THAT

18  WOULD TEND TO HELP LATER ON DURING THE COURSE OF THE

19  INVESTIGATION TO LINK OTHER LOCATIONS OR INDIVIDUALS WITH THAT

20  SET OF REMAINS.

21  Q    WHAT KIND OF TRACE EVIDENCE, PHYSICAL EVIDENCE, WERE YOU

22  LOOKING FOR?

23  A    THESE KIND OF THINGS ARE THINGS, FOR INSTANCE, AS HAIRS,

24  FIBERS, SOIL SAMPLES THAT COULD BE FOUND ON THE REMAINS;

25  SCRAPINGS FROM CLOTHING, SAMPLES OF CLOTHING, CUT OUT FROM THE

15-110

1    ITEM ITSELF; ANYTHING RECOVERABLE.

2            AND THAT'S WHAT I PROCEEDED TO GATHER AT THAT TIME.

3    Q    NOW, IF YOU WOULD, PLEASE, LOOK IN THE MATERIALS THAT ARE

4    PLACED IN FRONT OF YOU AND WHAT HAS BEEN MARKED AS EXHIBITS 90

5    AND 91.

6    A    (SEARCHES THROUGH EXHIBITS.)  YES, I HAVE EXHIBITS 90 AND

7    91.

8    Q    LOOKING FIRST AT EXHIBIT 90, DO YOU KNOW WHAT THAT IS?

9    A    I SEE HERE, ON THE SMALL BOX CONTAINED IN EXHIBIT 90, MY

10   SYMBOL, THE LETTERS T  M, AND THE INDICATION HERE WRITTEN ON

11   IT:  SOIL DEFINITION FROM RIGHT KNEE OF BODY NO. 1.

12   Q    NOW, DID YOU PUT SOMETHING INTO THAT BOX AT THE MORGUE ON

13   MARCH 7?

14   A    YES, I DID.

15   Q    WHAT DID YOU PUT INTO IT?

16   A    A SCRAPING OF SOIL FROM THE RIGHT KNEE OF BODY NO. 1.

17   Q    THE BODY THAT WAS IDENTIFIED AS AGENT CAMARENA'S BODY?

18   A    THAT'S CORRECT, YES.

19   Q    YOU SCRAPED THE SOIL OFF?

20   A    PERSONALLY, YES.

21   Q    NOW, WHILE YOU WERE AT THE MORGUE, AND AFTER YOU COMPLETED

22   YOUR EXAMINATION OF THE BODY, DID YOU EXAMINE ANY OTHER ITEMS?

23   A    AFTER I HAD COMPLETED THE EXAMINATION AT THE MORGUE?

24   Q    YES?

25   A    THE NEXT DAY, WE --

15-111

1    Q    I'M TALKING ABOUT THAT PARTICULAR DAY.  WERE THERE ANY

2    OTHER ITEMS AT THE MORGUE THAT YOU EXAMINED?

3    A    YES.  A SERIES OF ITEMS THAT I COLLECTED AND PRESERVED,

4    YES.

5    Q    ALL RIGHT.  DID YOU SEE -- WHEN YOU WENT IN AND VIEWED

6    THESE BODIES, DID YOU ALSO SEE SOME CLOTHING AND OTHER ITEMS?

7    A    YES.  THERE WERE NUMEROUS ITEMS ON THE MORGUE FLOOR, WHICH

8    I INQUIRED OF THE MORGUE PERSONNEL AS TO WHAT THEY ARE.

9          AND THEY, TOOK -- THEY INDICATED THAT THE TWO PILES

10    THAT I HAD OBSERVED DID RELATE TO BODIES NO. 1 AND BODIES NO.

11    2.

12    Q    AND DID YOU LOOK THROUGH THE ITEMS THAT WERE ASSOCIATED

13    WITH BODY NO. 1, AGENT CAMARENA'S BODY?

14    A    YES, I DID.

15    Q    WHAT DID YOU SEE?

16    A    THERE WERE A NUMBER OF ITEMS THERE THAT RELATED TO -- AS

17    INDICATED TO ME, RELATED TO BODY NO. 1, AS FAR AS CLOTHING

18    ITEMS.  THERE WERE SHORTS, THERE WAS A BINDING ROPE, ADHESIVE

19    TAPE.

20    Q    WAS THERE A SHEET THERE?

21    A    YES.  THERE WAS SOMETHING INDICATED TO ME AS A BURIAL SHEET

22    BY THE PERSONNEL THERE.

23    Q    NOW, DID ANY OF THESE ITEMS HAVE A PARTICULAR ODOR ABOUT

24    THEM?

25    A    YES.  THE ODOR WAS VERY TYPICAL OF THE ODOR OF

15-112

1    DECOMPOSITION OF A BODY.

2    Q    WERE YOU ABLE TO TAKE ANY OF THESE ITEMS AS EVIDENCE?

3    A    I INQUIRED OF THE OFFICIALS THERE AT THE MORGUE, THE

4    MEXICAN OFFICIALS THERE, AS TO WHETHER I COULD TAKE THESE ITEMS

5    AND RETAIN THEM.  AND THEIR RESPONSE WAS THAT I COULD NOT.

6         MY NEXT POSITION WAS TO REQUEST IF I COULD SCRAPE

7    THESE ITEMS AND RETAIN THE RESIDUE SCRAPED OFF OF THESE VARIOUS

8    ITEMS.  AND THEY SAID NO, THIS WAS NOT ACCEPTABLE.  SO I

9    REQUESTED PERMISSION FROM THEM TO TAKE SAMPLES OF EACH OF THE

10   ITEMS AND RETAIN THOSE.

11   Q    I'M SORRY.  SAMPLES OF THE ACTUAL ITEMS?

12   A    SAMPLES OF THE ITEMS, YES.

13   Q    I WOULD ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT

14   93.

15   A    I SEE SAMPLE -- RATHER EXHIBIT 93 HERE, WHICH CONTAINS A

16   PIECE OF CLOTH WITH MY SYMBOL ON IT, AND ALSO A PAPER BAG,

17   CLOSED, HERE, WITH MY SYMBOL ON.

18   Q    DO YOU RECOGNIZE THAT PIECE OF CLOTH?

19   A    YES, I DO.

20   Q    WHAT IS IT?

21   A    THIS IS A SOIL FABRIC SAMPLE FROM SHORTS THAT WERE

22   ASSOCIATED WITH BODY NO. 1.

23   Q    IS THAT A SAMPLE THAT YOU TOOK YOURSELF?

24   A    YES.  PERSONALLY.

25   Q    AND LOOKING AT EXHIBIT 91, IF YOU WOULD --

15-113

1   A    YES.

2   Q    -- WHAT IS EXHIBIT 91, IF YOU KNOW?

3   A    EXHIBIT 91 CONTAINS A SMALL BOX WITH MY SYMBOL ON IT, AND

4   THE INSCRIPTION:  SOIL SAMPLE FROM SHORTS ASSOCIATED WITH BODY

5   NO. 1.

6   Q    SO IS THAT REFERRING TO THE SHORTS THAT ARE MARKED AS

7   EXHIBIT 93?

8   A    YES.

9   Q    DID YOU SCRAPE DIRT DEBRIS OFF OF THOSE SHORTS?

10  A    YES.  THIS CAME OFF OF THE SHORTS.

11  Q    THAT'S WHAT EXHIBIT 91 IS, IS THE SOIL THAT YOU SCRAPED

12  FROM THE SHORTS?

13  A    YES.

14  Q    IF YOU WOULD LOOK AT EXHIBIT 92.

15  A    I HAVE EXHIBIT 92 IN FRONT OF ME HERE, AND WHAT I SEE

16  CONTAINED IN IT IS A SMALL BOX, ON ONE SIDE BEARING MY SYMBOL,

17  THE LETTERS T M, AND THE INSCRIPTION:  STRIP OF ADHESIVE,

18  BLINDFOLD, ASSOCIATED WITH BODY NO. 1.

19          IN PARENTHESES:  TAPE.

20  Q    IS THAT A PIECE OF TAPE THAT YOU TOOK ON MARCH 7TH?

21  A    YES, IT IS.

22  Q    AND IF YOU WOULD LOOK AT EXHIBIT 94.

23  A    (COMPLIES.)

24  Q    DO YOU RECOGNIZE THAT?

25  A    YES.  EXHIBIT 94 CONTAINS A PIECE OF CLOTH WITH MY SYMBOL

15-114

1    ON IT, T M, AND ALSO A PAPER BAG BEARING MY SYMBOL.

2    Q    AND WHAT IS THAT A SAMPLE OF?

3    A    EXHIBIT 94 IS A PIECE OF SOIL FABRIC FROM A BURIAL SHEET

4    ASSOCIATED WITH BODY NO. 1.

5    Q    AND DID YOU SCRAPE DEBRIS FROM THAT PIECE OF FABRIC, AS

6    WELL?

7    A    YES, I DID.

8    Q    AND IF YOU WOULD LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT

9    95.

10   A    (COMPLIES.)  EXHIBIT 95 CONTAINS A SMALL BOX WITH MY SYMBOL

11   ON IT AND THE INSCRIPTION:  DEBRIS FROM BURIAL SHEET ASSOCIATED

12   WITH BODY NO. 1.

13   Q    SO THEN, THAT WOULD BE DIRT AND OTHER DEBRIS THAT YOU

14   SCRAPED FROM THE BURIAL SHEET?

15   A    YES.

16        MR. CARLTON:  YOUR HONOR, I WOULD MOVE AT THIS TIME

17   THAT EXHIBITS 90 THROUGH 95 BE RECEIVED.

18        MR. STOLAR:  WE WOULD OBJECT ON THE BASIS THAT IT IS

19   ONLY HEARSAY THAT THESE ARE ASSOCIATED WITH BODY NO. 1.

20        THE COURT:  WE'LL DEAL WITH THE OBJECTIONS AT THE

21   RECESS.

22        MR. STOLAR:  ALL RIGHT.

23        THE COURT:  I'LL DEFER RULING.

24   BY MR. CARLTON:

25   Q    ALL RIGHT.  DID YOU HAVE OCCASION, AGENT DILLON, TO DEAL

15-115

1    WITH ANOTHER PILING OF CLOTHING AT THE MORGUE?

2    A    YES.   THERE WAS A PILE THAT WAS DESIGNATED AS BEING

3    ASSOCIATED WITH BODY NO. 2.

4    Q    AND DID YOU TAKE PHOTOGRAPHS OF THOSE ITEMS?

5    A    YES, I DID.

6    Q    WHAT DID THEY CONSIST OF?

7    Q    THERE WERE PHOTOGRAPHS RELATING TO A MULTI-COLORED SHIRT

8    AND A VELOUR SWEATSHIRT, AMONG OTHER THINGS.

9    Q    UH-HUH.   WOULD YOU PLEASE LOOK -- AND I THINK IT'S BELOW

10   THE PLASTIC BAGS IN FRONT OF YOU -- THERE ARE THREE EXHIBITS

11   MARKED 61 A  THROUGH C.

12   A    61 A  THROUGH C?

13        MR. CARLTON:   PARDON ME, YOUR HONOR.   MAY I HAVE A

14   MOMENT?

15        (PAUSE IN PROCEEDINGS.)

16        MR. CARLTON:   I BELIEVE MADAM CLERK HAS THESE THREE

17   PHOTOGRAPHS.   THEY'VE ALREADY BEEN RECEIVED.   61 A  THROUGH C.

18        I'M SORRY.   60, A, B, C, I THINK.

19        (EXHIBITS PLACED BEFORE WITNESS.)

20        THE WITNESS:   YES, I HAVE THEM.

21   BY MR. CARLTON:

22   Q    DO YOU RECOGNIZE THOSE PHOTOGRAPHS?

23   A    YES.   THESE ARE PHOTOGRAPHS OF CLOTHING WHICH I DID

24   PHOTOGRAPH THERE AT THE MORGUE AT GUADALAJARA.

25   Q    SO THAT'S THE CLOTHING ASSOCIATED WITH BODY NO. 2?

15-116

1    A    THAT'S CORRECT.

2    Q    YOU TOOK THOSE PHOTOGRAPHS?

3    A    PARDON ME?

4    Q    YOU TOOK THOSE PHOTOGRAPHS?

5    A    YES, I DID, PERSONALLY.

6    Q    NOW, IF YOU WOULD LOOK IN FRONT OF YOU AT WHAT HAS BEEN

7    MARKED AS EXHIBIT 96.

8    A    YES.  I HAVE EXHIBIT 96 IN FRONT OF ME.

9    Q    NOW, DID YOU ALSO TAKE SAMPLES OF THE CLOTHING ASSOCIATED

10   WITH BODY NO. 2?

11   A    YES, I DID.  WITH THE PERMISSION OF THE MORGUE AUTHORITIES,

12   I REQUESTED ALSO TO TAKE SAMPLES OF THE CLOTHING ASSOCIATED

13   WITH THE OTHER BODY, NOT AGENT CAMARENA'S.

14   Q    YES.  AND LOOKING AT EXHIBIT 96, DO YOU RECOGNIZE THAT?

15   A    YES, I DO.  IT'S A PIECE OF CLOTH HERE IN A CONTAINER

16   MARKED WITH MY SYMBOL, T  M.  IT'S BASICALLY SOILED FABRIC FROM

17   A MULTI-COLORED SHIRT.

18   Q    THAT WAS THE SHIRT ASSOCIATED WITH BODY NO. 2?

19   A    THAT IS CORRECT.

20   Q    AND IF YOU WOULD LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT

21   97.

22   A    EXHIBIT 97 CONTAINS A PAPER BAG BEARING MY MARK AND ALSO A

23   PIECE OF CLOTH, A SAMPLE OF CLOTH.

24   Q    AND WHAT IS THAT PIECE OF CLOTH ?

25   A    EXHIBIT 97 IS A SOIL FABRIC SAMPLE FROM A VELOUR

15-117

1   SWEATSHIRT.

2   Q   IS THAT VELOUR SWEATSHIRT ALSO ASSOCIATED WITH BODY NO. 2?

3        MS. KELLY:  I WOULD OBJECT TO THAT BASED ON LACK OF

4   PERSONAL KNOWLEDGE AND LACK OF FOUNDATION.

5        THE COURT:  OVERRULED.

6   BY MR. CARLTON:

7   Q   NOW, WHILE YOU WERE AT THE MORGUE, DID YOU TAKE A SAMPLE OF

8   HAIR FROM BODY NO. 1?

9   A   YES, I DID.

10  Q   IF YOU WOULD LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT 98.

11  A   EXHIBIT NUMBER?

12  Q   98.

13  A   98.  I HAVE EXHIBIT 98 IN FRONT OF ME.  IT DOES CONTAIN A

14  CARDBOARD BOX WITH MY SYMBOL ON IT AND THE INSCRIPTION:  HEAD

15  HAIR, SAMPLE, BODY NO. 1.

16  Q   WHEN YOU TOOK THE HEAD HAIR SAMPLE FROM BODY NO. 1, DID YOU

17  PLACE IT IN THAT BOX?

18  A   YES, I DID.

19  Q   AT THE TIME, DID TELL YOU SEAL THE BOX?

20  A   YES.

21  Q   AND WHAT DID YOU DO WITH THE BOX?

22  A   I KEPT IT IN MY CARE AND CUSTODY UNTIL I ULTIMATELY TURNED

23  IT OVER TO THE EVIDENCE CONTROL CENTER OF THE F.B.I.

24  Q   IN WASHINGTON, D.C.?

25  A   IN WASHINGTON, D.C.

15—118

1    Q    IF YOU WOULD LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT 99.

2    A    (COMPLIES.)  I SEE IN EXHIBIT 99 A BOX AND AN ENVELOPE THAT

3    CONTAINS A SAMPLE OF CORDAGE, OR ROPE.

4    Q    AND DID YOU COLLECT THAT PIECE OF ROPE AT THE MORGUE THAT

5    DAY, AS WELL?

6    A    YES.  THIS WAS INDICATED TO ME AS BEING A BINDING ROPE

7    ASSOCIATED WITH BODY NO. 1 BY THE MORGUE OFFICIALS.

8            MS. KELLY:  FOUNDATION OBJECTION, YOUR HONOR.

9            THE COURT:  OVERRULED.

10   BY MR. CARLTON:

11   Q    NOW, AFTER YOU'D COLLECTED ALL OF THESE ITEMS THAT YOU'VE

12   JUST DESCRIBED, WHAT DID YOU DO WITH THEM?

13   A    I SEALED THEM ALL AND KEPT THEM IN MY CARE AND CUSTODY

14   UNTIL ULTIMATELY THEY WERE TURNED OVER TO THE EVIDENCE CONTROL

15   CENTERS AT F.B.I. HEADQUARTERS.

16   Q    DID THEY REMAIN SEALED THAT ENTIRE TIME?

17   A    YES.

18   Q    WHEN DID YOU TURN THEM OVER TO THE EVIDENCE CONTROL CENTER?

19   A    ULTIMATELY, ON THE 13TH OF MARCH, AT F.B.I. HEADQUARTERS.

20   Q    NOW, DID YOU GO TO ANOTHER LOCATION THE FOLLOWING DAY TO

21   PURSUE YOUR INVESTIGATION?

22   A    YES.  THE PRIORITY WORK WAS ESTABLISHED BASICALLY BECAUSE

23   TO IDENTIFY THE BODIES WAS OBVIOUSLY THE CONCERN.

24          AND THE SECOND PRIORITY WAS TO GO WHERE THE BODIES HAD

25   BEEN FOUND AND TO FIND WHATEVER KINDS OF PHYSICAL EVIDENCE

15-119

1    MIGHT BE PRESENT THERE, TO POTENTIALLY ASSOCIATE SOMEONE LATER

2    ON DURING THE INVESTIGATION WITH THAT PARTICULAR LOCATION.

3    Q    NOW, DID YOU ASK THE MEXICAN AUTHORITIES THERE TO TAKE YOU

4    WHERE THE BODIES HAD BEEN FOUND?

5    A    YES.  ON THAT DATE, THE FOLLOWING DATE, WE PROCEEDED, MR.

6    COLLINS AND I, WITH D.E.A. AGENTS -- SPECIAL AGENT BOBBY

7    CASTILLO AND MEMBERS OF THE MEXICO FEDERAL JUDICIAL POLICE TO A

8    LOCATION SOUTH OF GUADALAJARA NEAR THE TOWN OF ZAMORA.

9    Q    AND WAS THERE A PARTICULAR LOCATION THAT YOU WERE TAKEN TO?

10   A    YES, THERE WAS A LOCATION ON THE FEDERAL HIGHWAY, JUST

11   NORTH OF THAT TOWN.

12   Q    NOW, IF YOU WOULD, PLEASE, JUST LOOK AT THE PHOTOGRAPH THAT

13   HAS BEEN MARKED 170.  I BELIEVE IT'S JUST BEEN PLACED NEXT TO

14   YOU.

15        I'M SORRY.  MADAM CLERK HAS THAT ONE, AS WELL.

16        (EXHIBIT PLACED BEFORE WITNESS.)

17        THE WITNESS:  YES.  EXHIBIT 170 IS AN ENLARGEMENT OF A

18   PHOTOGRAPH WHICH I TOOK PERSONALLY AT THE LOCATION INDICATED BY

19   THE MEMBERS OF THE MEXICAN FEDERAL JUDICIAL POLICE WHERE THE

20   BODIES HAD BEEN FOUND.

21   BY MR. CARLTON:

22   Q    NOW, WHAT DID YOU DO AT THIS LOCATION?

23   A    I ATTEMPTED TO GATHER ANY ITEMS THAT MIGHT BE USEFUL DURING

24   THE LATER COURSE OF INVESTIGATION TO TRY AND ASSOCIATE PERSONS

25   OR OBJECTS WITH THAT PARTICULAR PLACE OR TO POTENTIALLY

15-120

1    DISASSOCIATE PERSONS OR OTHER ITEMS FROM THAT LOCATION.

2    Q    AND IN DOING THAT, DID YOU TAKE SOME SOIL SAMPLES?

3    A    YES.   I COLLECTED A NUMBER OF ITEMS, TO INCLUDE SOIL

4    SAMPLES.   I COLLECTED CLOTH, CIGARETTE BUTTS, HAIR, AND PLANT

5    MATERIAL, BUT ALSO SOIL SAMPLES, FROM THAT SITE.

6    Q    I WOULD ASK YOU TO LOOK AT EXHIBITS 101 A  AND 101 B.

7    ACTUALLY, 101 B.

8    A    I HAVE 101 B, WHICH CONSISTS OF THREE PAPER CONTAINERS, ALL

9    OF WHICH ARE MARKED WITH MY SYMBOL AND BEAR THE INSCRIPTION:

10   SOIL SAMPLE FROM SIDE OF ROAD, 14 FEET FROM THE EDGE STRIPE,

11   NEXT TO A PATH, ONE AT THE EDGE OF THE ROADBED AND ANOTHER 32

12   FEET FROM THE EDGE STRIPE, NEXT TO A PATH.

13   Q    YOU TOOK THESE SOIL SAMPLES FROM THE LOCATION THAT IS

14   DEPICTED IN THE PHOTOGRAPH THAT YOU JUST SHOWED US, EXHIBIT

15   170?

16   A    THAT'S CORRECT.   IN THIS VICINITY HERE, BETWEEN THIS

17   LOCATION AND THE EDGE OF THE ROAD.

18   Q    SO THE ROAD WOULD BE IN THE FOREGROUND, LOOKING AT THAT?

19   A    IN THIS PARTICULAR PHOTOGRAPH, I WAS STANDING, AS I TOOK

20   IT, AT THE THE EDGE OF THE ROAD.

21   Q    AFTER YOU GATHERED THE SOIL SAMPLES, WHAT DID YOU DO WITH

22   THEM?

23   A    I SEALED THE SAMPLES IN THESE CONTAINERS AND ALSO KEPT

24   THESE IN MY CARE AND CUSTODY UNTIL I'D TURNED THEM OVER

25   ULTIMATELY TO THE EVIDENCE CONTROL CENTER, F.B.I. HEADQUARTERS.

15-121

1    Q    DID THESE SAMPLES REMAIN SEALED DURING THE ENTIRE TIME

2    FRAME --

3    A    YES.

4    Q    -- YOU COLLECTED UNTIL YOU TURNED THEM OVER TO THE EVIDENCE

5    CONTROL CENTER?

6    A    YES.  YES, THEY DID.

7    Q    AND WHEN DID YOU TURN THEM IN TO THE EVIDENCE CONTROL

8    CENTER?

9    A    THESE WERE TURNED OVER TO EVIDENCE CONTROL CENTER AT F.B.I.

10   HEADQUARTERS ON THE 13TH OF MARCH.

11          MR. CARLTON:  MAY I HAVE JUST A MOMENT, YOUR HONOR.

12          (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

13          MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

14          THE COURT:  DO YOU WISH TO CROSS-EXAMINE THIS WITNESS?

15          MR. STOLAR:  A LITTLE BIT.

16                    CROSS-EXAMINATION +

17   BY MR. STOLAR:

18   Q    YOU SAY YOU TEACH FORENSIC SCIENCE; IS THAT RIGHT?

19   A    UNTIL ABOUT TWO YEARS AGO, I DID.  I SPENT ABOUT SIX YEARS

20   TEACHING IT.

21   Q    AND WOULD IT BE FAIR TO SAY THAT ONE OF THE THINGS YOU

22   TEACH IS METHODS OF IDENTIFYING PEOPLE?  IS THAT RIGHT?

23   A    I'M NOT AN EXPERT IN THE IDENTIFICATION OF PEOPLE, BUT I

24   HAVE SPOKEN ABOUT THAT, YES.

25   Q    WHAT ARE THE TYPES OF METHODS OF IDENTIFICATION OF PEOPLE?

15-122

1    A    TO VARYING DEGREES, THERE ARE SOME TECHNIQUES THAT ARE

2    ACCURATE, MORE OR LESS.

3    Q    LIKE FINGERPRINTS?

4    A    I'M NOT SPEAKING AS AN EXPERT.

5    Q    ALL RIGHT.

6    A    I WOULD SAY FINGERPRINTS, OBVIOUSLY, IS UNEQUIVOCALLY

7    DEEMED IDENTIFIABLE OF A INDIVIDUAL.

8    Q    DENTAL RECORDS?

9    A    PARDON?

10   Q    DENTAL RECORDS.  DENTAL?

11   A    DENTAL RECORDS, THERE HAS BEEN EXPERT TESTIMONY GIVEN AS

12   FAR AS IDENTIFYING PEOPLE, WITHOUT QUESTION, BASED ON THESE

13   RECORDS.  ALSO D.N.A..

14   Q    THERE'S STILL SOME QUESTION ABOUT D.N.A., THOUGH, IS THERE

15   NOT?

16   A    TO MY UNDERSTANDING.  IT'S A MATTER OF HOW GOOD THE

17   TECHNIQUE IS, EMPLOYED BY PARTICULAR INDIVIDUALS.

18   Q    SPEECH PATTERNS, ANOTHER WAY?

19   A    THAT HAS LESS CREDIBILITY, GENERALLY SPEAKING, AS FAR AS --

20        MR. CARLTON:  OBJECTION TO THE RELEVANCE OF THIS, YOUR

21   HONOR.

22        THE COURT:  SUSTAINED.

23   BY MR. STOLAR:

24   Q    ONE OF THE THINGS THAT YOU PICKED UP AT THE MORGUE WAS A

25   HEAD HAIR SAMPLE; IS THAT RIGHT?  OR AT LEAST YOU THINK IT WAS

15-123

1    A HEAD HAIR?

2    A    IT WAS FROM THE HEAD OF AGENT CAMARENA, YES.

3    Q    NOW, THAT WAS SOMETHING THAT YOU WERE GOING TO TRY OR

4    SOMEBODY WAS GOING TO TRY TO MAKE AN IDENTIFICATION WITH; IS

5    THAT RIGHT?  OR THAT'S WHY YOU PICKED IT UP, ANYWAY?

6    A    WELL, IT'S NOT THE KIND OF A THING WHERE YOU WOULD MAKE A

7    SPECIFIC IDENTIFICATION OF AN INDIVIDUAL, NO.

8          I DON'T SPEAK AS AN EXPERT ON HAIR.

9          HOWEVER, YOU CAN SHOW CONSISTENCY WITH AN INDIVIDUAL.

10   BASED ON MY PERIOD OF INSTRUCTION, YOU CAN SHOW CONSISTENCY,

11   YES.

12   Q    BUT NOT IDENTIFICATION?

13   A    I DON'T KNOW OF A CASE MYSELF, NO.

14   Q    OKAY.  ARE YOU ALSO FAMILIAR WITH THE PRINCIPLES OF THE

15   CRIME SCENE SEARCH?  IS THAT RIGHT?

16   A    YES.

17   Q    AND ONE OF THOSE THINGS IS THAT THE SCENE SHOULD BE

18   ISOLATED OR AT LEAST KEPT FROM INTRUSION BY ANY PERSON; IS THAT

19   RIGHT?

20   A    THAT'S CORRECT, YES.

21   Q    BUT IF A SCENE IS NOT KEPT SECURE, SO TO SPEAK, THEN

22   WHATEVER FORENSIC EVIDENCE IS OBTAINED THERE IS POTENTIALLY OF

23   QUESTIONABLE USE; IS THAT RIGHT?

24   A    CONTAMINATION IS ALWAYS A CONCERN; THAT'S CORRECT.

25          MR. STOLAR:  THANK YOU, SIR.  I HAVE NOTHING FURTHER.

15-124

CROSS-EXAMINATION +

BY MR. MEZA:

Q    WHEN YOU ARRIVED AT THE MORGUE AND VIEWED THE BODIES, WAS THERE ANY CLOTHES ON THE BODIES?

A    NO.  THE CLOTHING HAD BEEN REMOVED.

Q    WELL, MY QUESTION IS:  WAS THERE ANY CLOTHES ON THE BODIES WHEN YOU SAW THEM?

        MR. CARLTON:  THE WITNESS ANSWERED THE QUESTION, YOUR HONOR.  ASKED AND ANSWERED.

        THE COURT:  HE'S ANSWERED.

BY MR. MEZA:

Q    NOW, THESE PILES OF CLOTHES THAT YOU SAW, HOW FAR WERE THEY FROM THE BODIES?

A    THE BODIES WERE ALIGNED WITH THE LONG DIMENSION OF THE ROOM, ON TWO SEPARATE TABLES.  THE CLOTHING WAS AT ONE END OF THIS ROOM.

Q    ABOUT HOW FAR AWAY?

A    IN TWO SEPARATE PILES.  FROM ONE BODY, PERHAPS 6 OR 8 FEET. FROM THE OTHER BODY, PROBABLY ON THE ORDER OF 20 FEET.

Q    AND YOU DON'T HAVE ANY PERSONAL KNOWLEDGE AS TO WHERE THOSE PILES OF CLOTHES CAME FROM, DO YOU?

A    I OBSERVED THOSE FIRST WHEN I WALKED IN AND INQUIRED ABOUT THEM.

Q    MY QUESTION IS:  DO YOU HAVE ANY PERSONAL KNOWLEDGE WHERE THOSE CLOTHES CAME FROM?

15-125

1    A    NO, I DON'T.

2    Q    SO WHEN YOU MAKE THE -- WHEN YOU WERE TESTIFYING AND USING

3    THE WORD "ASSOCIATED," THAT WORD, "ASSOCIATION," IS BASED ON

4    SOMETHING SOMEBODY TOLD YOU; IS THAT RIGHT?

5    A    BASED ON THE INQUIRY TO THE MORGUE OFFICIALS, YES.

6    Q    AND WHICH MORGUE OFFICIALS DID YOU TALK TO?  DO YOU KNOW

7    THEIR NAMES?

8    A    NO, I DON'T.

9    Q    DID YOU WRITE THEM DOWN?

10   A    NO, I DIDN'T.  THEY WERE SPANISH SPEAKERS, AND I DIDN'T

11   HAVE ANY LANGUAGE CAPABILITY.

12   Q    WELL, YOU UNDERSTOOD THEM WHEN THEY WERE TRYING TO MAKE THE

13   ASSOCIATION; IS THAT RIGHT?

14   A    YES, TO THAT EXTENT.

15   Q    SO TO THE EXTENT THAT YOU HAD DIFFICULTY WITH THE LANGUAGE,

16   YOU MAY HAVE MISASSOCIATED THE --

17   A    I WENT TO ELABORATE LENGTHS, THROUGH THE OFFICIALS,

18   AMERICAN AND MEXICAN, TO ESTABLISH WHICH PILE WAS ASSOCIATED

19   WITH WHICH BODY.

20   Q    YOU SAY "ELABORATE LENGTH."  DID YOU USE SOMEBODY AS AN

21   INTERPRETER?

22   A    I SPOKE TO A NUMBER OF DIFFERENT PEOPLE WHO SPOKE ENGLISH

23   AND SPANISH.

24   Q    AND WERE THESE U.S. GOVERNMENT AGENTS, F.B.I. OR D.E.A.?

25   A    SOME WERE D.E.A. OFFICIALS; SOME WERE MORGUE OFFICIALS.

15-126

1    Q    DO YOU RECALL --

2    A    I'M SORRY.

3    Q    DO YOU RECALL THE NAMES OF THE D.E.A. OFFICIALS?

4    A    NO, I DON'T.

5    Q    YOU DIDN'T WRITE THEM DOWN ANYWHERE?

6    A    NO.

7              MR. MEZA:  I HAVE NOTHING FURTHER.  THANK YOU.

8              THE COURT:  ANY FURTHER QUESTIONS FOR THIS WITNESS?

9    (NO AUDIBLE RESPONSE.)

10             YOU MAY STEP DOWN.

11             NOW, LADIES AND GENTLEMEN, WE'RE GOING TO ADJOURN AT

12   THIS TIME.  AND YOU WILL REMEMBER THAT BEFORE YOU AGREED TO

13   SERVE ON THIS JURY, I PROMISED YOU A WEEK OFF.

14             THE JURY:  (LAUGHTER.)

15             THE COURT:  AND THAT COMES NEXT WEEK.  THE TRIAL WILL

16   NOT BE IN SESSION NEXT WEEK.  WE WILL RECONVENE THE WEEK AFTER,

17   ON TUESDAY, AT 9:30.  THAT WILL BE JUNE THE 18TH, I BELIEVE.

18             THE CLERK:  19TH.

19             THE COURT:  PARDON?

20             THE CLERK:  19TH.

21             THE COURT:  19TH?  YES.  ANYWAY, IT'S TUESDAY.

22             KEEP IN MIND, PLEASE, THAT IT IS YOUR CONTINUING DUTY

23   NOT TO DISCUSS THIS CASE WITH EACH OTHER OR WITH ANYONE ELSE

24   AND NOT TO PERMIT ANYONE TO DISCUSS THE CASE WITH YOU AND NOT

25   TO READ OR SEE ANY PUBLICITY RELATING TO THIS CASE.

15-127

1          ENJOY YOUR WEEK OFF.

2          THE CLERK:  PLEASE RISE.

3          (JURY ABSENT:)

4          THE CLERK:  YOU MAY BE SEATED.

5          THE COURT:  NOW, LET'S DEAL WITH THIS EXHIBIT THAT YOU

6     OBJECTED TO.

7          MR. CARLTON:  WELL, YOUR HONOR, I WILL WITHDRAW THE

8     MOTION TO INTRODUCE IT AT THIS TIME AND HOLD THAT TO A LATER

9     TIME.

10         THE COURT:  ALL RIGHT.  THAT TAKES CARE OF IT, THEN.

11         MR. STOLAR:  THAT TAKES CARE OF IT.

12         THE COURT:  WE'RE ADJOURNED.

13         MR. STOLAR:  ENJOY ALASKA.

14         (PROCEEDINGS ADJOURNED TILL JUNE 19, 1990.)

15                       ---0---

16

17

18

19

20

21

22

23

24

25

```
INDEX:  U.S. V. MATTA BALLESTEROS      15-128
                                                        PG   LN
```

```
      (EXHIBIT 75, 82-83  #  RECEIVED IN EVIDENCE.)        99   21
             (EXHIBIT 84  #  RECEIVED IN EVIDENCE.)       100    6


          LOS ANGELES  +  CALIFORNIA   FRIDAY, JUNE        4    1
         JUNE 8, 1990  +  9:30 A.M.                        4    2
     E. FUENTES ORTIZ  +  PLAINTIFF'S WITNESS,             7    9
    DIRECT EXAMINATION  +    BY MR. MEDRANO:    A.          7   18
    CROSS-EXAMINATION  +    BY MR. NICOLAYSEN:     Q.      14    7
    CROSS-EXAMINATION  +  (CONTINUED)   BY MR.             17   10
 ESTELLA FUENTES ORTIZ  +  PLAINTIFF'S WITNESS, SWORN      27    3
    DIRECT EXAMINATION  +    BY MR. MEDRANO:    Q.         27    4
    CROSS-EXAMINATION  +    BY MR. NICOLAYSEN:   Q.        38    4
  REDIRECT EXAMINATION  +    BY MR. MEDRANO:    A.         46   23
     JAMES KUYKENDALL  +  PLAINTIFF'S WITNESS,            47   10
    DIRECT EXAMINATION  +    BY MR. CARLTON:    Q.         47   15
    CROSS-EXAMINATION  +    BY MR. MEDVENE:    Q.          63    8
    CROSS-EXAMINATION  +    BY MR. STOLAR:     Q.          76   20
          LOS ANGELES  +  CALIFORNIA, FRIDAY, JUNE 8,     80    1
         JUNE 8, 1990  +  1:30 P.M.            (JURY       80    2
     JAMES KUYKENDALL  +  PLAINTIFF'S WITNESS,            88   24
    CROSS-EXAMINATION  +  (RESUMED)   BY MR. STOLAR:      88   25
    CROSS-EXAMINATION  +    BY MR. MEZA:    Q  IN          90   19
  REDIRECT EXAMINATION  +    BY MR. CARLTON:    Q   MR.     96    7
        JOHN H. DILLON  +  PLAINTIFF'S WITNESS, SWORN     104   11
    DIRECT EXAMINATION  +    BY MR. CARLTON:    Q   MR.    104   17
    CROSS-EXAMINATION  +    BY MR. STOLAR:    Q   YOU      121   16
    CROSS-EXAMINATION  +    BY MR. MEZA:    Q   WHEN       124    1


  HAS BEEN MARKED AS   EXHIBIT   75.  DO YOU SEE THAT?     48    2
  HAS BEEN MARKED AS   EXHIBIT   S 78 AND 79.              49   17
  HAS BEEN MARKED AS   EXHIBIT   S 80 AND 81, DO YOU       50    9
  HAS BEEN MARKED AS   EXHIBIT   S 82 AND 83, WOULD        50   21
  IN THEIR ENTIRETY TO  EXHIBIT   S 82 AND 83?   A.         51   12
     PORTION TO THOSE   EXHIBIT   S 82 AND 83?   A.         51   15
         WHICH ARE     EXHIBIT   S 80 AND 81?   A.         51   20
 WITNESS REFER TO THE  EXHIBIT   NO. YOUR HONOR?           54    7
  HAS BEEN MARKED AS   EXHIBIT   84, YOUR HONOR.           54    9
    WITNESS:  THIS IS  EXHIBIT   78 ON IT.                 54   11
 CAN LOOK OVER THESE   EXHIBIT   S AND YOU CAN RESUME      79   16
   YOUR ATTENTION TO   EXHIBIT   84, HOW FAR IS IT,        92    1
 YOU WOULD, MS. CLERK,  EXHIBIT   63, IS THAT UP HERE?      95    4
 WITNESS TO LOOK AT    EXHIBIT   63?              MR.      95    6
 HONOR.           (    EXHIBIT   PROVIDED TO DO            95    9
   IS GOVERNMENT'S     EXHIBIT   74 BEING OFFERED IN       98   20
     MR. CARLTON:      EXHIBIT   75.              MR.      99    6
                 (    EXHIBIT   75, 82-83 # RECEIVED      99   21
```

```
INDEX:   U.S. V. MATTA BALLESTEROS      15-128
                                                    PG   LN
        WANTED TO MOVE IN   EXHIBIT  84, AS WELL.           100    4
AS WELL.              (     EXHIBIT  84 # RECEIVED IN       100    6
      HAS BEEN MARKED AS    EXHIBIT  S 90 AND 91.     A     110    4
       (SEARCHES THROUGH    EXHIBIT  S.)  YES, I HAVE       110    6
             YES, I HAVE    EXHIBIT  S 90 AND 91.    Q      110    6
       LOOKING FIRST AT     EXHIBIT  90, DO YOU KNOW WHAT   110    8
       BOX CONTAINED IN     EXHIBIT  90, MY SYMBOL, THE     110    9
      HAS BEEN MARKED AS    EXHIBIT  93.     A    I SEE     112   13
     SEE SAMPLE -- RATHER   EXHIBIT  93 HERE, WHICH         112   15
      Q   AND LOOKING AT    EXHIBIT  91, IF YOU WOULD --    112   25
YES.   Q   -- WHAT IS       EXHIBIT  91, IF YOU KNOW?    A  113    2
91, IF YOU KNOW?    A       EXHIBIT  91 CONTAINS A SMALL    113    3
    THAT ARE MARKED AS      EXHIBIT  93?   A    YES.   Q    113    7
       Q   THAT'S WHAT      EXHIBIT  91 IS, IS THE SOIL     113   11
    IF YOU WOULD LOOK AT    EXHIBIT  92.    A    I HAVE     113   14
        92.    A   I HAVE   EXHIBIT  92 IN FRONT OF ME      113   15
    IF YOU WOULD LOOK AT    EXHIBIT  94.     A              113   22
        THAT?    A   YES.   EXHIBIT  94 CONTAINS A PIECE    113   25
THAT A SAMPLE OF?    A      EXHIBIT  94 IS A PIECE OF SOIL  114    3
      HAS BEEN MARKED AS    EXHIBIT  95.     A              114    8
        A    (COMPLIES.)    EXHIBIT  95 CONTAINS A SMALL    114   10
       AT THIS TIME THAT    EXHIBIT  S 90 THROUGH 95 BE     114   17
       -- THERE ARE THREE   EXHIBIT  S MARKED 61 A          115   10
I THINK.             (      EXHIBIT  S PLACED BEFORE        115   19
      HAS BEEN MARKED AS    EXHIBIT  96.    A    YES.  I    116    7
        A    YES.  I HAVE   EXHIBIT  96 IN FRONT OF ME.     116    8
YES.   AND LOOKING AT       EXHIBIT  96, DO YOU RECOGNIZE   116   14
      HAS BEEN MARKED AS    EXHIBIT  97.    A    EXHIBIT 97 116   20
    AS EXHIBIT 97.    A     EXHIBIT  97 CONTAINS A PAPER    116   22
PIECE OF CLOTH ?    A       EXHIBIT  97 IS A SOIL FABRIC    116   25
      HAS BEEN MARKED AS    EXHIBIT  98.    A    EXHIBIT    117   10
    AS EXHIBIT 98.    A     EXHIBIT  NUMBER?   Q   98.   A  117   11
98.    A   98.  I HAVE      EXHIBIT  98 IN FRONT OF ME.     117   13
      HAS BEEN MARKED AS    EXHIBIT  99.     A              118    1
 (COMPLIES.)   I SEE IN     EXHIBIT  99 A BOX AND AN        118    2
AS WELL.             (      EXHIBIT  PLACED BEFORE          119   16
       THE WITNESS:  YES.   EXHIBIT  170 IS AN ENLARGEMENT  119   17
      ASK YOU TO LOOK AT    EXHIBIT  S 101 A  AND 101 B.    120    6
    YOU JUST SHOWED US,     EXHIBIT  170?   A    THAT'S     120   14
LET'S DEAL WITH THIS        EXHIBIT  THAT YOU OBJECTED TO.  127    5
```

15-129

<u>REPORTERS' CERTIFICATION</u>

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS FOR THE UNITED
STATES DISTRICT COURTS, HEREBY CERTIFY THAT THE FOREGOING IS A
CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.


_____        DATED: _____
JULIE A. CHURCHILL, CSR
OFFICIAL COURT REPORTER


_____        DATED: _____
SUSAN A. LEE, CSR
OFFICIAL COURT REPORTER

U.S.A. V. MATTA BALLESTEROS